UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | |
| **GORDON ALLEN WASHINGTON,** | : | |
| Debtor. | : | |
| | : | |
| | : | |
| **SPECIALIZED LOAN SERVICING** | : | |
| **LLC, and THE BANK OF NEW** | : | No. 14-cv-08063-SDW |
| **YORK MELLON, as trustee for** | : | |
| **the certificate-holders of** | : | |
| **the CWABS, Inc., asset-backed** | : | On appeal from an order of the |
| **certificates, series 2007-5,** | : | United States Bankruptcy Court |
| | : | for the District of New Jersey, |
| Appellants, | : | Case No. 14-14573 |
| | : | |
| v. | : | |
| | : | |
| **GORDON ALLEN WASHINGTON,** | : | |
| | : | **ORAL ARGUMENT REQUESTED** |
| Appellee. | : | |
| | : | |

**APPELLANTS' APPENDIX VOLUME I**

**Ballard Spahr LLP**
210 Lake Drive East Suite 200
Cherry Hill, New Jersey 08002
Tel. No. 856-761-3416
Fax No. 856-761-1020

Counsel for Appellants

*Of Counsel and On the Brief:*

Roberto A. Rivera-Soto
Daniel JT McKenna
Christopher N. Tomlin

DMWEST #11722759 v1

## **Table of Contents of Appendix**

## **Volume I**

**Page**

Amended Order Granting Debtor/Plaintiff Summary Judgment, Disallowing Defendant's Secured Claim Pursuant to 11 § U.S.C. 502(b)(1) and Avoiding Lien Pursuant to 11 § U.S.C. 506(a)(1) and (d) dated November 20, 2014 ............................................................................ A1

Memorandum Decision Granting Debtor's Motion for Partial Summary Judgment dated November 5, 2014 .................................................... A6

Counterstatement of Undisputed Material Facts by Defendants-Creditors dated July 29, 2014 ......................................................................... A30

Mortgage dated February 27, 2007 .................................................. A40

Adjustable Rate Note dated February 27, 2007 ................................ A58

Complaint to Determine Validity of Lien/Claim dated March 18, 2014.......... A61

Debtor's Motion for Summary Judgment Filed by Gordon Allen Washington, including Brief in Support and Other Exhibits dated June 2, 2014 ................. A65

SLS' Cross-Motion for Partial Summary Judgment, including Brief in Support and Other Exhibits dated July 29, 2014 .............................................. A205

N.J.S.A. 12A:3-118 and Uniform Commercial Code Comment ...................... A353

N.J.S.A. 2A:50-56.1 and Committee Statement ................................ A356

Order Filed on
**11/20/2014**
by Clerk U.S. Bankruptcy
Court District of New Jersey

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. LBR 9004-2(c)

Law Offices of Charles A. Gruen
381 Broadway, Suite 300
Westwood, New Jersey 07675
(201) 342-1212

In Re:

GORDON A. WASHINGTON

GORDON A. WASHINGTON

Plaintiff(s)

v.

SPECIALIZED LOAN SERVICING, LLC and
TTHE BANK OF NEW YORK MELLON, as
Trustee for the Certificate-holders of the CWABS,
Defendant(s)

| | |
|---|---|
| Case No.: | 14-14573 (TBA) |
| Hearing Date: | September 30, 2014 |
| Adv. No.: | 14-01319 (TBA) |
| Judge: | Michael B. Kaplan, USBJ |

**AMENDED**
**ORDER GRANTING DEBTOR/PLAINTIFF SUMMARY JUDGMENT, DISALLOWING**
**DEFENDANT'S SECURED CLAIM PURSUANT TO 11 § U.S.C. 502(b)(1) and**
**AVOIDING LIEN PURSUANT TO 11 § U.S.C. 506(a)(1) and (d)**

The relief set forth on the following pages, numbered two (2) through ____4____ is
hereby **ORDERED.**

**DATED: 11/20/2014**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

A1

| Debtor: | GORDON A. WASHINGTON |
|---|---|
| Case No.: | 14-14573 (TBA) |
| Adversary Pro. No.: | 14-01319 (TBA) |
| Caption of Order: | Order Granting Debtor/Plaintiff Summary Judgment, Disallowing Defendant's Secured Claim 11 U.S.C. § 502(b)(1)and Avoiding Lien pursuant to 11 U.S.C. § 506(a)(1) and (d) |

THIS MATTER having come before the Court upon an application of the Debtor/Plaintiff, GORDON A. WASHINGTON, by way of Motion and Cross Motion for Summary Judgment against the Defendants, SPECIALIZED LOAN SERVICING, LLC and THE BANK OF NEW YORK MELLON COMPANY  AS TRUSTEE FOR CERTIFICATEHOLDERS, CWABS, Inc. ASSET-BACKED CERTIFICATE SERIES 2007-5, and the Cross Motion for Summary Judgment of the Defendants, and the Court having considered the submissions of the parties, and the arguments of counsel and for the reasons set forth in the Court's opinion dated November 5, 2014:

IT IS ORDERED that the Motion and Cross Motion for Summary Judgment against the Defendants, SPECIALIZED LOAN SERVICING, LLC and THE BANK OF NEW YORK MELLON COMPANY AS TRUSTEE FOR CERTIFICATEHOLDERS, CWABS, Inc. ASSET-BACKED CERTIFICATE SERIES 2007-5, and in favor of Plaintiff, GORDON A. WASHINGTON, be, and the same are hereby granted with prejudice; and it is further

ORDERED that the Cross Motion for Summary Judgment of the Defendants, SPECIALIZED LOAN SERVICING, LLC and THE BANK OF NEW YORK MELLON COMPANY AS TRUSTEE FOR CERTIFICATEHOLDERS, CWABS, Inc. ASSET-BACKED CERTIFICATE SERIES 2007-5, be, and the same is hereby denied with prejudice; and it is further

ORDERED that the Proof of Claim filed by the Defendants, SPECIALIZED LOAN SERVICING, LLC and THE BANK OF NEW YORK MELLON COMPANY, on July 17,

A2

2014 [Proof of Claim Number 7-1] is hereby disallowed under 11 U.S.C. § 502(b)(1) as unenforceable ; and it is further

ORDERED that the Debtor/Plaintiff, GORDON A. WASHINGTON, hereby retains the real property described in the next paragraph, free and clear of any claim of the Defendants, SPECIALIZED LOAN SERVICING, LLC and THE BANK OF NEW YORK MELLON COMPANY AS TRUSTEE FOR CERTIFICATEHOLDERS, CWABS, Inc. ASSET-BACKED CERTIFICATE SERIES 2007-5; and it is further

ORDERED that the Mortgage/Lien referenced below is voided pursuant to 11 U.S.C. § 506(d), discharged and cancelled of record:

a)   Description of real property: 11 Walnut Street, Madison, New Jersey (Block 1001, Lot 25).  Legal description is attached hereto and made a part hereof as Exhibit "A";

b)   Description of Mortgage:

1. Original Mortgagee:  America's Wholesale Lender;

2. Current Assignee:  The Bank of New York for the Benefit of Certificate Holders, CWABS, Inc. Asset-Backed Certificates Series 2007-5, by Assignment dated November 12, 2007, recorded at Assignment Book 21153, page 683 on September 9, 2008, and Corrective Assignment dated December 31, 2013, recorded at Assignment Book 22480, page 789 on January 8, 2013 in the Morris County Clerk's Office;

3. Current Servicer:  Specialized Loan Servicing, LLC;

4. Date of Mortgage:  February 27, 2007;

5. Date of Recordation:  March 8, 2007;

6. Place of Recordation:  Morris County, County Clerk's Office, Morristown, New Jersey

i.    Mortgage Book 20764;
ii.   Page 0171

A3

Approved by Judge Michael Kaplan  November 20, 2014

7. Original principal balance of Mortgage: $520,000.00; and it is further

ORDERED that a certified or exemplified copy of this Order shall be recorded by

the Clerk or Register of Deeds with whom the original mortgage or lien was recorded.

A4

*Approved by Judge Michael Kaplan  November 20, 2014*

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
MLK Jr Federal Building
50 Walnut Street
Newark, NJ 07102

In Re:  Gordon Allen Washington
Debtor

Case No.: 14−14573−TBA
Chapter 13

Gordon Allen Washington
Plaintiff

v.

Specialized Loan Servicing
Defendant

Adv. Proc. No. 14−01319−TBA                   Judge: DONALD H. STECKROTH

## NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

Please be advised that on November 25, 2014, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 35 − 28
Amended Order Granting Debtor/Plaintiff Summary Judgment, Disallowing Defendant's Secured Claim Pursuant To 11 § U.S.C. 502(b)(1) and Avoiding Lien Pursuant to 11 § U.S.C. 506(a)(1) and (d) (related document:28 Opinion−Summary: Debtor filed a motion for summary judgment in his adversary proceeding ultimately seeking a declaration that the mortgage on the Debtors three−family residence is void and unenforceable because the mortgagee failed to file a foreclosure complaint within 6 years of the accelerated maturity date of the mortgage as required by N.J.S.A. § 2A:50−56.1(a) (the parties having agreed in the course of motion practice that enforcement of the note is time−barred). The Court finds that the statute of limitations under N.J.S.A. § 2A:50−56.1(a) for the mortgagee to enforce the accelerated mortgage has expired; that the mortgagee is time−barred from filing a foreclosure complaint; that the mortgagees claim is disallowed under 11 U.S.C. § 502(b)(1); and that the mortgage lien is void under 11 U.S.C. § 506(d). (related document:7 Motion re: Adversary filed by Plaintiff Gordon Allen Washington, 11 Cross Motion re: Cross−Motion for Partial Summary Judgment (related document:7 Motion re: Adversary filed by Plaintiff Gordon Allen Washington) filed by Defendant Specialized Loan Servicing, Defendant The Bank of New York Mellon, as Trustee for the Certificate−Holders of the CWABS, Inc., Asset−Backed Certificates, Series 2007−5).. Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. See BNC Certificate of Notice. Signed on 11/5/2014 (wir)).. Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. See BNC Certificate of Notice. Signed on 11/20/2014 (rah)

Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: November 25, 2014
JJW: rah

James J. Waldron
Clerk

A5

**NOT FOR PUBLICATION**
UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 13 |
| | |
| GORDON A. WASHINGTON, | Case No. 14-14573-TBA |

                             Debtor.

-------------------------------------------------------------X

| | |
|---|---|
| GORDON A. WASHINGTON, | Adv. Pro. No. 14-01319-TBA |
| | |
|                  Plaintiff, | Hearing date:  September 30, 2014 |
| v. | |
| | |
| SPECIALIZED LOAN SERVICING, LLC, and | |
| THE BANK OF NEW YORK MELLON, as | |
| Trustee for the Certificate-holders of the CWABS, | |
| Inc., Asset-backed Certificates, Series 2007-5 | |

                   Defendants.

-------------------------------------------------------------X

**APPEARANCES:**

Walter D. Nealy, Esq.
100 South Van Brunt Street
Englewood, NJ 07631
*Attorney for Gordon A. Washington*

Charles A. Gruen, Esq.
Rosa Amica-Terra, Esq.
Law Offices of Charles A. Gruen
381 Broadway - Suite 300
Westwood, NJ 07675
*Special Counsel for Gordon A. Washington*

David V. Mignardi, Esq.
Kenneth J. Flickinger, Esq.
Karen B. Olson, Esq.
Knuckles, Komosinski & Elliott, LLP
565 Taxter Road - Suite 590
Elmsford, NY 10523
*Attorney for Specialized Loan Servicing, LLC,
and The Bank of New York Mellon*

**MICHAEL B. KAPLAN, U.S.B.J.**

**MEMORANDUM DECISION**

## I.     INTRODUCTION.

"No one gets a free house." This Court and others have uttered that admonition since the early days of the mortgage crisis, where homeowners have sought relief under a myriad of state and federal consumer protection statutes and the Bankruptcy Code. Yet, with a proper measure of disquiet and chagrin, the Court now must retreat from this position, as Gordon A. Washington ("the Debtor") has presented a convincing argument for entitlement to such relief. So, with figurative hand holding the nose, the Court, for the reasons set forth below, will grant Debtor's motion for summary judgment.

These matters come before the Court on a motion and two cross motions for summary judgment in the adversary complaint filed by Debtor to determine the validity, priority and extent of the mortgage lien on his three-family residence in Madison, New Jersey, against Defendant creditors Specialized Loan Servicing, LLC, and The Bank of New York Mellon (as Trustee for the Certificate-holders of the CWABS, Inc., Asset-backed Certificates, Series 2007-5) ("SLS" and "BoNY") (collectively "the Defendants," represented by one counsel). The motions are:

(1) the Debtor's motion for partial summary judgment based on the argument that the 6-year statute of limitations applicable to suit on a negotiable instrument under N.J.S.A. § 12A:3-118(a) has expired, so that Defendants are out of time to sue on their mortgage note on which Debtor defaulted on or about June 1, 2007 (dkt. 7)[1]; and

(2) the Defendants' cross motion for partial summary judgment based on the argument that the 20-year statute of limitations applicable to foreclosure of a mortgage under N.J.S.A. § 2A:50-56.1(c) has *not* expired, so that Defendants may still foreclose the *mortgage* on which Debtor defaulted on or about June 1, 2007 (dkt. 11); and finally

(3) the Debtor's cross motion for summary judgment on the mortgage based on the arguments:

---

[1] Docket references are to adv. pro. no. 14-1319 unless stated otherwise. Debtor provided a signed Rule 56.1 Statement of Undisputed Material Facts ("Debtor SUMF") at dkt. 8 to replace the unsigned copy at dkt. 7, but this opinion refers to the Debtor's SUMF at dkt. 7 for consistency with the other elements of Debtor's motion.

2

(a) that the 6-year statute of limitations applicable to foreclosure of a mortgage *in which the maturity date has been accelerated* under N.J.S.A. § 2A:50-56.1(a) has expired, so that the Defendants are out of time to sue on either the note or the mortgage; and

(b) that Defendants lack standing to enforce the note and mortgage because the Assignment is defective and because the Defendants waived their interest in the loan under a Settlement Agreement (dkt. 19).

The Defendants filed a reply brief at dkt. 22.[2]  The Court heard oral argument on September 30, 2014 and reserved on the narrow issue of whether N.J.S.A. § 2A:50-56.1(a) and 11 U.S.C. §§ 502(b)(1) and 506(d) operate to make the mortgage unenforceable, to disallow the Defendants' claim, and to void the mortgage lien so that the Defendants have no claim against the Debtor, the property or the estate.

## II.    JURISDICTION.

The Court has jurisdiction over these matters under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on October 17, 2013.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O).  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## III.    BACKGROUND.[3]

### The acquisition of the property.

On February 27, 2007, the Debtor purchased a three-family home at 11 Walnut Street, Morris County, New Jersey ("Property"), paying a $130,000 deposit and obtaining a 30-year adjustable rate mortgage and note for $520,000 for the balance with first payment due on April 1, 2007 (dkt. 7-2, Debtor's Certification in Support of Summary Judgment, ¶ 4, Exhibit A, note).

---

[2] At dkt. 22, p. 1, n.1, the Defendants note the procedural impropriety of the Debtor having filed a cross motion to a cross motion. The Court considers the Debtor's cross motion at dkt. 19 as opposition to the Defendants' cross motion, and the Defendants' reply memorandum at dkt. 22 as a response thereto. For consistency with the docket entries, however, this opinion cites to Debtor's dkt. 19 as to the 'cross motion.'

[3] The facts recited herein are undisputed by any of the parties.

The mortgagee was America's Wholesale Lender (dkt. 7-2, Debtor, ¶ 5, 9).  Debtor's attorney asserts that Countrywide Home Loans served as the mortgage servicer, an assertion disputed by the Defendants (dkt. 7, Debtor SUMF, ¶ 7).  Debtor moved into the third-floor apartment and began to renovate the first and second floor apartments to rent (dkt. 7-2, Debtor ¶ 7).  During renovation, the first and second floor apartments suffered water damage and became uninhabitable (dkt. 7-2, ¶ 7).  Debtor failed to make the July 1, 2007 mortgage payment, and the loan has been in continuous default since that time (dkt. 7-2, Debtor, ¶8).[4]

**The bankruptcy case.**

The Debtor filed a voluntary Chapter 7 petition on March 12, 2014, along with a motion to convert the case to one under Chapter 13.  The case was converted by Order entered on April 9, 2014.  The claims bar date was August 18, 2014. Thereafter, the Debtor filed an original Plan on May 19, 2014 (main dkt. 17) and a first modified Plan on August 5, 2014 (main dkt. 25); a confirmation hearing is scheduled presently for November 20, 2014.  Each Plan proposes to *sell* the above property in a short period.  The first Plan proposes payments of 12 months @ $492 plus $554,000 in the last month; the second Plan proposes payments of 17 months @ $492 plus $554,000 in the last month.  The Debtor projected the value of the property at $550,000-$600,000 and scheduled the Defendants' debt at $519,000.  The Defendants filed a proof of claim for $920,469 (claim 7-1) (the $519,000 scheduled by the Debtor represents only the *principal* due) and filed an objection to the Plan because it indicates a short sale with a payoff of only $554,000 in the 18th month (main dkt. 34, ¶5).  The Plan suggests (does not state) that Debtor seeks to cram down the note on this three-family home to the value of the property; but

---

[4] Debtor believes that a friend made the July 1, 2007 payment but has not pressed or proven that point (dkt. 7-2, Debtor, ¶ 8).  The unassailable fact that Debtor went into default within 90 days of the loan closing makes this decision even less palatable.

4

the clear aim of this adversary proceeding is to render the Defendants' note and mortgage not only undersecured but wholly unenforceable.

Debtor scheduled $137,000 in general unsecured claims. Proofs of claim timely filed include, in addition to the claim of Defendants, $15,000 in priority tax claims; $70,000 in general unsecured claims (including $15,000 due a relative); and an additional $63,000 due on a student loan. The Debtor proposes a *pro rata* distribution to the general unsecured creditors.

### The adversary proceeding.

The Debtor filed this adversary proceeding on March 18, 2014 (dkt. 1). The Defendants answered on May 2, 2014 (dkt. 4), and on May 19, 2014 the parties entered a Joint Scheduling Order which scheduled trial for December 5, 2014 (dkt. 5). The Debtor filed the initial motion for partial summary judgment on June 2, 2014, and the cross motions followed. On September 30, 2014, in addition to hearing oral argument on these motions, the Court, on Defendant's motion, entered an Order which compelled discovery, modified the Joint Scheduling Order and rescheduled trial to February 20, 2015 at 10:00 a.m. (dkt. 23).

### The mortgage documents and related pleadings.

The February 1, 2007 Adjustable Rate Note ("the note") between America's Wholesale Lender and Debtor stated a principal of $520,000, periodic payments beginning April 1, 2007 at 8.950% interest, and monthly debt service of $4,165.34 (dkt. 7, Exhibit A). The note defined March 1, 2037 as the Maturity Date and provided that any amounts due would be paid on that date (dkt. 7, Exhibit A, ¶ 3(A), Maturity Date). The note contained the following default provisions and remedy:

> 7. BORROWER'S FAILURE TO PAY AS REQUIRED
> . . .
> (B) Default
> If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

A10

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(dkt. 7, Exhibit A).

The mortgage, dated February 27, 2007, referenced the note and contained its own default provisions:

NON-UNIFORM COVENANTS.   Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.**  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 [based on borrower's transfer of the property] unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceedings and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

and

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

6

A11

. . .

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants and agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting lender's interest in the Property and rights under this security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by the Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18 [Transfer of the Property or a Beneficial Interest in Borrower].

**. . .**

(dkt. 7, Exhibit B, ¶¶ 22 and 19). Accompanying the mortgage were an Adjustable Rate Rider and a 1-4 Family Rider which included at paragraph H an absolute assignment of rents (dkt. 7 Exhibit B, Mortgage). Both accompanying documents were dated February 27, 2007.

The mortgage was assigned by MERS as Nominee for America's Wholesale Lender to co-Defendant The Bank of New York [as Trustee] for the Benefit of the Certificate-holders, CWABS Inc. Asset-Backed Certificates Series 2007-5 ("BoNY") for $1.00 by an Assignment of Mortgage effective November 12, 2007 but recorded on September 9, 2008 (dkt. 7, Exhibit L, "the Assignment").

The Assignment recites the original amount of the mortgage as $520,000 and states in relevant part:

And the Assignor covenants that there is now due and owning upon the Mortgage
and the Bond, Note or other obligation secured thereby, the sum of $519,132.54
Dollars principal with interest thereon to be computed at the rate of 8.950 percent
per year from June 1, 2007, along with such other sums as may be collectible, and
that there are no set-offs, counterclaims or defenses against the Mortgage or the
Bond, Note or other obligation, in law or in equity, nor have there been any
modifications or other changes in the original terms thereof, other than as stated in
this Assignment.

(dkt. 7, Exhibit L). [5]  Debtor relies in part on this language in the Assignment for the proposition

that the Defendants accelerated the maturity date of the note and mortgage to June 1, 2007 (dkt.

19-13, Debtor's response to Defendants' SUMF, ¶ 5; dkt 19-13, Debtor's Counterstatement of

Undisputed Material Facts, ¶ 5, 13; dkt. 19-1, Debtor's certification in support of cross motion,

¶¶ 6, 9-10, 13; dkt. 19-14, Debtor's brief in support of cross motion, pp. 1, 2, 8, 12, 14, 16-17).

On December 14, 2007, the Defendants filed a foreclosure Complaint in Superior Court

of New Jersey, Chancery Division, Morris County, Dkt. No. F-34837-07 (dkt. 7, Exhibit E) ("the

Complaint").  The Complaint described the loan as "an obligation (note) to secure the sum of

$520,000.00 payable on March 1, 2037" (dkt. 7, Exhibit E, ¶ 1).  The Complaint continues in

relevant part:

8.  The Defendants named in Paragraphs 1 and 2 above, or their grantee or
grantees, if any has failed to make the installment payment due on June 1, 2007,
and all payments becoming due thereafter.  Therefore the loan has been in default
since July 1, 2007, and said payments have remained unpaid for more than 30
days from the date of the mailing of the Notice of Default to the obligor, and are
still unpaid.  **Plaintiff herein, by reason of said default, elected that the whole
unpaid principal sum due on the aforesaid obligation and mortgage referred**

---

[5] The Defendants also provided a copy of this recorded Assignment at dkt. 11, Exhibit C.  Debtor questions the
authenticity and effectiveness of the Assignment generally, because a different version of it, unrecorded and bearing
different officer signatures, was attached to the foreclosure complaint, *infra* (dkt. 19, Exhibit 3, "Unrecorded
Assignment").  Both the recorded and the Unrecorded Assignment contain the clause accelerating the debt to June 1,
2007.

Matthew R. Stahlhut, officer at Bank of America ("BoA"), asserts that BoA serviced the loan from its inception
through transfer of servicing rights on November 16, 2013 to defendant-servicer SLS (dkt. 11-3, Stahlhut cert., ¶5).
Defendants provide an Amended Assignment of Mortgage signed on December 31, 2013, recorded on January 8,
2014, purportedly to correct the name of BoNY (dkt. 11, Exhibit D, "Amended Assignment").  The Amended
Assignment is different in format from the original Assignment and does not contain the acceleration clause.

to in Paragraphs 1 and 2 above, with all interest and advances made, shall be
now due (Emphasis added).

. . .

10. Notice of Intention to Foreclose was sent in compliance with the Fair
Foreclosure Act more than 31 days prior to filing of the complaint.

(dkt. 7, Exhibit E, ¶¶ 8, 10).  Debtor also relies on ¶ 8 in the Complaint for the proposition that

the Defendants accelerated the maturity date of the loan to June 1, 2007 (dkt. 7, Debtor's SUMF,

¶ 11; dkt. 7-2, Debtor's certification in support of motion, ¶ 12; dkt. 7-22, Debtor's brief, p. 3).

The Debtor filed his Answer on February 8, 2008 and in it neither admitted nor denied the

allegations in ¶ 8 but *denied* the allegations in ¶ 10 (dkt. 7, Exhibit F (Answer), ¶¶ 8, 10).

Defendants concur that the payment default occurred on July 1, 2007 (the interest default

having occurred on June 1, 2007) but dispute the acceleration date (dkt. 11-2, July 29, 2014

affidavit of Cynthia Wallace for SLS in support of Defendants' crossmotion, ¶ 4b; dkt. 11-3,

affidavit of Matthew R. Stahlhut for BoA in support of Defendants' crossmotion, ¶ 7).

Defendants "assert that the subject loan . . . was accelerated on December 14, 2007 upon the

filing of the 2007 Foreclosure Complaint" (dkt. 11-1, Defendants' response to Debtor's SUMF, ¶

8, also ¶ 11; dkt. 11-1 Defendants' Counterstatement of Undisputed Material Facts, ¶ 5).   As

explained below, whether the default and acceleration date is reckoned as June 1, 2007, July 1,

2007 or December 14, 2007, does not affect the outcome of this case.

By Return Notice dated October 28, 2010, the Office of Foreclosure returned the

foreclosure judgment package to BoNY with extensive deficiencies noted, including at ¶ 23,

"One attorney certified copy of each of the following must be submitted:  bond or note, recorded

mortgage, assignments(s), if any" (dkt. 7, Exhibit H, "Return Notice" dated October 28, 2010).

BoNY filed a Notice of Lis Pendens dated February 5, 2013, recorded on February 7, 2013 (dkt.

7, Exhibit M, "Notice of Lis Pendens").

On May 31, 2013, the Superior Court Clerk's Office issued a notice of intent to dismiss the foreclosure case without prejudice for lack of prosecution within 30 days unless the plaintiff produced <u>one</u> of the following documents:  amended complaint; request for default or motion to enter default out of time; motion to: strike answer, enter judgment or for summary judgment; proof of bankruptcy filing or other condition that stays the case; affidavit or certification asserting that failure to file or take the next required action is due to exceptional circumstances" (dkt. 7, Exhibit I, "Foreclosure Dismissal Notice").  Counsel for BoNY responded on June 21, 2013 that he intended to file an Order to Show Cause to obtain more time (dkt. 7, Exhibit J, Certification of John Caporale, Esq.).  On July 5, 2013, the Superior Court Clerk's Office issued a Foreclosure Dismissal Order, dismissing the Defendants' complaint for lack of prosecution without prejudice and with the provision, "Reinstatement of the matter after dismissal may be requested by a motion for good cause" (dkt. 7, Exhibit K) ("Foreclosure Dismissal Order"). BoNY caused a Discharge of Lis Pendens to be recorded on August 21, 2013 (dkt. 7, Exhibit N, "Discharge of Lis Pendens").

Thus, to date, the Defendants have not obtained a Final Judgment of Foreclosure. Moreover, Defendants admit the dismissal of the foreclosure Complaint without prejudice (dkt. 11-1, response to Debtor's SUMF, ¶¶ 17, 19).[6]  Debtor certifies that Defendants' failure to produce the original note, mortgage or assignment was the primary basis for the dismissal (dkt. 7-2, Debtor, ¶¶ 14, 17, 20) and contends that BoNY never produced the original note during the foreclosure proceedings (dkt. 7-22, Debtor's brief, p. 4), citing N.J. R. 4:64-2(a) (which requires production of original documents in support of foreclosure judgment).  Following inspection of

---

[6] In response to Debtor's SUMF, ¶ 16, that the Defendants "never obtained a judgment against the Homeowner in the 2007 Foreclosure Complaint," Defendants assert without documentary evidence or certified response that they obtained "summary judgment," but that judgment (not provided) appears simply to have stricken the Debtor's answer (dkt. 11-1, Defendant's response to Debtor's SUMF, ¶ 16).

Defendants' files on October 7, 2014, the Debtor appears to concede that Defendants have the

original note[7], but challenged the absence of an Allonge which Defendants assert does not exist

(dkt. 25, Debtor's October 9, 2014 letter to the Court; dkt. 26, Defendants' October 10, 2014

responsive letter to the Court). The basis for the dismissal of the foreclosure proceeding and

whether Defendants possess an Allonge have little or no bearing on the Court's decision in this

matter.

## IV.     DISCUSSION.

### The Parties' Positions

The Debtor initially argued that BoNY's claim for action on the note accrued on June 1,

2007, when BoNY declared the default and accelerated the loan.  The Debtor asserted that

N.J.S.A. § 12A:3-118(a) serves as the statute of limitations for bringing an action on the note as

a negotiable instrument (dkt. 7-22, Debtor's brief, pp. 12-13).[8]  Inasmuch as the statute of

limitations under N.J.S.A. § 12A:3-118(a) runs six years after the due date or the accelerated due

date, the Debtor posited that BoNY was time-barred from enforcing the note and that the Debtor

should be granted summary judgment as a matter of law, declaring the note unenforceable.

In their cross motion, the Defendants *conceded* that the 6-year statute of limitations for

enforcement of the note had run but argued that enforcement of the mortgage is subject to a 20-

year statute of limitations recognized as a common law matter in *Security Nat'l Partners Ltd.*

*P'ship v. Mahler*, 336 N.J. Super. 101, 107, *cert den.*, 169 N.J. 607 (2001) ("*Mahler*") and later

---

[7] Cynthia Wallace, an officer of SLS, certifies that CWABS, Inc., Asset-Backed Certificates, Series 2007-5 ("the Trust") "maintain[s] . . . through its custodian" the note, mortgage, assignment, and corrective assignment signed December 31, 2013 and recorded on January 8, 2014 (dkt. 11-2, Wallace cert. ¶¶ 1, 3 and dkt. 11, Exhibits A, B, C, D).

[8] N.J.S.A. § 12A:3-118(a) provides:  "Except as provided in subsection e. of this section, an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note *or, if a due date is accelerated*, within six years after the accelerated due date."  N.J.S.A. § 12A:3-118(a) (emphasis added).  Uniform Commercial Code cmt. 2 to this section iterates, "If the note is payable at a definite time, a six-year limitations period starts at the due date of the note, subject to prior acceleration."

codified at N.J.S.A. § 2A:50-56.1(c) ("Statute of limitations relative to foreclosure proceedings")
(dkt. 11-14, Defendants' brief, p. 4). Defendants submit that that they are entitled to foreclose on
the property and to apply the sale proceeds to their debt but admit that they are unlikely to be
able to enforce any deficiency against the Debtor.[9]  *In re Pecora*, 297 B.R. 1, 3 (Bankr.
W.D.N.Y. 2003) (distinguishing debtor liability for the mortgage debt from the persistence of the
mortgagee's lien, citing *Dewsnup v. Timm*, 502 U.S. 410, 417-18 (1992) and *Johnson v. Home
State Bank*, 501 U.S., 78, 84-85 (1991)). The Defendants contend that the Trust is entitled to
summary judgment because there is no genuine issue of material fact and they can enforce the
mortgage as a matter of law.

In his cross motion, Debtor argues that Defendants' declaration of default and
acceleration (which both parties acknowledge with respect to the note, *supra*) advanced the
*maturity date of the mortgage* to June 1, 2007 so that under N.J.S.A. § 2A:50-56.1(a), which
requires the mortgagee to file a foreclosure action within 6 years of the *maturity date* of the
mortgage, Defendants cannot pursue foreclosure of the Property (dkt. 19-14, pp. 12-18; dkt. 7,
Exhibits L and E). Whether the accelerated *maturity* of the mortgage is found to be July 1, 2007,
or December 14, 2007 (as urged by Defendants), the Defendants are still out of time under
Debtor's interpretation of N.J.S.A. § 2A:50-56.1(a) to file a foreclosure complaint.

In their response, the Defendants press *Mahler* and make the bare assertion that the
lender-accelerated date does not satisfy the requirement in N.J.S.A. § 2A:50-56.1(a) of a
"*maturity* date set forth in the mortgage or the note, bond, or other obligation secured by the
mortgage, whether the date is itself set forth or may be calculated from information contained in
the mortgage or note, bond, or other obligation." N.J.S.A. § 2A:50-56.1(a) (emphasis added);

---

[9] Defendants state that the 6-year statute of limitations would obviate any deficiency claim, but Debtor's eventual
discharge in Chapter 13 or Chapter 7 would also relieve him of personal liability for the debt. N.J.S.A. § 2A:50-52
("No deficiency judgment") also prohibits deficiency judgments on foreclosures under this statute.

(dkt. 22, Defendants' reply brief, pp. 6-7).  The question for the Court is whether acceleration of the note and mortgage advanced the *maturity date* so that N.J.S.A. § 2A:50-56.1(a) cuts off the Defendants' cause of action, and whether this statute, effective August 6, 2009, applies to the instant case.

### The Fair Foreclosure Act and N.J.S.A. § 2A:50-56.1

N.J.S.A. § 2A:50-53 through -68, "Foreclosure of Residential Mortgages" ("Fair Foreclosure Act," or "FFA"), was approved on September 5, 1995, effective on December 4, 1995 and applicable "'to foreclosure actions commenced on or after that date.'"  N.J.S.A. § 2A:50-53, citing L. 1995, c. 244, § 19 (a note to the Act).   The Legislature made part of the body of the statute the finding and declaration that it is "public policy of this State that homeowners should be given every opportunity to pay their home mortgages" and that mortgagees benefit when defaulted loans return to performing status.  N.J.S.A. § 2A:50-54.  The FFA defines "residential mortgage" as one secured by a property with not more than 4 dwelling units, "one of which shall be, or is planned to be, occupied by the Debtor or a member of the Debtor's immediate family as the Debtor's or member's residence at the time the loan is originated" and therefore applies to the 3-dwelling-unit residence occupied by the Debtor when the loan originated.  N.J.S.A. § 2A:50-55 ("Definitions"); (dkt 7-2, Debtor, ¶ 7).

The FFA codifies the mortgagee's obligation to give borrowers precise notice of the mortgagee's intention to foreclose and the borrowers' opportunities to cure defaults.  *U.S. Bank Nat'l Ass'n. v. Guillaume*, 209 N.J. 449, 469-70 (2012).  The statute acknowledges acceleration of the maturity date as a consequence of default and de-acceleration as a consequence of curing default:

2A:50-56.  Written notice of intent to foreclose; contents

a.  Upon failure to perform any obligation of a residential mortgage by the residential mortgage debtor and *before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation and commence any foreclosure or other legal action to take possession of the residential property* which is the subject of the mortgage, the residential mortgage lender shall give the residential mortgage debtor notice of such intention at least 30 days in advance of such action as provided in this section.

N.J.S.A. § 2A:50-56(a) (West 2000 and Supp. 2014) (emphasis added).   N.J.S.A.

§ 2A:50-57 provides:

2A:50-57.  Right to cure default; procedure

a.  Notwithstanding the provisions of any other law to the contrary . . . the debtor . . . shall have the right at any time, up to the entry of final judgment or the entry by the office or the court of an order of redemption pursuant to [N.J.S.A. § 2A:50-56], *to cure the default, de-accelerate and reinstate the residential mortgage by tendering the amount or performance specified in subsection b. of this section.* . . .

d.  Cure of a default reinstates the debtor to the same position as if the default had not occurred. *It nullifies, as of the date of cure, any acceleration of any obligation under the mortgage, note or bond arising from the default.*

N.J.S.A. § 2A:50-57 (West 2000 and Supp. 2014) (emphases added).   "Acceleration" and

"maturity" are not otherwise defined in the statute.   Certain courts view as axiomatic the

proposition that acceleration advances the maturity date of the debt.  *Bank v. Kim*, 361 N.J.

Super. 331, 344 (App Div. 2003) ("In pursuit of this objective [of encouraging homeowners to

cure mortgage defaults], N.J.S.A. 2A:50-56 sets forth in considerable detail the steps required of

a lender seeking to *accelerate maturity* and foreclose a residential mortgage upon the debtor's

failure to perform an obligation under the mortgage"); *In re LHD Realty Corp.*, 726 F.2d 327,

330 (7th Cir. 1984) (determining that a mortgagee loses its right to a prepayment premium when

it decides to accelerate a debt "because acceleration, by definition, advances the maturity date of

the debt so that payment thereafter is not prepayment but instead is payment made after

14

maturity"); *cited in Westmark Comm. Mtge. Fund IV*, 362 N.J. Super. 336, 345, 346-47 (App. Div. 2003) (which ultimately decided that prepayment premium was due and payable notwithstanding acceleration because the parties had bargained for it).

Shortly after the Fair Foreclosure Act was enacted, the Appellate Division of the Superior Court of New Jersey in *Security Nat'l Partners Ltd. P'shp v. Mahler*, 336 N.J. Super. 101, 105 (App. Div. 2000), *cert. den.*, 169 N.J. 607 (2001) addressed the absence of a statute of limitations for foreclosure actions in New Jersey ("this State has never had a statute of limitations expressly referring to mortgage foreclosures"). In *Mahler*, the parties entered the note and mortgage on June 22, 1988 with final payment due June 22, 2003; the debtors defaulted on March 22, 1989; and the lender filed a foreclosure complaint on August 8, 1990. *Id.* at 103. After the complaint was filed, the debt was transferred multiple times, and the second-to-last assignee unilaterally dismissed the complaint. On June 26, 1996, the last assignee, the plaintiff-appellant, refiled the complaint which the chancery court dismissed as untimely. *Id.* at 103. The Appellate Division in *Mahler* reiterated the distinction between action on the note and action on the mortgage and declared that the lender's time to sue on the note, governed by the 6-year statute of limitations in N.J.S.A. § 12A:3-118(a), had run. *Mahler*, 336 N.J. Super. at 105. The court rejected the borrowers' argument that the same 6-year statute governed suits on the mortgage. *Id.* at 105.

The Appellate Division in *Mahler* observed that New Jersey common law had developed a 20-year limitation period for a suit on a mortgage

> by borrowing and applying the twenty-year limitation period in certain adverse possession statutes. The concept was that a mortgagor in possession or control of the mortgaged property, who failed to make required payments under the mortgage, was in "adverse possession" of the property since—by his conduct—he was denying the mortgagee's claim of ownership and right to possession.

*Mahler*, 336 N.J. Super. at 106.

15

The Appellate Division in *Mahler* reiterated that, apart from non-payment throughout the limitations period, the debtor is not required to take any other action to establish adverse possession. *Mahler*, 336 N.J. Super. at 107. The court in *Mahler* concluded that a foreclosure action is time-barred if not commenced within 20 years after the debtor's default; declared that the time had not run in its case; and echoed the request in a well-known treatise that New Jersey adopt a statute of limitations for mortgage foreclosure actions. *Mahler*, 336 N.J. Super. at 106-107, 108; 30 *New Jersey Practice, Law of Mortgages* § 298, at 196 (Roger A. Cunningham & Saul Tischler) (1975).

In response to *Mahler*, the New Jersey Legislature promulgated as part of the Fair Foreclosure Act N.J.S.A. § 2A:50-56.1 ("Statute of limitations relative to foreclosure proceedings"), effective August 6, 2009:

2A:50-56.1 Statute of limitations relative to foreclosure proceedings.

An action to foreclose a residential mortgage shall not be commenced following the earliest of:

a. *Six years from* the date fixed for the making of the last payment or *the maturity date set forth in the mortgage or the note, bond, or other obligation secured by the mortgage, whether the date is itself set forth or may be calculated from information contained in the mortgage or note, bond, or other obligation*, except that if the date fixed for the making of the last payment or the maturity date has been extended by a written instrument, the action to foreclose shall not be commenced after six years from the extended date under the terms of the written instrument;

b. Thirty-six years from the date of recording of the mortgage, or, if the mortgage is not recorded, 36 years from the date of execution, so long as the mortgage itself does not provide for a period of repayment in excess of 30 years; or

c. Twenty years from the date on which the debtor defaulted, which default has not been cured, as to any of the obligations or covenants contained in the mortgage or in the note, bond, or other obligation secured by the mortgage, except that if the date to perform any of the obligations or covenants has been extended by a written instrument or payment on account has been made, the action to foreclose shall not be commenced after 20 years from the date on which the

default or payment on account thereof occurred under the terms of the written instrument.

N.J.S.A. § 2A:50-56.1 (West 2000 and Supp. 2013) (emphasis added).

As explained in the Assembly Financial Institutions and Insurance Committee Statement, Senate, No. 250-L. 2009, c. 105 ("the Committee Statement") accompanying the bill which became N.J.S.A. § 2A:50-56.1, the statute "in part, codifies the holding in *Security National Partners Limited Partnership v. Mahler*, 336 N.J. Super. 101 (App. Div. 2000)." The Committee Statement in an October 6, 2008 report says:

> The Assembly Financial Institutions and Insurance Committee reports favorably Senate Bill 250 (1R).

> This bill supplements the "Fair Foreclosure Act," P.L.1995, c.244 (C.2A:50-53 et seq.) by applying a statute of limitations to residential mortgage foreclosure actions. *The bill is intended to address some of the problems caused by the presence on the record of residential mortgages which have been paid or which are otherwise unenforceable. These mortgages constitute clouds on title which may render real property titles unmarketable and delay real estate transactions.*

> The bill provides that a foreclosure action must be commenced by the earliest of: (1) six years from the date of maturity on the mortgage or other obligation secured by the mortgage, *matching the six-year statute of limitations on actions based on contract law*; (2) 36 years from the date of recording or execution of the mortgage, provided the mortgage itself does not provide for a period of repayment in excess of 30 years, again relying upon the six-year statute of limitations for contract law; or (3) 20 years from the date of default by the debtor on the mortgage or other obligation secured by the mortgage, matching the 20-year statute of limitations on adverse possession actions. *Thus, the bill allows a determination that certain mortgages are not clouds on title because a party can no longer bring an action to foreclose them beyond the bill's expressly stated statute of limitations, as borrowed from actions in contract law or adverse possession, as applicable.*

> The bill, in part, codifies the holding in Security National Partners Limited Partnership v. Mahler, 336 N.J. Super. 101 (App. Div. 2000) which applied a 20-year statute of limitations to a residential mortgage foreclosure action based on a default due to nonpayment. In its decision, the court noted that since there is currently no statute of limitations expressly applicable to mortgage foreclosures in these situations, courts have resorted to drawing analogies to adverse possession statutes which bar rights of entry onto land after 20 years. This bill would resolve

17

the uncertainties surrounding this area of law by providing a specific statute of limitations of 20 years from the date of the default by the debtor.

(cited at N.J.S.A. § 2A:50-56.1 (West 2000 and Supp. 2013)) (emphases added).

While federal courts allow recourse to legislative history to interpret a statute only if the text is "ambiguous or otherwise unclear," the New Jersey Supreme Court has encouraged the use of "extrinsic aids" to interpretation. *Compare U.S. v. Cheeseman*, 600 F.3d 270, 285-86 (3d Cir.), *cert den.*, ___ U.S. ___, 131 S. Ct. 636 (2010) (concurring) *with Nat'l Waste Recycling, Inc. v. Middlesex Cty. Improvement Auth.*, 150 N.J. 209, 224 (1997); *but see U.S. Bank. Nat'l Ass'n. v. Guillaume*, 209 N.J. at 471-72 (the court must construe a statute from its plain language; stop the "'interpretive process'" if there is no ambiguity, and "'not resort to extrinsic interpretive aids when the statute is clear and unambiguous'") (internal citations omitted). The legislative history accompanying N.J.S.A. § 2A:50-56.1(a) provides a limited measure of guidance as to whether the maturity referenced in the statute includes an accelerated maturity date. The Committee Statement notes that the six-year limitations period "match[es] the six-year statute of limitations on actions based on contract law." If the foreclosure statute is meant to parallel N.J.S.A. § 2A:14-1, that statute is neutral on acceleration and maturity:

> Every action at law . . . for recovery upon a contractual claim or liability, express or implied, not under seal, or upon an account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within 6 years next after the cause of any such action shall have accrued [except for action on breach of sale governed by N.J.S.A. § 12A:2-275].

N.J.S.A. § 2A:14-1 ("Limitation of Actions/Adverse Possession/Various Actions/Six Years"). If the foreclosure statute is meant to parallel N.J.S.A. § 12A:3-118 ("Negotiable Instruments/ General Provisions and Definitions/Statute of Limitations"), there is a stronger argument that an accelerated maturity date applies and starts the running of the statute of limitations:

18

Except as provided in subsection e. of this section, an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note *or, if a due date is accelerated*, within six years after the accelerated due date.

N.J.S.A. § 12A:3-118(a) (emphasis added) (As stated earlier Uniform Commercial Code cmt. 2 to this section iterates, "If the note is payable at a definite time, a six-year limitations period starts at the due date of the note, subject to prior acceleration.")

### The Application of N.J.S.A. § 2A:50-56.1 to this Case

N.J.S.A. § 2A:50-56.1 went into effect on August 6, 2009 (West 2000 and Supp. 2014). The statute does not state whether the effective date is measured against the date of the mortgage, the date of the default, or the date on which the foreclosure action is filed. The parent Fair Foreclosure Act became effective on the 90th day after its September 5, 1995 enactment (effective December 4, 1995) and "appl[ied] to *foreclosure actions commenced* on or after the effective date." N.J.S.A. § 2A:50-53, citing L. 1995, c. 244, § 19 (a note to the Act) (emphasis added). If the amendment at N.J.S.A. § 2A:50-56.1 is presumed to measure effectiveness in the same manner, then the statute does apply to the instant case in which the Defendants have not yet filed a viable foreclosure complaint.

Defendants contended at the September 30, 2014 hearing that a foreclosure complaint filed now should "relate back" to the complaint filed on December 14, 2007 and dismissed without prejudice on July 5, 2013 (dkt. 7, Exhibits E and K). In the unsolicited letter of October 9, 2014, Debtor argued that a foreclosure action filed now would not "relate back" to the original proceeding because the Defendants discharged the *lis pendens* and failed to appeal the July 5, 2013 dismissal, with the 45-day appeal period having expired (dkt. 25, October 9, 2014 letter to the court; N.J.R. 4:37-1, cmt. 1.2; N.J.R. 4:37-2(a), cmt. 4; *O'Loughlin v. Nat'l Comm. Bank*, 338 N.J. Super. 592, 603 (App. Div.), *cert. den.*, 169 N.J. 606 (2001) ("[a] dismissal without

19

A24

prejudice adjudicates nothing and does not constitute a bar to re-institution of the action, subject to the constraint imposed by the statute of limitations") (affirming the dismissal of a complaint in part because plaintiff failed to refile by the deadline stipulated in a consent order, citing the comment to N.J.R. 4:37–1). In their reply letter, the Defendants did not respond to the Debtor's challenge to their "relation back" argument (dkt. 26, October 26, 2014 letter to the Court).

To the extent that N.J.S.A. § 2A:50-56.1 applies to this case only if given retroactive application, this statute meets the criteria for retroactive application reiterated in *James v. N.J. Mfrs. Ins. Co.*, 216 N.J. 552, 558, 563 (2014). In New Jersey, statutes are given prospective application (1) unless "'the Legislature intended to give the statute retroactive application'" and (2) provided retroactive application does not "'result in either an unconstitutional interference with vested rights or a manifest injustice.'" *James*, 216 N.J. at 563, *quoting In re D.C.*, 146 N.J. 31, 50 (1996) and *Phillips v. Curiale*, 128 N.J. 608, 617 (1992) (other internal citations omitted by *James*). The court in *James*, collecting other cases, expanded the first prong to three circumstances:

    (1) that the Legislature expressed or implied its intent for retroactivity (necessity for fulfilling a legislative goal; unworkability without retroactive application);

    (2) that the amendment is merely curative or clarifying rather than representing a change in existing law; or

    (3) that the expectations of the parties warrant retroactivity.

*James*, 216 N.J. at 563. If any of these circumstances exists, the Court still examines whether retroactive application would result in "manifest injustice," meaning that "'the parties relied on prior law to their detriment, such that retroactive application would cause a "deleterious and irrevocable" result.'" *James*, 216 N.J. at 565, *quoting Gibbons v. Gibbons*, 86 N.J. 515, 523-24 (1981). Myron Weinstein in New Jersey Practice indicated that giving the broadest application to N.J.S.A. § 2A:50-56.1 fulfills legislative purpose:

> It is not clear whether the statute is retroactive or whether it only applies to *mortgages or defaults* after the effective date. If so, its benefits would be greatly reduced, as one of its stated purposes is to remove mortgage constituting "clouds on title which may render real property titles unmarketable and delay real estate transactions.

Myron, Weinstein. *Law of Mortgages*. 29 New Jersey Practice § 13.16 ("Statute of Limitations") (emphasis added). By any prospective or retroactive measure of effectiveness, N.J.S.A. § 2A:50-56.1 applies to the instant case.

The Defendants accelerated the maturity date of the loan to the June 1, 2007 default date, as acknowledged in the Assignment (dkt. 7, Exhibit L).[10] Moreover, neither the Debtor nor the Defendants have taken any measures under the note or mortgage, or under the Fair Foreclosure Act, to de-accelerate the debt, and the Defendants have further failed to file a foreclosure complaint within 6 years of the accelerated maturity date as required by N.J.S.A. § 2A:50-56.1(a). Accordingly, the Defendants are now time-barred from filing a foreclosure complaint and from obtaining a final judgment of foreclosure.

### The Disallowance of the Defendants' Proof of Claim and Avoidance of the Underlying Mortgage.

On July 17, 2014, the Defendants timely filed secured proof of claim 7-1 under 11 U.S.C. § 501(a) for $920,469.86 based on their note and mortgage (the claims bar date was August 18, 2014). A claim in bankruptcy is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Debt is "liability on a claim." 11 U.S.C. § 101(12). Moreover, pursuant to 11 U.S.C. § 102(2), a claim against the Debtor's property also constitutes a claim against the Debtor. Thus, while Defendants have only *in rem*

---

[10] Whether the default were measured from July 1, 2007 or from the December 14, 2007 filing date of the foreclosure complaint, the statute of limitations under N.J.S.A. § 2A:50-56.1 has still run.

21

claims, having failed to sue on the note within the six years permitted under the statute, such claims remain claims against the Debtor in this bankruptcy proceeding.

11 U.S.C. § 502(a) controls the claims allowance process:  "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Debtor's adversary complaint includes a demand which constitutes an objection to the Defendants' proof of claim:  "Determine that Defendants have no allowed secured claim" (dkt. 1, "Request for Relief, p. 4, ¶ b) and triggers the Court's review.  11 U.S.C. § 502(b) governs unenforceability of claims and states in relevant part:

> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section [not relevant here] if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or *applicable law* for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1) (emphasis added).  11 U.S.C. § 506 controls the allowance of secured claims and provides that, if the claim underlying the lien is disallowed, then the lien is void:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
> . . .
>
> (d) **To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void**, unless [conditions not relevant here] exist].

11 U.S.C. § 506(a)(1) and (d)(emphasis added).

As explained above, by application of N.J.S.A. § 2A:50-56.1(a) and (c), the Defendants are time-barred under New Jersey state law from enforcing either the note or the accelerated mortgage.  As a result, Defendants' proof of claim 7 must be disallowed under 11 U.S.C. § 502(b)(1) as unenforceable against the Debtor or against Debtor's property under applicable state law.  Having determined that Defendants do not have an allowed secured claim, the underlying lien is deemed void pursuant to 11 U.S.C. §§ 506(a)(1) and (d).[11]

## V.     CONCLUSION.

In light of Defendants' acceleration of the maturity date of the underlying debt as of June 1, 2007, and because neither Debtor nor Defendants took any action under either the mortgage instruments, or the Fair Foreclosure Act, to de-accelerate the maturity date, Defendants' right to file a foreclosure complaint expired 6 years after the June 1, 2007 acceleration date under N.J.S.A. § 2A:50-56.1(a). Given that Defendants' putative secured claim is unenforceable under 11 U.S.C. § 502(b)(1), by applicable New Jersey statute, their mortgage lien is void under 11 U.S.C. § 506(d), and the Debtor retains the property, free of any claim of the Defendants. Debtor is to submit a form of judgment. The Court will proceed to gargle in an effort to remove the lingering bad taste.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: November 5, 2014

---

[11] Inasmuch as the Court finds that the Defendants are time-barred from enforcing the note or the mortgage, it is not necessary to address Debtor's arguments that Defendants lack standing to enforce the note and mortgage based on alleged defects in the Assignment or the alleged impact of a Settlement Agreement.

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
MLK Jr Federal Building
50 Walnut Street
Newark, NJ 07102

In Re:  Gordon Allen Washington
Debtor

Case No.: 14−14573−TBA
Chapter 13

Gordon Allen Washington
Plaintiff

v.

Specialized Loan Servicing
Defendant

Adv. Proc. No. 14−01319−TBA                    Judge: DONALD H. STECKROTH

## NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

Please be advised that on November 5, 2014, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 28 − 7, 11
Opinion−Summary: Debtor filed a motion for summary judgment in his adversary proceeding ultimately seeking a declaration that the mortgage on the Debtors three−family residence is void and unenforceable because the mortgagee failed to file a foreclosure complaint within 6 years of the accelerated maturity date of the mortgage as required by N.J.S.A. § 2A:50−56.1(a) (the parties having agreed in the course of motion practice that enforcement of the note is time−barred). The Court finds that the statute of limitations under N.J.S.A. § 2A:50−56.1(a) for the mortgagee to enforce the accelerated mortgage has expired; that the mortgagee is time−barred from filing a foreclosure complaint; that the mortgagees claim is disallowed under 11 U.S.C. § 502(b)(1); and that the mortgage lien is void under 11 U.S.C. § 506(d). (related document:7 Motion re: Adversary filed by Plaintiff Gordon Allen Washington, 11 Cross Motion re: Cross−Motion for Partial Summary Judgment (related document:7 Motion re: Adversary filed by Plaintiff Gordon Allen Washington) filed by Defendant Specialized Loan Servicing, Defendant The Bank of New York Mellon, as Trustee for the Certificate−Holders of the CWABS, Inc., Asset−Backed Certificates, Series 2007−5).. Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. See BNC Certificate of Notice. Signed on 11/5/2014 (wir)

Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: November 5, 2014
JJW: wir

James J. Waldron
Clerk

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 32 of 224 PageID: 200
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 1 of 10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

GORDON ALLEN WASHINGTON,

　　　　　　　　Plaintiff-Debtor,

　　　　　　　　　　　　　　　　　　　　　Case No.: 14-14573

　　　vs.

SPECIALIZED LOAN SERVICING, LLC, and THE　　Adversary No.: 14-01319
BANK OF NEW YORK MELLON, AS TRUSTEE
FOR THE CERTIFICATE-HOLDERS OF THE
CWABS, INC., ASSET-BACKED CERTIFICATES,
SERIES 2007-5,

　　　　　　　　Defendants-Creditors.

### COUNTERSTATEMENT OF
### UNDISPUTED MATERIAL FACTS BY DEFENDANTS-CREDITORS

I. Defendants-creditors Specialized Loan Servicing, LLC ("SLS"), and The Bank of

New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of

the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5 s/h/a The Bank of

New York Mellon, as Trustee for the certificate-holders of the CWABS, Inc., ASSET-

BACKED CERTIFICATES, SERIES 2007-5 (the "Trust") (collectively "Defendants"),

hereby responds to the Statement of Undisputed Material Facts submitted by Plaintiff-

Debtor Gordon Allen Washington ("Plaintiff") in support of his motion for summary

judgment pursuant to Court Rule 56.1, as follows:

1. Plaintiff is Debtor, Gordon A. Washington (hereinafter referred to as "Mr.

Washington" or "Homeowner").

**Response:** Defendants admit Plaintiff's Statement 1.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 33 of 224 PageID: 201
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 2 of 10

2.     Mr. Washington filed a voluntary chapter 13 petition on March 12, 2014.
Mr. Washington filed this adversary proceeding on March 18, 2014, against the Bank of
New York Mellon as Trustee for the CWABS, Inc. Asset Back Series 2007-5 (hereinafter
referred to as "The Bank of New York") and Specialized Loan Servicing, LLC
(hereinafter referred to as "SLS"), its servicer.

**Response:**     Defendants admit Plaintiff's Statement 2.

3.     The adversary complaint seeks judgment declaring that the promissory
note and mortgage executed by Mr. Washington in connection with the purchase of his
home on February 27, 2007, allegedly held or serviced by Defendants, is unenforceable
under the New Jersey Commercial Code (UCC), *N.J.S.A. 12A:1-101, et. seq.*

**Response:**     Defendants admit Plaintiff's Statement 3 to the extent that Plaintiff,
via his adversary complaint, seeks judgment declaring the promissory note and
mortgage unenforceable.

4.     On February 27, 2007 Mr. Washington purchased his three-family home
located at 11 Walnut Street, Morris County, New Jersey (hereinafter referred to as the
"Property" or the "Home").

**Response:**     Defendants deny Plaintiff's Statement 4, but admit that the subject
loan was extended to Plaintiff in connection with the purchase of the Property.

5.     In connection with the purchase of the property the Homeowner signed a
promissory note (hereinafter referred to as the "Promissory Note") with a lender,
America's Wholesale Lender.

**Response:**     Defendants admit Plaintiff's Statement 5.

Case 2:14-cv-08063-SDW Document 12 Filed 01/28/15 Page 34 of 224 PageID: 202
Case 14-01319-MBK Doc 11-1 Filed 07/29/14 Entered 07/29/14 17:34:09 Desc
Counter-Statement of Material Undisputed Facts Page 3 of 10

6.    In connection with the purchase of the Property, the Homeowner gave a security interest (hereinafter referred to as the "Mortgage") in the Property to America's Wholesale Lender.

**Response:** Defendants admit Plaintiff's Statement 6 but clarify that Mortgage Electronic Registration Systems, Inc. was the mortgagee of record solely in its capacity as nominee for America's Wholesale Lender.

7.    Countrywide® Home Loans was the servicer of the Promissory Note and Mortgage.

**Response:** Defendants deny Plaintiff's Statement 7, but assert that Bank of America, N.A. ("BANA") and/or its successors serviced the subject loan from the date of origination until servicing rights were transferred to SLS on November 16, 2013. See SLS Cert. ¶ 4c; Stahlhut Cert. ¶ 5; see also Ex. I.

8.    Countrywide® Home Loans declared a default due to non-payment on Promissory Note and accelerated the Promissory Note as of June 1, 2007.

**Response:** Defendants deny Plaintiff's Statement 8, but assert that the subject loan has been in default since July 1, 2007 and was accelerated on December 14, 2007 upon the filing of the 2007 Foreclosure Complaint. See SLS Cert. ¶ 4b; Stahlhut Cert. ¶ 7; see also Ex. E; Pl. Ex. E.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 35 of 224 PageID: 203
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 4 of 10

9.     On December 14, 2007, The Bank of New York for the Benefit of the

Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5, filed a

foreclosure complaint against Mr. Washington in the Chancery Division, Morris

County, New Jersey, under docket number F-34837-07 (hereinafter referred to as the

"2007 Foreclosure Complaint").

**Response:**     Defendants admit Plaintiff's Statement 9.

10.     In the 2007 Foreclosure Complaint The Bank of New York for the Benefit

of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 asserted

that it was the present holder Promissory Note.

**Response:**     Defendants admit Plaintiff's Statement 10.

11.     The 2007 Foreclosure Complaint states in paragraph 4 that the Promissory

Note had been accelerated as of June 1, 2007 and provides as follows:

> The defendants named in Paragraphs 1 and 2 above, or their
> grantee or grantees, if any has failed to make the installment
> payment due on June 1, 2007, and all payments becoming
> due thereafter. Therefore the loan has been in default since
> July 1, 2007, and said payments have remained unpaid for
> more than 30 days from the date of mailing of the Notice of
> Default to the obligor, and are still unpaid. Plaintiff herein,
> by reason of said default, elected that the whole unpaid
> principal sum due on the aforesaid obligation…

**Response:**     Defendants deny Plaintiff's Statement 11, but assert that the

aforementioned excerpt was stated in Paragraph eight (8) of the 2007 Foreclosure

Complaint and that the subject loan was accelerated on December 14, 2007 upon the

filing of the 2007 Foreclosure Complaint. See Pl. Ex. E.

-4-

A33

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 36 of 224 PageID: 204
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 5 of 10

12.     In the 2007 Foreclosure Complaint The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 asserted that the Mortgage was assigned to it, which Assignment was unrecorded.

**Response:**   Defendants admit Plaintiff's Statement 12 but clarify that said assignment was unrecorded at the time of the filing of the 2007 Foreclosure Complaint. See Ex. C, D.

13.     In the 2007 Foreclosure Complaint proceedings, The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 never produced the original Promissory Note, Mortgage or Assignment, or a certified true copy of original documents by an attorney of the State of New Jersey.

**Response:**   Defendants admit Plaintiff's Statement 13 but clarify that copies of said documents were exhibited to the motion for summary judgment of The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5, which motion was granted by the Court in said proceedings.

14.     The Homeowner filed an Answer to the 2007 Complaint filed by The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5.

**Response:**   Defendants admit Plaintiff's Statement 14.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 37 of 224 PageID: 205
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 6 of 10

15.    The application for Final Judgment by The Bank of New York for the

Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5

was rejected by the Office of Foreclosure by Return Notice dated November 28, 2010.

The deficiencies in the Return Notice include:

> "17. Submit notice and proof of service of notice. R.4:64-1(b)…"
> "23. One attorney certified copy of each of the following must be submitted: bond or note, recorded mortgage, assignments, if any…"
> "27. Failure to comply with Fair Foreclosure Act (L. 1995, C.244)."

**Response:**    Defendants deny Plaintiff's Statement 15 but assert that said

dispute regards a fact which is immaterial and therefore does not preclude the granting

of summary judgment.

16.    The Bank of New York for the Benefit of the Certificateholders, CWABS,

Inc. Asset-Backed Certificates Series 2007-5 never obtained a judgment against the

Homeowner in the 2007 Foreclosure Complaint.

**Response:**    Defendants deny Plaintiff's Statement 16 and assert that summary

judgment was granted in favor of The Bank of New York for the Benefit of the

Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 and Plaintiff's

answer was stricken within said action.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 38 of 224 PageID: 206
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 7 of 10

17.     On May 31, 2013, the Superior Court of New Jersey Office of Foreclosure sent a Notice of Proposed Dismissal to the Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5.

**Response:**     Defendants deny Plaintiff's Statement 17 but admit the existence of a Foreclosure Dismissal Notice dated May 31, 2013 seemingly sent by the Superior Court Clerk's Office, Foreclosure Proceeding Services.

18.     The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 submitted a Certification in opposition to the Notice of Proposed Dismissal dated June 21, 2013.

**Response:**     Defendants admit Plaintiff's Statement 18.

19.     On July 5, 2013, the Superior Court of New Jersey entered an order dismissing the 2007 Foreclosure Complaint.

**Response:**     Defendants admit Plaintiff's Statement 19 but clarify that, pursuant to said order, the foreclosure proceedings were dismissed without prejudice and the plaintiff was given leave to move for reinstatement thereof upon good cause shown.

20.     On August 21, 2013, foreclosure counsel for The Bank of New York filed a Discharge of Notice of *Lis Pendens* dated August 9, 2013.

**Response:**     Defendants admit Plaintiff's Statement 20.

21.     More than six years have passed since acceleration of the Promissory Note and Assignment of Mortgage.

**Response:**     Defendants deny admit Plaintiff's Statement 20.

Case 2:14-cv-08063-SDW  Document 12  Filed 01/28/15  Page 39 of 224 PageID: 207
Case 14-01319-MBK  Doc 11-1  Filed 07/29/14  Entered 07/29/14 17:34:09  Desc
Counter-Statement of Material Undisputed Facts  Page 8 of 10

II.  Defendants hereby submit their Counterstatement of Undisputed Material Facts in support of their cross-motion for partial summary judgment pursuant to Court Rule 56.1, as follows:

1.      On or about February 27, 2007, plaintiff-debtor Gordon Allen Washington ("Plaintiff") borrowed the sum of $520,000.00 from America's Wholesale Lender ("AWL").  See Ex. A.

2.      As security for the repayment of this sum, Plaintiff executed a promissory note evidencing the indebtedness to AWL (the "Note") and a mortgage securing repayment of the Note (the "Mortgage") against the real property commonly known as 11 Walnut Street, Madison, New Jersey 07940. See Ex. A, B.

3.      The Note and Mortgage were assigned to The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5 pursuant to an assignment of mortgage dated November 12, 2007. See Ex. C.

4.      The aforementioned assignment was corrected to reflect The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5 as the assignee pursuant to a corrective assignment of mortgage dated December 31, 2013. See Ex. D.

5.      Plaintiff defaulted on the terms of the Note in failing to make the installment payment due and payable on July 1, 2007, and each payment due monthly thereafter. See Wallace Cert. ¶ 4b; Stahlhut Cert. ¶ 7; see also Ex. E.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 40 of 224 PageID: 208
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 9 of 10

6.      Bank of New York and Bank of America Corporation and the latter's affiliates entered into a Settlement Agreement dated June 28, 2011. See Ex. H.

7.      Plaintiff is not a party to said Settlement Agreement dated June 28, 2011. See Ex. H.

8.      BANA and/or its successors in interest serviced the subject loan since the date of origination until November 16, 2013. See Stahlhut Cert. ¶ 5.

9.      On November 16, 2013, BANA transferred its servicing rights with respect to the subject loan to SLS. See Wallace Cert. ¶ 4c; Stahlhut Cert. ¶ 5; see also Ex. I.

10.     At the time of said transfer of servicing rights, the unpaid principal balance due and owing on the Note was $519,132.54. See Wallace Cert. ¶ 4d; Stahlhut Cert. ¶ 8; see also Ex. E.

11.     The unpaid principal balance due and owing on the Note has been neither paid in full by any individual or entity nor deemed satisfied by the Trust, BANA or SLS. See Wallace Cert. ¶ 4d; Stahlhut Cert. ¶¶ 8, 10; see also Ex. E.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 41 of 224 PageID: 209
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 10 of 10

12.     The Trust came into physical possession of the original Note and Mortgage on or about March 2, 2007 and has remained in said possession via its custodian and/or counsel, since said date. See Wallace Cert. ¶ 4a; see also Stahlhut Cert. ¶ 6.

13.     The original Note bears an indorsement in blank by Countrywide Home Loans, Inc., a New York Corporation Doing Business As AWL. See Wallace Cert. ¶¶ 3a, 4a; see also Stahlhut Cert. ¶ 6.

Dated:   Elmsford, New York
         July 29, 2014

                        KNUCKLES, KOMOSINSKI & ELLIOTT, LLP
                        Attorneys for Defendants-Creditors
                        *Specialized Loan Servicing, LLC and The Bank of New*
                        *York Mellon FKA The Bank of New York, as Trustee*
                        *for the certificateholders of the CWABS, Inc., ASSET-*
                        *BACKED CERTIFICATES, SERIES 2007-5*

                        By:   _____
                              DAVID V. MIGNARDI, ESQ. (DM-4090)
                              565 Taxter Road, Suite 590
                              Elmsford, New York 10523
                              Tel: (914) 345-3020
                              dvm@kkelaw.com

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
CARLA WILLIAMS

[Space Above This Line For Recording Data]

WASHINGTON
[Escrow/Closing #]                    [Doc ID #]

# MORTGAGE

MIN 1000157-0007764653-3

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated FEBRUARY ,27, 2007 , together with all Riders to this document.
(B) "Borrower" is
GORDON A WASHINGTON, AN UNMARRIED MAN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(E) "Note" means the promissory note signed by Borrower and dated FEBRUARY 27, 2007 . The Note states that Borrower owes Lender
FIVE HUNDRED TWENTY THOUSAND and 00/100

Dollars (U.S. $ 520,000.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MARCH 01, 2037 .

NEW JERSEY-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
VMP -6A(NJ) (0512)   CHL (07/06)(d)       Page 1 of 10                    Form 3031 1/01
CONV/VA





Def. Prod. 4

DOC ID #:

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider      [ ] Condominium Rider           [ ] Second Home Rider
[ ] Balloon Rider              [ ] Planned Unit Development Rider  [X] 1-4 Family Rider
[ ] VA Rider                   [ ] Biweekly Payment Rider       [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
COUNTY                  of              MORRIS
[Type of Recording Jurisdiction]         [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:                                          which currently has the address of
                    11 WALNUT ST, MADISON
                         [Street/City]
New Jersey 07940-1621 ("Property Address"):
          [Zip Code]

VMP -6A(NJ) (0512)   CHL (07/08)        Page 2 of 10               Form 3031 1/01

Def. Prod. 5

A41

DOC ID #: ████████████

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment

UMP -6A(NJ) (0512)    CHL (07/08)    Page 3 of 10    Form 3031 1/01



Def. Prod. 6

A42

Case 2:14-cv-13909-BKS DDoc 88-7 mFileed 11/26/14 / Entered Page 26/514 / 15:25:5 geID #st3
Exhibit 5 to Certification of Counsel    Page 5 of 19
Case 14-01319-TBA    Doc 11-5    Filed 07/29/14    Entered 07/29/14 17:34:09    Desc
Exhibit B    Page 5 of 19

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓▓

within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges



Def. Prod. 7

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓

that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for

ⓋⓂⓅ -6A(NJ) (0512)          CHL (07/06)              Page 5 of 10                          Form 3031 1/01



Def. Prod. 8

DOC ID #:

enforcement of a lien which may attain priority over this Security Instrument, or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

VMP -6A(NJ) (0512)        CHL (07/06)                Page 8 of 10                          Form 3031 1/01

Def. Prod. 9

A45

DOC ID #:

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and

VMP®-6A(NJ) (0512)          CHL (07/06)                    Page 7 of 10                              Form 3031 1/01



Def. Prod. 10

DOC ID #: 

agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest

-BA(NJ) (0512)          CHL (07/06)                    Page 8 of 10                              Form 3031 1/01



Def. Prod. 11

DOC ID #:

In the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to

Def. Prod. 12

DOC ID #:

reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a
default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure
required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey
Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the
notice, Lender at its option may require immediate payment in full of all sums secured by this Security
Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.
Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this
Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of
Court.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this
Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for
releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the
charging of the fee is permitted under Applicable Law.

24. No Claim of Credit for Taxes. Borrower will not make deduction from or claim credit on the
principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or
charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this
Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ (Seal)
GORDON A. WASHINGTON                     -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

STATE OF NEW JERSEY,        Hudson                 County ss:

On this    7th    day of   February 2007.         , before me, the subscriber,
personally appeared
Gordon A. Washington
_____
_____
_____
_____
                                            who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

                                    _____
Notary Public

                              Julio C. Morales
                              Attorney-at-Law
                              of the State
                              of New Jersey

-6A(NJ) (0512)      CHL (07/06)      Page 10 of 10           Form 3031 1/01

Def. Prod. 13

Prepared by: CARLA WILLIAMS

## AMERICA'S WHOLESALE LENDER

Branch #: 0009182
2 JERICHO PLAZA, 3RD FLOOR
JERICHO, NY 11753
Phone: (516)733-6000
Br Fax No.:

DATE:        02/27/2007
CASE #:
DOC ID #:
BORROWER: GORDON A. WASHINGTON
PROPERTY ADDRESS: 11 WALNUT ST
        MADISON, NJ 07940-1621

## LEGAL DESCRIPTION EXHIBIT A

FHA/VA/CONV
Legal Description Exhibit A
2C404-XX (04/03)(d)





Def. Prod. 14

Case 2:14-cv-08406-KSD Doc 38-7 Filed 12/17/14/15 Entered 14/26/14 13:25:54 Page 1 of 21
Exhibit 5 to Certification of Counsel    Page 13 of 19
Case 14-01319-TBA    Doc 11-5    Filed 07/29/14    Entered 07/29/14 17:34:09    Desc
Exhibit B    Page 13 of 19



DOC ID #: ▇▇▇▇▇▇▇

## ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this TWENTY—SEVENTH    day of
FEBRUARY, 2007    , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the
same date given by the undersigned (the "Borrower") to secure Borrower's Note to
AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the property described in the Security Instrument and
located at:

11 WALNUT ST, MADISON, NJ 07940-1621

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

MULTISTATE ADJUSTABLE RATE RIDER – LIBOR INDEX - Single Family
CONV
• BC - ARM Rider
1U193-US (12/05)(d)                    Page 1 of 4





' 2 3 9 9 1 '          ' 1 5 7 8 0 6 8 1 5 0 0 0 0 0 1 U 1 9 3 '

Def. Prod. 15

A51

DOC ID #:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of    8.950 %.  The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    (A) Change Dates
    The interest rate I will pay may change on the  first                    day of MARCH, 2009        , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

    (B) The Index
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent index figure available as of the date 45 days before each  Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable  information. The Note Holder will give me notice of this choice.
    (C) Calculation of Changes
    Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & ONE-HALF              percentage point(s) (    6.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
    The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the  unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
    (D) Limits on Interest Rate Changes
    The interest rate I am required to pay at the first Change Date will not be greater than 10.450 % or less than    8.950  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) (    1.500 %) from the rate of interest I have been paying for the preceding six  months. My interest rate will never be greater than    15.950  % or less than 8.950 %.
    (E) Effective Date of Changes
    My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly  payment beginning on the first monthly payment date after the Change Date until the amount of my monthly  payment changes again.

CONV
• BC - ARM Rider
1U193-US (12/05)                    Page 2 of 4

Def. Prod. 16

Case 2:14-01319-BKSD Doc 88-7 me Filed 11/26/14 / Entered 11/26/14 15:25:54 el Desc 23
Exhibit 5 to Certification of Counsel    Page 15 of 19
Case 14-01319-TBA    Doc 11-5    Filed 07/29/14    Entered 07/29/14 17:34:09    Desc
Exhibit B    Page 15 of 19

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:
Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CONV
• BC ~ ARM Rider
1U193-US (12/05)                    Page 3 of 4

Def. Prod. 17

Case 2:14-cv-09046-BKSDW Doc 38-7 Filed 12/17/16/14 Entered Page 4 of 25:45:25:54 ID 524
Exhibit 5 to Certification of Counsel    Page 16 of 19
Case 14-01319-TBA    Doc 11-5    Filed 07/29/14    Entered 07/29/14 17:34:09    Desc
Exhibit B    Page 16 of 19

DOC ID #: ████████████

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Gordon A. Washington_ _____ (Seal)
GORDON A. WASHINGTON                                      - Borrower

_____ (Seal)
                                                         - Borrower

_____ (Seal)
                                                         - Borrower

_____ (Seal)
                                                         - Borrower

CONV
• BC - ARM Rider
1U193-US (12/05)                    Page 4 of 4

Def. Prod. 18

A54

## 1-4 FAMILY RIDER
### (Assignment of Rents)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

PARCEL ID #:

Prepared By:
CARLA WILLIAMS

WASHINGTON                    
[Escrow/Closing #]            [Doc ID #]

THIS 1-4 FAMILY RIDER is made this TWENTY-SEVENTH day of FEBRUARY, 2007,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note to
AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
11 WALNUT ST
MADISON, NJ 07940-1621
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®-57R (0401).01    CHL (06/04)(d)      Page 1 of 3          Initials: _____
VMP Mortgage Solutions, Inc. (800)521-7291                    Form 3170 1/01





Def. Prod. 19

DOC ID #: ▮▮▮▮▮▮▮▮▮▮

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and

Initials: ▮▮▮

VMP®-57R (0401).01  CHL (06/04)              Page 2 of 3                    Form 3170 1/01

Def. Prod. 20

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓▓

maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_(signature)_____ (Seal)
GORDON A. WASHINGTON                                    - Borrower

_____ (Seal)
                                                        - Borrower

_____ (Seal)
                                                        - Borrower

_____ (Seal)
                                                        - Borrower

Def. Prod. 21

Case 2:14-01-01319-06KSD WDoc38e-6m File12:171/26/141 /En1ereP1d/26/04 f 15:22 5 el Desc
Exhibit 4 to Certification of Counsel     Page 2 of 4
Case 14-01319-TBA     Doc 11-4     Filed 07/29/14     Entered 07/29/14 17:34:09     Desc
Exhibit A     Page 2 of 4

Prepared by: CARLA WILLIAMS

LOAN #:

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

FEBRUARY 27, 2007                    UNION CITY                         NEW JERSEY
[Date]                               [City]                             [State]

11 WALNUT ST, MADISON, NJ 07940-1621
[Property Address]

**1. BORROWER'S PROMISE TO PAY**
      In return for a loan that I have received, I promise to pay U.S. $ 520,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is AMERICA'S WHOLESALE LENDER
I will make all payments under this Note in the form of cash, check or money order.
      I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
      Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     8.950 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
      The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
      (A) Time and Place of Payments
      I will pay Principal and interest by making a payment every month.
      I will make my monthly payment on the first          day of each month beginning on APRIL 01, 2007     . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   MARCH 01, 2037     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
      I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.
      (B) Amount of My Initial Monthly Payments
      Each of my initial monthly payments will be in the amount of U.S. $ 4,165.34          . This amount may change.
      (C) Monthly Payment Changes
      Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
      (A) Change Dates
      The interest rate I will pay may change on the first          day of MARCH, 2009     , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
      (B) The Index
      Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
      If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
      (C) Calculation of Changes
      Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & ONE-HALF          percentage point(s) (   6.500  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

NEW JERSEY ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family
● BC - ARM Note                                                              Page 1 of 3
2D148-NJ (12/05)(d)




Def. Prod. 1

23991                                    1 5 7 8 0 8 8 1 5 0 0 0 0 0 0

LOAN #: ▓▓▓▓▓▓▓

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.450 % or less than 8.950 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 15.950 % or less than 8.950 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this note.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

[X] I may prepay this Note in full at any time without penalty.

[ ] If this Note is secured by my principal residence and if within the first _____ months after the execution of this Note, I make any prepayment(s) within any 12-month period, the total of which exceeds 20 percent (20%) of the original principal amount of this loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds 20 percent (20%) of the original principal amount of the loan.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

*AA*

Def. Prod. 2

Case 2:14-cv-01899-BJKSD Doc 38-6 me Filed 12/16/14 Entered 12/26/14 12:25:54 Desc
Exhibit 4 to Certification of Counsel    Page 4 of 4
Case 14-01319-TBA    Doc 11-4    Filed 07/29/14    Entered 07/29/14 17:34:09    Desc
Exhibit A    Page 4 of 4

LOAN #: ▓▓▓▓▓▓▓

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____
GORDON A. WASHINGTON                                                              -Borrower

_____
                                                                                 -Borrower

_____
                                                                                 -Borrower

_____
                                                                                 -Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC., A NEW YORK CORPORATION
DOING BUSINESS AS AMERICA'S WHOLESALE LENDER

BY: _____
MICHELE SJOLANDER
EXECUTIVE VICE PRESIDENT

Def. Prod. 3

WALTER D. NEALY, ESQ.
ATTORNEY AT LAW
Bar No. 023181983
100 South Van Brunt Street, Suite 2C
Englewood, New Jersey 07631
Telephone: (201) 227-0063
Fax: (201) 227-6118
Attorney for Plaintiff-Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | CASE NO.: 14-14573 |
| | ADVERSARY NO.: |
| GORDON A. WASHINGTON | |
| *Plaintiff-Debtor* | CHAPTER 13 |
| – vs. – | |
| | ***COMPLAINT TO DETERMINE*** |
| SPECIALIZED LOAN SERVICING, LLC | ***VALIDITY OF LIEN/CLAIM*** |
| and THE BANK of NEW YORK MELLON, | |
| as TRUSTEE for the CERTIFICATE-HOLDERS | |
| of the CWABS, INC., ASSET-BACKED | |
| CERTIFICATES, SERIES 2007-5 | |
| *Defendants-Creditors* | |

Plaintiff-Debtor, Gordon A. Washington, with a residence located at 11 Walnut Street, Madison, Morris County, New Jersey, by way of complaint against the Defendants-Creditors, says as follows:

### PRELIMINARY STATEMENT

1. The Debtor filed the instant voluntary petition under chapter 13 of the Bankruptcy Code on March 12, 2014.

1

2.     This is a complaint challenging the validity of an alleged debt and the extent/amount of the secured interest in property owned by Plaintiff-Debtor. The basis of Plaintiff-Debtor's complaint is founded upon (a) The New Jersey Uniform Commercial Code (UCC), *N.J.S.* 12A:101-1, et seq.: (b) *N.J.S.* 46:9-9; (c) The Real Estate Settlement Procedures Act (RESPA), *U.S.C.* 2605(e); (d) "Subtitle E Mortgage Service" of the Dodd-Frank Wall Street Reform and Consumer Protection Act; (e) Regulation X, § 3500.21(e)(1); (f) The New Jersey Consumer Fraud Act, *N.J.S.* 56:8-1, et seq., and such other laws as are applicable

### *JURISDICTION*

1.     Jurisdiction of the Bankruptcy Court in this matter is provided by 28 U.S.C. §§ 1334 and 157, as amended.

2.     This is a core proceeding.

### *PARTIES*

1.     Plaintiff-Debtor, Gordon A. Washington, is an adult individual residing at 11 Walnut, Street, Madison, Morris County, New Jersey (hereinafter referred to as the "Property"). The Property is a three-family dwelling and Plaintiff-Debtor has resided therein, and maintained the Property, since he purchased the Property on February 27, 2007.

2.     Specialized Loan Servicing, LLC (hereinafter referred to as "SLS") is mortgage servicing and/or debt Collection Company with a business address located at 8742 Lucent Boulevard – Suite 300, Highlands Ranch, Colorado 80129. SLS alleges it is the authorized servicer of an alleged Promissory Note and Mortgage between Plaintiff-Debtor and America's Wholesale Lender dated February 27, 2007.

3.     The Bank of New York Mellon, as Trustee for the Certificate Holders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-5 (hereinafter referred to as "Bank of New

York"), c/o SLS, 8742 Lucent Boulevard – Suite 300, Highlands Ranch, Colorado 80129, alleges it is the owner of the Promissory Note and Mortgage between Plaintiff-Debtor and America's Wholesale Lender dated February 27, 2007.

### *CAUSES OF ACTION/BASIS FOR RELIEF*

1.    The Original Note and Mortgage for the Property has been transferred from America's Whole Lender to various entities, servicers and/or sub-servicers.

2.    Notwithstanding numerous Qualified Written Requests made by Plaintiff-Debtor, Defendants, SLS and Bank of New York, have refused and neglected to provide the original loan documentation to demonstrate entitlement to enforce the alleged Note and alleged Mortgage securing the alleged debt. The conduct of Defendants, SLS and Bank of New York, violates The Real Estate Settlement Procedures Act (RESPA), *U.S.C.* 2605(e); "Subtitle E Mortgage Service" of the Dodd-Frank Wall Street Reform and Consumer Protection Act; Regulation X, § 3500.21(e)(1); and The New Jersey Consumer Fraud Act, *N.J.S.* 56:8-1, et seq., *inter-alia*.

3.    Defendants, SLS and Bank of New York, are not entitled to enforce the alleged Note between Plaintiff-Debtor and America's Wholesale Lender pursuant to the UCC, *inter-alia*.

4.    Defendants, SLS and Bank of New York, are not entitled to enforce the alleged Mortgage securing the Property pursuant to N.J.S.46:9-9, *inter-alia*.

### *REQUEST FOR RELIEF*

*WHEREFORE,* Plaintiff-Debtor demands judgment against Defendants, Specialized Loan Servicing, LLC and The Bank of New York Mellon, as Trustee for the Certificate Holders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-5, or any of its successors in right title and interest, as follows:

a.  Assume jurisdiction of this proceeding;

b.  Declare that any promissory note executed regarding the Property is unenforceable;

c.  Declare that any mortgage held by Defendants on the Property is void and unenforceable;

d.  Determine that Defendants have no allowed secured claim;

e.  Award Plaintiff-Debtor $2,000.00 in statutory damages for each failure of Defendants' to comply with Qualified Written Requests;

f.  Award Plaintiff-Debtor's counsel reasonable attorney fees pursuant to applicable law; and

g.  Award such other relief as the Court deems equitable and just.

Dated: March 18, 2014                    _____/S/ Walter D. Nealy_____
                                         Walter D. Nealy,
                                         Attorney for Plaintiff-Debtor

WALTER D. NEALY, ESQ.
Bar No. 023181983
100 South Van Brunt Street, Suite 2C
Englewood, New Jersey 07631
Telephone: (201) 227-0063
Fax: (201) 227-6118
Attorney for Plaintiff-Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | CASE NO.: 14-14573-TBA |
| GORDON A. WASHINGTON | ADVERSARY NO.: 14- 01319 |
| | HEARING DATE: July 15, 2014 |
| *Plaintiff-Debtor* | TIME: 1:00 pm |
| - vs. – | ***NOTICE OF MOTION*** |
| SPECIALIZED LOAN SERVICING, LLC and THE BANK of NEW YORK MELLON, as TRUSTEE for the CERTIFICATE-HOLDERS of the CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-5 | |
| *Defendants-Creditors* | |

TO:    Kenneth J. Flickinger, Esq.
       Knuckles, Komosinski & Elliott
       565 Taxter Road, Suite 590
       Elmsford, New York 10523
       Attorneys for Defendants-Creditors Specialized Loan Servicing, LLC.

To Whom It May Concern:

The Debtor has filed papers with the Court for an Order granting the relief requested,
above and for other such relief as the Court may deem appropriate.

Your rights may be affected. You should read these papers carefully and discuss them
with our attorney, if you have on, in this bankruptcy case. (If you do not have an attorney,
you may wish to consult one).

1

If you do not want the Court to render the relief requested or if you want the Court to consider your views on the motion, then within seven days prior to the scheduled hearing you or your attorney must: File a written response in opposition to this motion explaining your position (s) and send it to:

Clerk
United States Bankruptcy Court
P.O. Box 1352
Newark, New Jersey 07101-1352

If you mail your response to the Court for filing, you must mail it early enough so the Court will receive it on or before the date stated above.

You must also mail a copy to:

Walter D. Nealy, Esq.
Attorney At Law
100 South Van Brunt Street, Suite 2C
Englewood, New Jersey 07631

**IF YOU OPPOSE THE RELIEF REQUESTED HEREIN YOU SHOULD ATTEND THE HEARING SCHEDULED TO BE HELD BEFORE:**

Honorable: TBA
Date: July 15, 2014
Time: 1:00 pm
Place: United States Bankruptcy Court
    50 Walnut Street, 3rd Floor
    Courtroom 3A
    Newark, New Jersey 07101-1352

Pursuant to D.N.J. LBR 9013-1(d) et seq., if you wish to contest the within motion, you must file with the Office of the Clerk of the Bankruptcy Court, responding papers stating with particularity the basis of your opposition to the within Motion no later than (7) days of the return date on the motion. A copy of the proposed Order, which is sought, is enclosed with this Motion.

If you or your attorney do not take these steps, the Court may decide that you do not take these steps, the Court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.

Dated: June 2, 2014                    By:    Walter D. Nealy
                                              WALTER D. NEALY, ESQ.

2

A66

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 69 of 224 PageID: 237
Case 14-01319-VFP   Doc 7-1   Filed 06/02/14   Entered 06/02/14 19:51:43   Desc
Statement of Undisputed Material Facts   Page 1 of 5

WALTER D. NEALY, ESQ.
100 South Van Brunt Street – Suite 2
Englewood, New Jersey 07631
Telephone: (201) 227-0063
Attorney for Plaintiff-Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.: 14-14573 |
| GORDON A. WASHINGTON | CHAPTER 13 |
| *Plaintiff-Debtor* | ADVERSARY NO.: 14- 01319 |
| - vs. -- | |
| SPECIALIZED LOAN SERVICING, LLC and THE BANK of NEW YORK MELLON, as TRUSTEE for the CERTIFICATE-HOLDERS of the CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-5 | ***STATEMENT OF UNDISPUTED MATERIAL FACTS*** |
| *Defendants-Creditors* | |

Plaintiff-Debtor, Gordon A. Washington, hereby submits the within statement of undisputed material facts in support of his motion for summary judgment pursuant to Court Rule 56.1. The undisputed material facts are as follows:

1.    Plaintiff is Debtor, Gordon A. Washington (hereinafter referred to as "Mr. Washington" or "Homeowner"). Certification of Homeowner dated May 20, 2014, ¶ 1.

2.    Mr. Washington filed a voluntary chapter 13 petition on March 12, 2014. Mr. Washington filed this adversary proceeding on March 18, 2014, against The Bank of New York Mellon as the Trustee for the CWABS. Inc. Asset Back Series 2007-5 (hereinafter referred to as

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 70 of 224 PageID: 238
Case 14-01319-VFP   Doc 7-1   Filed 06/02/14   Entered 06/02/14 19:51:43   Desc
Statement of Undisputed Material Facts   Page 2 of 5

"The Bank of New York") and Specialized Loan Servicing, LLC (hereinafter referred to as "SLS"), its servicer. Certification of Homeowner dated May 21, 2014, ¶ 2.

3.      The adversary complaint seeks judgment declaring that the promissory note and mortgage executed by Mr. Washington in connection with the purchase of his home on February 27, 2007, allegedly held or serviced by Defendants, is unenforceable under the New Jersey Uniform Commercial Code (UCC), *N.J.S.A.* 12A:1-101, *et. seq.* Certification of Homeowner dated May 21, 2014, ¶ 2.

4.      On February 27, 2007 Mr. Washington purchased his three-family home located at 11 Walnut Street, Morris County, New Jersey (hereinafter referred to as the "Property" or the "Home"). Certification of Homeowner dated May 21, 2014, ¶ 4.

5.      In connection with the purchase of the property the Homeowner signed a promissory note (hereinafter referred to as the "Promissory Note") with a lender, America's Wholesale Lender. Certification of Homeowner dated May 21, 2014, ¶ 5, Exhibit A.

6.      In connection with the purchase of the Property, the Homeowner gave a security interest (hereinafter referred to as the "Mortgage") in the Property to America's Wholesale Lender. Certification of Homeowner dated May 21, 2014, ¶ 6, Exhibit B.

7.      Countrywide® Home Loans was the servicer of the Promissory Note and Mortgage. Certification of Homeowner dated May 21, 2014, ¶ 9.

8.      Countrywide® Home Loans declared a default due to non-payment on Promissory Note and accelerated the Promissory Note as of June 1, 2007. Certification of Homeowner dated May 21, 2014, ¶ 12, Exhibit E.

9.      On December 14, 2007, The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5, filed a foreclosure

2

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 71 of 224 PageID: 239
Case 14-01319-VFP   Doc 7-1   Filed 06/02/14   Entered 06/02/14 19:51:43   Desc
Statement of Undisputed Material Facts   Page 3 of 5

complaint against Mr. Washington in the Chancery Division, Morris County, New Jersey, under

docket number F-34837-07 (hereinafter referred to as the "2007 Foreclosure Complaint").

Certification of Homeowner dated May 21, 2014, ¶ 12, Exhibit E.

10.     In the 2007 Foreclosure Complaint The Bank of New York for the Benefit of the

Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 asserted that it was the

present holder Promissory Note. Exhibit E, ¶ 4.

11.     The 2007 Foreclosure Complaint states in paragraph 4 that the Promissory Note

had been accelerated as of June 1, 2007 and provides as follows:

> The defendants named in Paragraphs 1 and 2 above, or their grantee or
> grantees, if any has failed to make the installment payment due on June 1,
> 2007, and all payments becoming due thereafter. Therefore the loan has been
> in default since July 1, 2007, and said payments have remained unpaid for
> more than 30 days from the date of the mailing of the Notice of Default to the
> obligor, and are still unpaid. Plaintiff herein, by reason of said default, elected
> that the whole unpaid principal sum due on the aforesaid obligation ....

12.     In the 2007 Foreclosure Complaint The Bank of New York for the Benefit of the

Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 asserted that the

Mortgage was assigned to it, which Assignment was unrecorded. Exhibit E, ¶ 2a.

13.     In the 2007 Foreclosure Complaint proceedings, The Bank of New York for the

Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 never

produced the original Promissory Note, Mortgage or Assignment, or a certified true copy of the

original documents by an attorney of the State of New Jersey. Certification of Homeowner dated

May 21, 2014, ¶¶ 14, 16, Exhibit G.

14.     The Homeowner filed an Answer to the 2007 Complaint filed by The Bank of

New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates

Series 2007-5. Certification of Homeowner dated May 21, 2014, ¶ 15, Exhibit F.

3

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 72 of 224 PageID: 240
Case 14-01319-VFP   Doc 7-1   Filed 06/02/14   Entered 06/02/14 19:51:43   Desc
Statement of Undisputed Material Facts   Page 4 of 5

15.     The application for Final Judgment by The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 was rejected by the Office of Foreclosure by Return Notice dated November 28, 2010.   Certification of Homeowner dated May 21, 2014, ¶ 17, Exhibit H.   The deficiencies in the Return Notice include:

> "17.  Submit notice and proof of service of notice. R.4:64-1(b)…".
>
> "23.  One attorney certified copy of each of the following must be submitted: bond or note, recorded mortgage, assignments, if any…."
>
> "27.  Failure to comply with Fair Foreclosure Act (L. 1995, C.244)."

16.     The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 never obtained a judgment against the Homeowner in the 2007 Foreclosure Complaint.   Certification of Homeowner dated May 21, 2014, ¶ 18, Exhibits H, I, K.

17.     On May 31, 2013, the Superior Court of New Jersey Office of Foreclosure sent a Notice of Proposed Dismissal to The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5.   Certification of Homeowner dated May 21, 2014, ¶ 19, Exhibit I.

18.     The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 submitted a Certification in opposition to the Notice of Proposed Dismissal dated June 21, 2013.   Certification of Homeowner dated May 21, 2014, ¶ 20, Exhibit J.

19.     On July 5, 2013 the Superior Court of New Jersey entered an order dismissing the 2007 Foreclosure Complaint.   Certification of Homeowner dated May 21, 2014, ¶ 21, Exhibit K.

4

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 73 of 224 PageID: 241
Case 14-01319-VFP    Doc 7-1   Filed 06/02/14   Entered 06/02/14 19:51:43   Desc
Statement of Undisputed Material Facts     Page 5 of 5

20.    On August 21, 2013, foreclosure counsel for The Bank of New York filed a Discharge of the Notice of *Lis Pendens* dated August 9, 2013.  Certification of Homeowner dated May 21, 2014, ¶ 25, Exhibit N.

21.    More than six years have passed since acceleration of the Promissory Note and Assignment of Mortgage.  Certification of Homeowner dated May 21, 2014, ¶ 21.

WALTER D. NEALY, ESQ.
100 South Van Brunt Street – Suite 2
Englewood, New Jersey 07631
Telephone: (201) 227-0063
Attorney for Plaintiff-Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.: 14-14573 |
| GORDON A. WASHINGTON | CHAPTER 13 |
| *Plaintiff-Debtor* | ADVERSARY NO.: 14- 01319 |
| – vs. – | |
| SPECIALIZED LOAN SERVICING, LLC and THE BANK of NEW YORK MELLON, as TRUSTEE for the CERTIFICATE-HOLDERS of the CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-5 | *CERTIFICATION IN SUPPORT OF SUMMARY JUDGMENT* |
| *Defendants-Creditors* | |

I, Gordon A. Washington, being of full age, do hereby certify as follows:

1.       I am the Plaintiff-Debtor in this action and I make this certification based upon my own personal knowledge. The facts contained in this certification are based upon things that I actually witnessed or obtained from public records. I make this certification in support of this motion to enter summary judgment against the Defendants-Creditors.

### INTRODUCTION

2.       On March 12, 2014 I filed a Petition for protection under the Bankruptcy Code. On March 18, 2014 I filed this Adversary Complaint against the Defendants, The Bank of New

York Mellon as the Trustee for the CWABS, Inc. Asset Back Series 2007-5 (hereinafter referred to as "The Bank of New York") and Specialized Loan Servicing, LLC (hereinafter referred to as "SLS"), its servicer. The adversary complaint seeks judgment declaring that the promissory note and mortgage is unenforceable under the New Jersey Uniform Commercial Code (UCC), *N.J.S.A.* 12A:1-101, *et. seq.*

3.      I am filing this motion for summary judgment at the outset of this proceeding on the narrow issue of the Statute of Limitations so as to avoid unnecessary legal expense and expenditure of the Court's resources, and to expedite implementation of my plan of reorganization. I believe there are several other legal reasons for me to prevail in this case; but, the information I need to prove it is in the hands of the Defendants-Creditors. My attorney has served discovery to ferret out information to prove other reasons to prove their expected claim is not valid. However, I hope that such extensive discovery and trial will not be necessary.

BACKGROUND

4.      On February 27, 2007 I bought my three-family home located at 11 Walnut Street, Morris County, New Jersey (hereinafter referred to as the "Property" or the "Home"). In connection with the purchase of my Home, I gave a down payment in the amount of $130,000.00 and financed the balance, $520,000.00.

5.      At that time I signed a promissory note (hereinafter referred to as the "Promissory Note") with a lender, America's Wholesale Lender. Attached as Exhibit A and incorporated by reference is a true and genuine copy of the Promissory Note I signed.

6.      I also signed a mortgage (hereinafter referred to as the "Mortgage") in the Property to America's Wholesale Lender. Attached as Exhibit B and incorporated by reference is a true and genuine copy of the Mortgage.

2

7.      After I closed, I immediately moving into the third-floor unit and started to renovate the first and second floor apartments.  On April 8, 2007, a plumbing malfunction occurred that caused water damage to the first and second floor apartments, making the apartments un-rentable.  I distinctly remember the date because I had gone to sunrise service at my Church for Easter, and when I came home water was pouring out of my radiators.  The water had been pouring out for a long time and damaged the second and first floor apartments, making them uninhabitable.

8.      I paid the loan as long as I could but I defaulted after making at least three payments.  I believe a friend made a fourth payment.  I could not afford the loan without the rental income I expected to be receiving when I closed.

9.      I remember calling Countrywide Home Loans to explain what happened and to ask about modifying my loan.  I received a letter from Countrywide dated September 6, 2007. Attached as Exhibit C and incorporated by reference is a true and genuine copy of the letter.

10.     In late December 2007 I was served with a Foreclosure Complaint.  I did not recognize the name on the Complaint and had not been informed that the loan had been transferred.

### 2007 FORECLOSURE PROCEEDINGS

11.     On April 23, 2014, at the direction of my attorney, I went the Superior Court Clerk's Office and obtained Certified Case File Report and a CD of the documents in the file. Attached as Exhibit D and incorporated by reference are a true and genuine copy of the Case File Report and a photocopy of the Disk.  I obtained exhibits E to K from the Court's file.

12.     Attached as Exhibit E and incorporated by reference is a true and genuine copy of the 2007 Foreclosure Complaint.  The 2007 Foreclosure Complaint and provides as follows:

3

The defendants named in Paragraphs 1 and 2 above, or their grantee or grantees, if any has failed to make the installment payment due on June 1, 2007, and all payments becoming due thereafter. Therefore the loan has been in default since July 1, 2007, and said payments have remained unpaid for more than 30 days from the date of the mailing of the Notice of Default to the obligor, and are still unpaid. Plaintiff herein, by reason of said default, elected that the whole unpaid principal sum due on the aforesaid obligation ….

13.    In the 2007 Foreclosure Complaint The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 asserted that the Mortgage was assigned to it, which Assignment was unrecorded. Exhibit E, ¶ 2a.

14.    In the 2007 Foreclosure Complaint proceedings, The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 never produced the original Promissory Note, Mortgage or Assignment, or a certified true copy of the original documents by an attorney of the State of New Jersey.

15.    Attached as Exhibit F and incorporated by reference is a true and genuine copy of the Answer to Complaint I filed.

16.    Attached as Exhibit G and incorporated by reference is a true and genuine copy of the undated certification of Dionne Stevenson with the exhibits submitted in support of the motion to strike my Answer to Complaint.

17.    Attached as Exhibit H and incorporated by reference is a true and genuine copy of the Return Notice from the Office of Foreclosure dated November 28, 2010. The deficiencies in the Return Notice include:

"17.  Submit notice and proof of service of notice, R.4:64-1(b)…."

"23.  One attorney certified copy of each of the following must be submitted: bond or note, recorded mortgage, assignments, if any…."

"27.  Failure to comply with Fair Foreclosure Act (L. 1995, C.244)."

4

18.     The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc.
Asset-Backed Certificates Series 2007-5 never obtained a judgment against me in the 2007
Foreclosure Complaint.

19.     Attached as Exhibit I and incorporated by reference is a true and genuine copy of
the Notice of Proposed Dismissal Due to Lack of Prosecution.

20.     Attached as Exhibit J and incorporated by reference is a true and genuine copy of
the Certification submitted by counsel on behalf of The Bank of New York dated June 21, 2013.
Counsel for The Bank of New York did not submit "the name of the original mortgagee and a
recital of all assignments in the chain of title" as request in the Notice of Return.

21.     Attached as Exhibit K and incorporated by reference is a true and genuine copy of
the Foreclosure Dismissal Order dated July 5, 2013.  Based on my review of the Court's Case
File, The Bank of New York did not file a motion to reconsider the Dismissal Order or file an
appeal of the Order of Dismissal.  More than six years has pasted since acceleration of the Note
and Mortgage.

22.     I first became aware of the Notice of Proposed Dismissal and the Dismissal Order
when I went to the Superior Court Clerk's Office in Trenton.

23.     On March 2014 I obtained a land search of my home.  Attached as Exhibit L and
incorporated by reference is a true and genuine copy of an Assignment of Mortgage filed on
September 9, 2008.

24.     Attached as Exhibit M and incorporated by reference is a true and genuine copy
of a Notice of *Lis Pendens* dated February 5, 2013 filed regard the 2007 Foreclosure Complaint.

25.     Attached as Exhibit N and incorporated by reference is a true and genuine copy of
a Discharge of Lis Pendens recorded on August 21, 2013.

5

26.     After I went to Trenton in April 2014, I also searched the New Jersey Judiciary's website. Attached as Exhibit O and incorporated by reference is a true and genuine copy of an Administrative Order 01-2010 dated December 20, 2010.

27.     Attached as Exhibit P and incorporated by reference is a true and genuine copy of a Notice to the Bar issued in connection with Exhibit O.

28.     Attached as Exhibit Q and incorporated by reference is a true and genuine copy of a Supplemental Administrative Order filed January 31, 2011.

29.     Attached as Exhibit R and incorporated by reference is a true and genuine copy of an Order dated February 2, 2012 closing out the proceedings initiated by Administrative Order 01-2010.

## BANK OF AMERICA & BANK OF NEW YORK SETTLEMENT

30.     According to a January 2008 Press Release, Bank of America Corporation acquired Countrywide Financial Corp. and its affiliates, which include Countrywide Home Loans, Inc., Countrywide Home Loans Servicing, LP., Countrywide Securities Corporation, CWABS, Inc., and others. This information is available online at: http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=iro.

31.     I searched online and discovered the corporate history concerning The Bank of New York. The Bank of New York and Mellon Financial Corporation merged effective July 2, 2007. See http://en.wikipedia.org/wiki/The_Bank_of_New_York_Mellon. The successor entity is The Bank of New York Mellon.

32.     There are also published reports that there was a settlement between Bank of America and The Bank of New York Mellon. These published reports indicate these banks entered into a settlement. In the Settlement, Bank of America agreed to pay 8.5 Billion Dollars

6

to The Bank of New York as trustee in repurchase exposure for faulty legacy Countrywide residential mortgage-backed securitizations. This is available on Bank of America's web page. See http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=iro .

33.   Based on the fact that the New Jersey Superior Court dismissed the 2007 Complaint in 2013, expiration of the Statute of Limitations expired and my receipt of a letter in November 2013 from an affiliate of Bank of America that the loan was "PAID IN FULL", I believe the Defendants are trying to collect a double payment.

34.   SLS has not responded to my several Qualified Written Requests demonstrating it, or The Bank of New York, owns or has authority to collect the debt. Attached as Exhibit S and incorporated by reference is one of the unanswered Qualified Written Requests I sent to SLS. In any event, I believe the Note and Mortgage are unenforceable because the Statute of Limitations lapsed.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Gordon A. Washington

Dated: May 21, 2014

7

A78

A

Prepared by: CARLA WILLIAMS

LOAN #: 157806815

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

FEBRUARY 27, 2007                    UNION CITY                    NEW JERSEY
[Date]                               [City]                        [State]

11 WALNUT ST, MADISON, NJ 07940-1621
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 520,000.00     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
AMERICA'S WHOLESALE LENDER                                                                    .
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     8.950 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the first     day of each month beginning on
APRIL 01, 2007     . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   MARCH 01, 2037     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 4,165.34     . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the first     day of MARCH, 2009     , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
SIX & ONE-HALF     percentage point(s) (   6.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

NEW JERSEY ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family
● BC - ARM Note
2D148-NJ (12/05)(d)                                                          Page 1 of 3





LOAN #: 157806815

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than   10.450  % or less than  8.950  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF           percentage point(s) (   1.500  %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than   15.950  % or less than   8.950  %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this note.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

[X] I may prepay this Note in full at any time without penalty.

[ ] If this Note is secured by my principal residence and if within the first _____ months after the execution of the Note, I make any prepayment(s) within any 12-month period, the total of which exceeds 20 percent (20%) of the original principal amount of this loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds 20 percent (20%) of the original principal amount of the loan.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN           calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000  % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

* BC - ARM Note
RU148-NJ (12/05)

Page 2 of 3

LOAN #: 157806815

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____
GORDON A. WASHINGTON                                    -Borrower

_____
                                                        -Borrower

_____
                                                        -Borrower

_____
                                                        -Borrower

                                              *[Sign Original Only]*

**B**

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
CARLA WILLIAMS

———————————— [Space Above This Line For Recording Data] ————————————

WASHINGTON                    00015780681502007
[Escrow/Closing #]                (Doc ID #)

# MORTGAGE

MIN 1000157-0007764653-3

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated FEBRUARY 27, 2007   , together with all Riders to this document.
(B) "Borrower" is
GORDON A WASHINGTON, AN UNMARRIED MAN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(E) "Note" means the promissory note signed by Borrower and dated FEBRUARY 27, 2007   . The Note states that Borrower owes Lender
FIVE HUNDRED TWENTY THOUSAND and 00/100

Dollars (U.S. $ 520,000.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MARCH 01, 2037   .

NEW JERSEY–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
(VMP) -6A(NJ) (0512)    CHL (07/06)(d)          Page 1 of 10          Form 3031 1/01
CONV/VA





DOC ID #: 00015780681502007

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

| COUNTY | of | MORRIS | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:                                        which currently has the address of
                          11 WALNUT ST, MADISON
                          [Street/City]
New Jersey 07940-1621 ("Property Address"):
            [Zip Code]

DOC ID #: 00015780681502007

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment



A86

DOC ID #: 00015780601502007

within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges

 -6A(NJ) (0512)     CHL (07/06)          Page 4 of 10                              Form 3031 1/01



A87

DOC ID #: 0001578060B1502007

that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for




DOC ID #: 00015780681502007

enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.



A89

DOC ID #: 0001578068150200?

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and




A90

DOC ID #: 00015780681502007

agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest




A91

DOC ID #: 00015780681502007

in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to





DOC ID #: 00015780601502007

reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a
default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure
required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey
Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the
notice, Lender at its option may require immediate payment in full of all sums secured by this Security
Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.
Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this
Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of
Court.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this
Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for
releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the
charging of the fee is permitted under Applicable Law.

24. No Claim of Credit for Taxes. Borrower will not make deduction from or claim credit on the
principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or
charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this
Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ (Seal)
GORDON A. WASHINGTON                      -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

STATE OF NEW JERSEY,        Hudson            County ss:

On this 7th day of February 2007, before me, the subscriber,
personally appeared Gordon A. Washington

_____

_____

_____ who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

Notary Public

Julio C. ████████
Attorney-at-Law
of the State
of New Jersey

A93

Prepared by: CARLA WILLIAMS

**AMERICA'S WHOLESALE LENDER**

DATE:           02/27/2007
CASE #:
DOC ID #:       00015780681502007
BORROWER: GORDON A. WASHINGTON
PROPERTY ADDRESS: 11 WALNUT ST
                  MADISON, NJ 07940-1621

Branch #: 0009182
2 JERICHO PLAZA, 3RD FLOOR
JERICHO, NY 11753
Phone: (516)733-6000
Br Fax No.:

**LEGAL DESCRIPTION EXHIBIT A**

FHA/VA/CONV
Legal Description Exhibit A
2C4U4-XX (04/02)(d)





A94

Prepared by. CARLA WILLIAMS

**AMERICA'S WHOLESALE LENDER**

DATE:          02/27/2007
BORROWER:   GORDON A. WASHINGTON
CASE #:
LOAN #:        157806815
PROPERTY ADDRESS:   11 WALNUT ST
                    MADISON, NJ 07940-1621

Branch #: 0009182
2 JERICHO PLAZA, 3RD FLOOR
JERICHO, NY 11753
Phone: (516)733-6000
Br Fax No.:

## DISCLOSURE STATEMENT ABOUT MERS

Mortgage Electronic Registration Systems, Inc. (MERS) is named on your mortgage as the mortgagee in a nominee capacity for
AMERICA'S WHOLESALE LENDER
(Lender). MERS is a company separate from your lender that operates an electronic tracking system for mortgage rights.   MERS is not your lender; it is a company that provides an alternative means of registering the mortgage lien in the public records. MERS maintains a database of all the loans registered with it, including the name of the lender on each loan. Your lender has elected to name MERS as the mortgagee in a nominee capacity and record the mortgage in the public land records to protect its lien against your property.

**Naming MERS as the mortgagee and registering the mortgage on the MERS electronic tracking system does not affect your obligation to your Lender, under the Promissory Note.**

■ MERS Disclosure Statement
1D542-US (09/06)(d/i)

DOC ID #: 00015780681502007

# ADJUSTABLE RATE RIDER
(LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this TWENTY-SEVENTH   day of
FEBRUARY, 2007 , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the
same date given by the undersigned (the "Borrower") to secure Borrower's Note to
AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the property described in the Security Instrument and
located at:

11 WALNUT ST, MADISON, NJ 07940-1621

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR INDEX -** Single Family
CONV
• BC - ARM Rider
1U193-US (12/05)(d)                    Page 1 of 4





A96

DOC ID #: 00015780681502007

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of    8.950 %.  The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the   first              day of MARCH, 2009           , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent index figure available as of the date 45 days before each  Change Date is called the "Current Index."

If the index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & ONE-HALF            percentage point(s) (    6.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the  unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    10.450 % or less than    8.950  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) (   1.500 %) from the rate of interest I have been paying for the preceding six  months. My interest rate will never be greater than   15.950  % or less than 8.950 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly  payment beginning on the first monthly payment date after the Change Date until the amount of my monthly  payment changes again.

CONV
■ BC - ARM Rider
111193-US (12/05)                          Page 2 of 4

DOC ID #: 00015780681502007

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CONV
● BC - ARM Rider
1U193-US (12/05)                    Page 3 of 4

DOC ID #: 00015780681502007

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Gordon A. Wyatt_ _____ (Seal)

GORDON A. WASHINGTON                          - Borrower

_____ (Seal)
                                                          - Borrower

_____ (Seal)
                                                          - Borrower

_____ (Seal)
                                                          - Borrower

CONV
● BC - ARM Rider
1U193-US (12/05)                    Page 4 of 4

# 1-4 FAMILY RIDER
### (Assignment of Rents)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

PARCEL ID #:

Prepared By:
CARLA WILLIAMS

WASHINGTON                    00015780681502007
[Escrow/Closing #]              [Doc ID #]

THIS 1-4 FAMILY RIDER is made this TWENTY-SEVENTH   day of  FEBRUARY, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note to
AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
11 WALNUT ST
MADISON, NJ 07940-1621
[Property Address]

1-4 FAMILY COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument,  Borrower and Lender further covenant and agree as follows:

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP -57R (0401).01     CHL (06/04)(d)      Page 1 of 3                         Initials: 
                       VMP Mortgage Solutions, Inc. (800)521-7291              Form 3170 1/01

*23991*                         *157806815000002057R*

A100

DOC ID #: 00015780681502007

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and

Initials: _____

-57R (0401).01  CHL (06/04)         Page 2 of 3                    Form 3170 1/01

DOC ID #: 00015780681502007

maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____(Seal)
GORDON A. WASHINGTON                                   - Borrower

_____(Seal)
                                                       - Borrower

_____(Seal)
                                                       - Borrower

_____(Seal)
                                                       - Borrower

-57R (0401).01 CHL (06/04)          Page 3 of 3          Form 3170 1/01

A102

C



**HOME LOANS**
Mail Stop: PTX A-65
7105 Corporate Drive
Plano, TX 75024

**Notice Date:**   September 6, 2007

Gordon A Washington
17 N Dean St
Englewood, NJ 07631

**Account No.:** 157806815

**Property Address:**
11 Walnut St
Madison, NJ 07940

---

**IMPORTANT MESSAGE ABOUT YOUR LOAN**

We would like to speak with you about a Fresh Start, so together we can find a solution to the default of your mortgage.

**WHAT THIS MEANS**

If you have a hardship that has affected your financial ability to make your payments, such as unemployment, divorce, illness or other situations that have impacted your life, Countrywide may have options to assist you in recovering from the default.

Some of the assistance options listed that you may qualify for are:

- Loan Modification - this program provides a permanent cure to your mortgage delinquency by adding your unpaid amounts into your loan balance and spreading the repayment over the remaining term of the loan.

- Repayment Plan - this program allows you to repay your delinquent amounts over a specified extended period of time, in addition to your regular monthly payments.

- Short Sale - this program allows you to sell your home at its current market value, even if you do not have sufficient equity to pay off your loan in full.

- Deed-in-Lieu - this program allows you to deed your property to Countrywide, to avoid the time and expense of the foreclosure process.

**WHAT YOU NEED TO DO**

These options are not guaranteed and are subject to Countrywide's and its investors/insurers approval.

Please contact us at 1-800-222-9944 at your earliest convenience, so that we may further discuss the options that may be best suited for you.

For information about other services we offer, please visit us online at www.countrywide.com.

⌂ Equal Housing Lender. © 2007 Countrywide Home Loans, Inc., 4500 Park Granada, Calabasas, CA 91302. Trade/servicemarks are the property of Countrywide Financial Corporation and/or its subsidiaries. Arizona Mortgage Banker License Number BK8805; Licensed by the Department of Corporations under the California Residential Mortgage Lending Act; Georgia Reg. #5929; Illinois Residential Mortgage Licensee; Massachusetts Mortgage Lender License No. ML 1623; this is not an offer to enter into an interest rate lock-in agreement under Minnesota law; in MN, Countrywide Home Loans of Minnesota, Inc. makes all HELOCS of $100,000 or less; Licensed by the New Hampshire Banking Department; New Jersey (818) 313-6526, Licensed Mortgage Banker, NJ Department of Banking and Insurance; Licensed Mortgage Banker, NYS Banking Department; Registered with the Pennsylvania Banking Department; Rhode Island Lender's License. Some products may not be available in all states. This is not a commitment to lend. Restrictions apply. All rights reserved.

SOLICITATION-GOV FCL FAST STATES  7345/7608  2/14/2007

A104

**D**





New Jersey Superior Court Case File Report for F 034837-07
BANK OF NEW YORK VS WASHINGTON

CASE FILE DATE: 12/14/2007
CASE STATUS: CLOSED

COURT TYPE: GENL EQUITY
CASE TYPE: RESIDENTIAL FORECLOSURE
COUNTY: MORRIS

PLAINTIFF
BANK OF NEW YORK

ATTORNEY
FRENKEL LAMBERT WEISS WEISMA G

DEFENDANT(S)
GORDON A WASHINGTON
STATUS: DISM W/O PR

ATTORNEY
NO ATTORNEY

CASE PARTY INFORMATION
GORDON A WASHINGTON MRS
STATUS: DISM W/O PR 1/31/2008
TYPE: DEFENDANT

ATTORNEY
NO ATTORNEY

| | | | | |
|---|---|---|---|---|
| 2011/01/13 19:18:04 | Answer | Answer | Corp Source | Source Corp |
| 2011/01/13 19:18:05 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:18:05 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:18:06 | Proof-Mail | Proof-Mail | Corp Source | Source Corp |
| 2011/01/13 19:18:06 | Proof-Mail | Proof-Mail | Corp Source | Source Corp |
| 2011/01/13 19:18:07 | Return-Service | Return-Service | Corp Source | Source Corp |
| 2011/01/13 19:18:08 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:21:54 | Req-Default | Req-Default | Corp Source | Source Corp |
| 2011/01/13 19:21:55 | Corresp-General | Corresp-General | Corp Source | Source Corp |
| 2011/01/13 19:21:57 | Certifications | Certifications | Corp Source | Source Corp |
| 2011/01/13 19:21:58 | Certifications | Certifications | Corp Source | Source Corp |
| 2011/01/13 19:25:49 | Stips-Sett-Dism | Stips-Sett-Dism | Corp Source | Source Corp |
| 2011/01/13 19:25:50 | Corresp-General | Corresp-General | Corp Source | Source Corp |
| 2011/01/13 19:25:51 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:25:51 | Motion | Motion | Corp Source | Source Corp |
| 2011/01/13 19:30:56 | Return-Service | Return-Service | Corp Source | Source Corp |
| 2011/01/13 19:30:57 | Corresp-General | Corresp-General | Corp Source | Source Corp |
| 2011/01/13 19:30:58 | Answer | Answer | Corp Source | Source Corp |
| 2011/01/13 19:30:58 | Corresp-General | Corresp-General | Corp Source | Source Corp |
| 2011/01/13 19:42:31 | Complaint | Complaint | Corp Source | Source Corp |
| 2011/01/13 19:42:31 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:42:34 | Certifications | Certifications | Corp Source | Source Corp |
| 2011/01/13 19:42:34 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:42:35 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:42:36 | Judgments | Judgments | Corp Source | Source Corp |
| 2011/01/13 19:42:37 | Judgments | Judgments | Corp Source | Source Corp |
| 2013/06/03 09:11:35 | CMPost | NTC: FORECLOSURE DISMISSAL WARNING | | |
| 2013/06/21 14:32:36 | Certifications | Certifications | Caporale John | Frenkel Lambert Weiss Wei |
| 2013/07/08 09:27:08 | CMPost | NTC: FORECLOSURE | | |

Page 1 of 2

| | | DISMISSAL ORDER | | |
|---|---|---|---|---|
| 2013/07/08 09:27:08 | CMPost | NTC:<br>FORECLOSURE<br>DISMISSAL ORDER | | |

Certified to be a true
copy of the original on
file in the Superior Court
Clerk's Office

Michelle M. Smith, Esq.
Clerk of Superior Court

A107

SUPERIOR COURT OFFICE OF THE CLERK
TRENTON N.J.

**Date:** 4-23-14          # 1 -  0006848

## Request for Services

**Docket #/Client name:** _Washington_

| Appellate # 1 | | | Foreclosure # 2 | | |
|---|---|---|---|---|---|
| | | | **Filings:** | | |
| Appeal | # 01 | $_____ | Complaint | # 01 | $_____ |
| Motion | # 02 | $_____ | Motion | # 02 | $_____ |
| Cross Appeal | # 03 | $_____ | Answer | # 03 | $_____ |
| Security | # 04 | $_____ | **Foreclosure Customer Service** | | |
| Copies | # 08 | $_____ | Copies | # 08 | $_____ |
| Other | # 10 | $_____ | Other | # 10 | $_____ |

| Misc. # 3 | | | Tax # 4 | | |
|---|---|---|---|---|---|
| **Judgment Filings:** | | | | | |
| Satisf. of Judgmt. | # 01 | $_____ | 1st Contested | # 01 | $_____ |
| Judgment - Order | # 02 | $_____ | 1st Cont'd/Sm. Claims | # 02 | $_____ |
| Stmt. for Docketing | # 03 | $_____ | Copies | # 08 | $_____ |
| **Misc. Customer Service** | | | Other | # 10 | $_____ |
| Copies | # 08 | $ 5.00 | | | |
| Other _CD_ | # 10 | $ 10.00 | | | |

MGMT & ADMIN SERVICES
PO BOX 980
TRENTON, NJ 08625
609-292-4691

REG 04-23-2014(WED) 16:00
C BEHMKE   MC#01   001557
CHECK No. 042314

1 M-COPIES          $5.00
1 M-OTHER          $10.00
TL              $15.00
CASH            $20.00
CG               $5.00

**TOTAL $** _15.00_          (BCM – total must match register tape)

**COMMENTS:** _____

**Court contact:** _____

**Receipt # (Court only)** _____

WHITE: Customer     YELLOW: Court Copy     PINK: Finance          -1507-(1/11)



E



REC'D & FILED
SUPERIOR COURT
OF NEW JERSEY

CK 16038
SUPERIOR COURT OF N.J.
B A I D

ESCHEN, FRENKEL, WEISMAN & GORDON, LLP **DEC 1 4 2007**
80 Main Street, 5th Floor
West Orange, New Jersey 07052
(973) 325-8800
Attorney for Plaintiff
Our File No. 4870

*Probate J. Potts*
ACTING CLERK

DEC 14 20..

GENERAL EQUITY UNIT

The Bank of New York for the Benefit of
the Certificateholders, CWABS Inc.
Asset-Backed Certificates Series 2007-5,

Plaintiff,

*contested, pro se – struck by*
*SJ order dated 4/29/08*

vs.

Gordon A. Washington; Mrs. Gordon A. Washington, his wife

Defendants.

Superior Court of New Jersey
Chancery Division
Morris County

Civil Action

Docket No.: **F-34837-07**

**COMPLAINT**

MRS - OFF

The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5 licensed to do business in New Jersey and located at 7105 Corporate Drive, Plano, TX 75024; the plaintiff in this action, says:

**FIRST COUNT**

1. On February 27, 2007, Gordon A. Washington executed to America's Wholesale Lender an obligation (note) to secure the sum of $520,000.00, payable on March 1, 2037, with interest at the initial rate of 8.950% per annum which rate was and is subject to adjustment, payable by payments of initially $4,165.34 monthly for principal and interest. The note further provides for a late charge of 5 percent for any payment not received 15 days from the date due.

2. To secure the payment of the obligation, Gordon A. Washington executed to Mortgage Electronic Registration System Inc. as Nominee for America's Wholesale Lender a purchase money mortgage of even date with said obligation and thereby conveyed to Mortgage Electronic Registration System Inc. as Nominee for America's Wholesale Lender in fee the land hereinafter described on the express condition that such conveyance should be void if payment should be made at the time and times and in the manner described in said obligation. Said mortgage was duly recorded on March 8, 2007 in the Office of the Morris Clerk / Register in Mortgage Book 20764 at page 0171, et seq.

✓

2a.     Said mortgage was assigned from Mortgage Electronic Registration System Inc. as Nominee for America's Wholesale Lender  to The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5 which is unrecorded at this time.

3.     This metes and bounds description is derived from the mortgage being foreclosed upon herein. The mortgaged premises are fully described in Schedule "A" annexed hereto and made a part hereof.

4.     The holder at present of the obligation and mortgage is:
        The present plaintiff.

5.     The obligation contained an agreement that if any installment payment of interest and principal, taxes and insurance should remain unpaid for more than 30 days, the whole principal sum with all interest should at the option of the mortgagee or the heirs, executors, administrators, representatives or assigns, become immediately due and payable.

6.     The defendants listed herein are named as party defendants to this action for any right, title and interest they may have in, to or against the subject property for reasons set forth herein:

6a.   Gordon A. Washington executed the Note and Mortgage on February 27, 2007 as an unmarried person. The Deed does not set forth marital status of Gordon A. Washington at the time he acquired title to the mortgaged premises. In the event that Gordon A. Washington was married subsequent to taking title to the property or executing the Note and Mortgage, Mrs. Gordon A. Washington, is made a defendant by virtue of any interest whatsoever she may have acquired in the mortgaged premises subsequent to the execution of the Note and Mortgage by Gordon A. Washington , including but not limited to any possessory or curtesy interest she may hold in the premises as the wife of Gordon A. Washington , record owner. Her name is not known at this time. Title to the mortgaged premises is vested only in Gordon A. Washington.

7. Pursuant to the terms of the obligation referred to in paragraph 1, (the terms of which are incorporated and referred to in paragraph 2 above), the obligee named in the obligation reserved the right to pay taxes or other liens affecting the property which liens are superior to the mortgage referred to herein and which liens, when paid by the obligee or assignee, together with interest as provided, are to be added to the amount due on the obligation and mortgage. The obligee may be required to pay such liens during the pendency of this action and will demand that such payments so made by said obligee or assignee be added to the mortgage debt as aforesaid.

8.     The defendants named in Paragraphs 1 and 2 above, or their grantee or grantees, if any has failed to make the installment payment due on June 1, 2007, and all payments becoming due thereafter. Therefore the loan has been in default since July 1, 2007, and said payments have remained unpaid for more than 30 days from the date of the mailing of the Notice of Default to the obligor, and are still unpaid. Plaintiff herein, by reason of said default, elected that the whole unpaid principal sum due on the aforesaid obligation and mortgage referred to in Paragraphs 1 and 2 above, with all interest and advances made, shall now be due.

9.     Any interest or lien on the premises described in paragraph 3 above which the mortgagor named in paragraph 2 above or the grantees of said mortgagor, or which subsequent encumbrancer or lien holders, if any, named in paragraph 6 above, or tenants  named in paragraph 6, who are the defendants herein have or claim to have in or upon the aforesaid mortgage premises or some part thereof are subject and subordinate to the lien of the mortgage set forth in paragraph 2 above, which mortgage is held by the plaintiff herein.

10.    Notice of Intention to Foreclose was sent in compliance with the Fair Foreclosure Act more than 31 days prior to filing of the complaint.

WHEREFORE, the plaintiff and /or its assignee demand judgment:

a.    Fixing the amount due on the mortgage referred to in Paragraph 2.
b.    Barring and foreclosing all of the defendants of all equity and redemption in and to the aforesaid lands;
c.    Directing that plaintiff be paid the amount due to plaintiff as provided in the mortgage set forth in paragraph 2, together with interest and costs.
d.    Adjudging that the lands described in paragraph 3 be sold according to law to satisfy the amount due to plaintiff on the mortgage set forth in paragraph 2 above;
e.    Appointing a rent receiver of rents, issues and profits of the lands described in paragraph 3.

### SECOND COUNT

1.     By the terms of the obligation and mortgage referred to in paragraphs 1 and 2 of the First Count, the plaintiff is entitled to possession of the tract of land with the appurtenances thereon as more described in Paragraph 3 of the First Count of the Complaint.

2.     On August 1, 2007, the plaintiff and/or its assignees, by the terms of the obligation and mortgage, became entitled to possession of the premises described in Paragraph 3 of the First Count of this complaint, except as those tenants protected under N.J.S.A. 2A: 18-61.1.

3.      The defendants named in Paragraphs 1, 2 and 6 of this complaint have or may have certain rights in the premises in paragraph 3 of the First Count of the Complaint by reason thereof and have deprived the plaintiff herein of the possession of the premises aforesaid.

WHEREFORE, the plaintiff or its assignees or the successful bidder at the Sheriff's sale demands judgment against the defendants except those persons protected under N.J.S.A. 2A: 18-61.1, et seq.;

a.      For possession of said premises;
b.      For damages for mesne profits;
c.      For costs.

Dated: December 12, 2007

ESCHEN, FRENKEL, WEISMAN & GORDON, LLP
Attorney for Plaintiff

By: Jennifer T. Pelkowsky, Esq.

CERTIFICATION

I hereby certify that this matter is not the subject of any other Court proceeding or arbitration and that to the best of my belief, no other parties need be joined and that no other proceedings are contemplated, except that the Plaintiff reserves and preserves its right to institute a deficiency proceeding consistent with the appropriate New Jersey Statutes.

Dated: December 12, 2007

Jennifer T. Pelkowsky

## CERTIFICATION PURSUANT TO R.4:64-1(a)

Jennifer T. Pelkowsky, Esq., being of full age, hereby certifies as follows:

1. I am an attorney at law in the State of New Jersey and I represent the plaintiff in the within Mortgage Foreclosure action.

2. In preparing the within Mortgage Foreclosure complaint, I received and reviewed a title search of the public record for the real property described in the Mortgage Foreclosure complaint.

3. I certify that the foregoing statements made by me are true and accurate. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Dated: December 12, 2007

_____
Jennifer T. Pelkowsky, Esq.

## SCHEDULE A

THE PROPERTY CONSISTS OF THE LAND AND ALL THE BUILDINGS AND
STRUCTURES ON THE LAND IN THE , COUNTY OF  Morris, AND STATE OF NEW
JERSEY.  THE LEGAL DESCRIPTION IS:

Chicago Title Insurance Company

COMMITMENT

SCHEDULE A

Commitment No.  10182

All that certain lot, tract, or parcel of land situate, lying and being in the Borough of Madison, in the County of
Morris and the State of New Jersey and being known as Lots 25 and 26 as shown on a certain map entitled "Map No.
1 Property of Luke C. Dehart Est., Madison, Morris co., N.J." dated August 1922 and filed in the Morris County
Clerk's Office on March 24, 1923 as Map No. 604, Case C, being also known and designated as lot 25 in Block
1001 as shown Sheet No. 10 on the Official Tax Map of the Borough of Madison and being more particularly
bounded and described as follows, to wit:

BEGINNING at a point at the intersection of the Northeasterly line of Walnut Street (50' ROW) with the
Southwesterly line of Dehart Place (50' ROW) and RUNNING:

1.   NORTH 59 degrees 33 minutes 00 seconds EAST, 150.00' along the said Southwesterly line of Dehart
     Place, THENCE

2.   SOUTH 30 degrees 27 minutes 00 seconds EAST, 100.00'; THENCE

3.   SOUTH 59 degrees 33 minutes 00 seconds WEST, 150.00' to an iron pipe found in the said Northeasterly
     line of Walnut Street; THENCE

4.   NORTH 30 degrees 01 minutes 00 seconds WEST, 100.00' along the same, to the Point of BEGINNING.

The above description was drawn in accordance with a survey made by Fletcher Engineering, Inc. dated August 13,
2005.

FOR INFORMATION PURPOSES ONLY:  Also known as lot 25 in block 1001 on the tax map of the Borough of
Madison, Morris County, New Jersey.

Being commonly known as 11 Walnut Street, Madison, New Jersey

Being designated on the tax maps of the County of Morris as Block 1001, Lot 25

PQ

**NOTICE REQUIRED BY THE**
**FAIR DEBT COLLECTION PRACTICES ACT (THE ACT)**
**15 U.S.C. 1601 AS AMENDED**

1.      The original amount of the debt is stated in Paragraph One of the attached complaint.  You were provided with the amount necessary to reinstate your account in the Notice of Intention pursuant to the Fair Foreclosure Act.  Current amounts to payoff your debt or reinstate your account are available upon written request from this office.

2      The plaintiff who is named in the complaint is the creditor to whom the debt is owed.

3.      The debt described in the complaint attached hereto and evidenced by the mortgage note will be assumed to be valid by the creditor's law firm unless the debtors, within thirty (30) days after receipt of this notice, disputes the validity of the debt or some portion of the debt.  A copy of the note and/or mortgage is available to you if you contact this firm.

4.      If the debtor notifies the creditor's law firm within thirty (30) days of the receipt of this notice that the debt or a portion thereof is disputed, the creditor's law firm will obtain verification of the debt and a copy of the verification will be mailed to the debtor by the creditor's law firm.

5.      If the creditor who is named as plaintiff in the attached summons and complaint is not the original creditor, and if the debtor makes request to the creditor's law firm within thirty (30) days from the receipt of this notice, the name and address of the original creditor will be mailed to the debtor by the creditor's law firm.

6.      Requests should be addressed to:  Fair Debt Collection Clerk, ESCHEN, FRENKEL, WEISMAN & GORDON, LLP, 80 Main Street, 5th Floor, West Orange, NJ 07052.

**NOTICE: THIS IS AN ATTEMPT TO COLLECT A DEBT.**
**ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

F

CONTESTED
OFFICE OF FORECLOSURE

REC'D & FILED
SUPERIOR COURT
OF NEW JERSEY
FEB 0 8 2008

# 3059

SUPERIOR COURT OF N.J.
B.A.I.D.
FEB 22 2008

$ 1350
CK

GORDON A. WASHINGTON
17 NORTH DEAN STREET
ENGLEWOOD, NEW JERSEY 07631
Telephone: (201) 227-9100
Pro Se

GENERAL EQUITY UNIT

THE BANK OF NEW YORK for the
benefit of Certificate-holders, CWABS
Asset-Backed Certificate Series 2007-5

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: MORRIS COUNTY

DOCKET NO.: F-34837-07

*Plaintiff*

Civil Action

– Vs. –

**ANSWER TO COMPLAINT**

GORDON A. WASHINGTON, et al.

*Defendants*

Gordon A. Washington, by way of answer to the complaint filed by the Plaintiff, says as follows:

## AS TO THE FIRST COUNT

1.    Admitted.

2.    Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

3.    Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

4.    Defendant does not have sufficient information upon which to form a belief as to the truth of the allegations contained in this paragraph and leaves Plaintiff to its proofs.

5.      Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

6.      Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

7.      Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

8.      Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

9.      Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

10.    Denied.

### AS TO THE SECOND COUNT

1.      Defendant repeats and reiterates that answers to the allegations set forth as to the First Count as if set forth herein verbatim and at length.  Denied.

2.      Denied.

3.      Defendant neither admits nor denies the allegations contained in this paragraph and leaves Plaintiff to its proofs.

WHEREFORE, Defendant, Gordon A. Washington, demands judgment dismissing the complaint with prejudice and costs

February 5, 2008

Gordon A. Washington

2

A121

law office of
Alan Washigh
?

H

Docket No. F- **34837-07**

Office of Foreclosure
Hughes Justice Complex
PO Box 971
Trenton, NJ 08625

## RETURN NOTICE

Your papers cannot be processed at this time because of deficiencies noted below. Please resubmit all items requested below, along with all papers returned herewith and this notice to the above address.

1. Prior lien holders are not proper parties defendant to a mortgage foreclosure action (except for judgments prior to a purchase money mortgage being foreclosed). See 30 N.J. Prac. § 29.13; N.J.S.A. 46:9-8.
2. Municipal tax liens cannot be extinguished in a mortgage foreclosure action. N.J.S.A. 54:5-9
3. Submit dismissal as to defendant(s)_____
4. Fictitiously named defendants are not designated in compliance with R.4:26-5.
5. Order Correcting Clerical Error/Defendant's Name must be submitted to this office. R. 1:34-6(l), (2).
6. Guardian ad litem must be appointed for infant or incompetent defendant. R.4:43-2(b); R.4:64-1 (f).
7. No proof of service on file as to_____
8. Service on county prosecutor required where State of New Jersey made a party defendant because of recognizance. R.4:4-(a)(7).
9. Affidavit of inquiry required for substituted service. R.4:4-3; R4:4-4(b); R.4:4-5; R.4:4-7.
   A. Supply postal service verification that out-of-state defendant resides address mailed to.
10. Proceed before the Chancery Judge of the vicinage for relief requested.
11. 60 day summons required for service on the United States Of America and the State of New Jersey 28 U.S.C. § 2410(b). R.4:64-1(g). 30A NJ Prac. § 30.21
12. Dual service on U.S.A. required. See requirements in 28 U.S.C.A. 24-10 (b)
13. Acknowledgment of service by non-attorney must be notarized. R.4:4-6.
14. Request and affidavit of default must be filed as to_____. R.4:43-1.
15. Default period has expired as to_____. Submit order to enter default to this office with notice to defaulting defendant(s). R.4:43-1; R.1:6-3.
16. Judgment period has expired. Notice of motion for judgment must be given to all parties in default. Submit notice and proof of service of the notice. R.4:43-2(d);R. 1:6-3.
17. Notice of motion for judgment must be given to all appearing parties (even if answer stricken). Submit notice and proof of service of notice. R.4:64-1(b).
18. 33 days notice of motion for judgment must be given when there are other encumbrances. R.4:64-1(30days) and R.1:3-3 (additional 3 days for mailed service of notice).
19. Default premature. Time to answer had not expired as of certification date. R.4:6-1(a).
20. A contested pleading has been filed. This office has no jurisdiction to proceed unless contest is removed. R.1:34-6; R.4:64-1.
21. Incorrect form of final judgment and/or writ of execution submitted. See 30B NJ Prac. Appendix G, pgs 450-458. Pg. 465
22. Incorrect form of proof of amount due. See 30 N.J. Prac. 597-98;30 N.J. Prac. § 253 (Supp.) ¶.1, ¶2.
    A. Must have schedule in form shown on 30B NJ Prac., Pg. 441.
    B. Late charges—specify amount per month, # of months and date of last charge (which may not be beyond date complaint filed).
    C. Late charges may not be based on percentage of total principle balance.
    D. Itemize escrow advances; only advances will be reimbursed, but not escrow deficiency.
    E. Figures on proof do not add up.
    F. Principal balance may not exceed face amount of mortgage unless specifically provided for in note or mortgage.
    G. Interest appears high – please review and correct or explain.
    H. Attorney fee in lien claim is too high.
    I. Default rate of interest is too high.
23. One attorney certified copy of each of the following must be submitted: bond or note, recorded mortgage, assignment(s), if any.
24. Condominium association liens can only be foreclosed for exact monetary amount set forth in recorded claim of lien plus interest. See 30 NJ Prac. § 26.7, page 437; N.J.S.A. 46:8B-21 (a)
25. Submit proof that bankruptcy stay has been lifted.
26. All papers to be filed must be in pleading form. R.1:4-1.
27. Failure to comply with Fair Foreclosure Act (L. 1995,C.244) provision(s). See attached.
28. Substitution of attorney required.
29. Certification is postdated and is therefore a false oath.
30. Need consent of answering party.
31. If an original of any above item has been previously filed with Clerk, please submit a copy of your filed copy.

**REMARKS** please provide a breakdown of the $18,991.22 claimed for taxes and the $11,236.52 claimed for home owners insurance.

DATED: 10/28/10
Larry Scott

A124

SUPERIOR COURT CLERK'S OFFICE
FORECLOSURE PROCESSING SERVICES
PO BOX 971
TRENTON, NJ  08625-0971          FORECLOSURE DISMISSAL NOTICE


          DATE: MAY 31, 2013
          RE: BANK OF NEW YORK VS WASHINGTON
          DOCKET: SWC F -034837-07
          PARTY: BANK OF NEW YORK

PLEASE TAKE NOTICE THAT ON JUNE 30, 2013 (30 DAYS FROM THE DATE OF THIS NOTICE),
THE CLERK WILL DISMISS THE ABOVE CASE FOR LACK OF PROSECUTION WITHOUT PREJUDICE
PURSUANT TO RULE 4:64-8 UNLESS ONE OF THE FOLLOWING PAPERS IS FILED:

  > AMENDED COMPLAINT
  > REQUEST FOR DEFAULT OR MOTION TO ENTER DEFAULT OUT OF TIME
  > MOTION TO: STRIKE ANSWER, ENTER JUDGMENT OR FOR SUMMARY JUDGMENT
  > PROOF OF BANKRUPTCY FILING OR OTHER CONDITION THAT STAYS THE CASE
  > AFFIDAVIT OR CERTIFICATION ASSERTING THAT FAILURE TO FILE OR TAKE THE NEXT
    REQUIRED ACTION IS DUE TO EXCEPTIONAL CIRCUMSTANCES

FOR FURTHER INFORMATION, PLEASE CALL (609) 421-6100 BETWEEN
8:30 AM - 4:30 PM OR SCCO.MAILBOX@JUDICIARY.STATE.NJ.US.          JENNIFER T PELKOWSKY
                              FRENKEL LAMBERT WEISS WEISMA G
                              80 MAIN ST
ELISABETH ANN STROM, ESQ.                4TH FL  SUITE 460
ACTING CLERK OF SUPERIOR COURT             WEST ORANGE NJ 07052

A126

J

RECEIVED   FRIDAY 6/21/2013 2:29:38 PM 10602065

FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP
80 Main Street, Suite 460
West Orange, NJ 07052
(973) 325-8800
Attorney for Plaintiff
Our File No. 03-004870-F00

| | |
|---|---|
| The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5, | Superior Court of New Jersey Chancery Division Morris County |
| Plaintiff, | Civil Action |
| vs. | Docket No.: F-034837-07 |
| Gordon A Washington, | **CERTIFICATION OF COUNSEL IN RESPONSE TO COURT'S NOTICE OF INTENT TO DISMISS FORECLOSURE FOR LACK OF PROSECUTION UNDER RULE 4:64-8** |
| Defendants. | |

John Caporale, Esq. does hereby certify:

1.    I am an attorney-at-law in the State of New Jersey and an associate with the firm of FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP, attorneys for Bank of America, N.A. ("BANA"), servicer for Plaintiff in the action appearing in the caption hereof and am familiar with the proceedings in the above matter.

2.    BANA is currently engaged in filing an Order to Show Cause to seek permission from the Court to issue a curative Notice of Intention to Foreclose.

3.    BANA has been proceeding with this action to the best of its efforts and intends to proceed diligently going forward.

4.    Accordingly, this office would respectfully request that the Court withdraw its notice to dismiss for lack of prosecution and permit this action to continue, due to the aforementioned exceptional circumstances.

A128

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP
Attorneys for Plaintiff

Date: June 21, 2013                    /s/ John Caporale
                                       John Caporale, Esq.

K

SUPERIOR COURT CLERK'S OFFICE
FORECLOSURE PROCESSING SERVICES
PO BOX 971
TRENTON, NJ 08625-0971
FORECLOSURE DISMISSAL ORDER

DATE: JULY 05, 2013
RE: BANK OF NEW YORK VS WASHINGTON
DOCKET: SWC F -034837-07
PARTY: GORDON A WASHINGTON

IT IS HEREBY ORDERED THAT PURSUANT TO RULE 4:64-8, THE ABOVE-CAPTIONED MATTER HAS BEEN
DISMISSED WITHOUT PREJUDICE FOR LACK OF PROSECUTION.  REINSTATEMENT OF THE MATTER AFTER
DISMISSAL MAY BE REQUESTED BY A MOTION FOR GOOD CAUSE.

FOR FURTHER INFORMATION, PLEASE CALL (609) 421-6100 BETWEEN THE HOURS OF
8:30 AM – 4:30 PM OR SCCO.MAILBOX@JUDICIARY.STATE.NJ.US.


ELISABETH ANN STROM, ESQ.
_____

ACTING CLERK OF SUPERIOR COURT

GORDON A WASHINGTON

17 NORTH DEAN ST
ENGLEWOOD NJ 07631

A132

L

RECORD AND RETURN TO:
Fortune Title Agency, Inc.
39 Woodland Road
Roseland, NJ 07068

# ASSIGNMENT OF MORTGAGE

File Number: 4870

The Assignor Mortgage Electronic Registration System Inc. as Nominee for America's Wholesale Lender having offices at 4500 Park Granada MSN# SVB-314, Calabasas CA 91302, referred to as the Assignor, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of whereof is hereby acknowledged, hereby assigns to

The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5

having offices at c/o 7105 Corporate Drive, Plano, TX 75024, referred to as the Assignee, a certain mortgage dated February 27, 2007, made by Gordon A. Washington, referred to as the Mortgagor.

The property covered by the Mortgage is located in the Borough of Madison, Morris County, State of New Jersey and is commonly known as 11 Walnut Street, Madison, New Jersey. The Mortgage was recorded on March 8, 2007 in the office of the Clerk or Register of Morris County, New Jersey in Mortgage Book 20764 at Page 0171, et seq. The original amount of the mortgage was $520,000.00.

The effective date of the Assignment of Mortgage is 11/12/2007, which is the date that the Mortgage was transferred from the Assignee to the Assignor.

Together with the Bond, Note or other obligation described in the Mortgage, and the money due and to become due thereon, with the interest. To have and to hold the same unto the Assignee forever, subject only to all the provisions contained in the Mortgage and the Bond, Note or other obligation. And the Assignor hereby constitutes and appoints the Assignee as the Assignor's true and lawful attorney, irrevocable in law or in equity, in the Assignor's name, place and stead but at the Assignee's costs and expense, to have, use and take all lawful ways and means for the recovery of all the said money and interest; and in case of payment, to discharge the same as fully as the Assignor might or could do if this Assignment was not made. And the Assignor covenants that there is now due and owing upon the Mortgage and the Bond, Note or other obligation secured thereby, the sum of $519,132.54 Dollars principal with interest thereon to be computed at the rate of 8.950 percent per year from June 1, 2007, along with such other sums as may be collectible, and that there are no set-offs, counterclaims or defenses against the Mortgage or the Bond, Note or other obligation, in law or in equity, nor have there been any modifications or other changes in the original terms thereof, other than as stated in this Assignment.

In all references in this Assignment to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.

Book21153/Page683

**SIGNATURES.**   I agree to the terms of this Assignment.  If the Assignor is a Corporation, its proper officers and its corporate seal is affixed.

Attested by:

Mortgage Electronic Registration System Inc.
as Nominee for America's Wholesale Lender

By: _____
Title:   CARRIE A HOOVER
         1ST VICE PRESIDENT

By: _____ (seal)
Title:  M. KELLY MICHIE   1ST VICE PRESIDENT

STATE OF **TEXAS**           , COUNTY OF **COLLIN**           SS.:
   I CERTIFY that on        11/12/2007
                    M. KELLY MICHIE,
personally came before me, and this person acknowledged under oath, to my satisfaction, that
   (a) this person is the 1ST V. P. President of Mortgage Electronic Registration System Inc.
as Nominee for America's Wholesale Lender  the corporation named in this document;
   (b) this person is the attesting witness to the signing of this document by the proper corporate
officer who is ___CARRIE A HOOVER___, the ___1ST VICE PRESIDENT___ of the corporation;
   (c) this document was signed and delivered by the corporation as its voluntary act  duly
authorized by a proper resolution of its Board of Directors
   (d) this person knows the proper seal of the corporation which was affixed to this document;
and
   (e) this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
11/12/2007

NOTARY PUBLIC

JORGE VARGAS
My Commission Expires
May 6, 2010

**RECORD AND RETURN TO:**
Eschen, Frenkel & Weisman, LLP
80 Main Street
West Orange, New Jersey 07052
File Number:  4870

Book21153/Page684

M

**FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP**
80 Main Street, Suite 460
West Orange, NJ 07052
(973) 325-8800
Attorneys for Plaintiff
Our File No.: 03-004870-F00

MORRIS COUNTY, NEW JERSEY
JOAN BRAMHALL, COUNTY CLERK
LPF-OR BOOK 22249 PG 0459
RECORDED 02/07/2013 14:47:40
FILE NUMBER 2013011584
RCPT #: 8303281 RECD BY: ann
RECORDING FEES   40.00
MARGINAL NOTATION CO 5.00 ST 5.00

| | |
|---|---|
| The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5; | Superior Court of New Jersey CHANCERY DIVISION Morris County |
| Plaintiff, | Civil Action |
| v. | Docket No.: F-34837-07 |
| Gordon A Washington; | **NOTICE OF LIS PENDENS** |
| Defendants. | |

TO WHOM IT MAY CONCERN:

NOTICE IS HEREBY GIVEN OF THE COMMENCEMENT AND PENDENCY OF THE ABOVE ENTITLED CIVIL ACTION, THE GENERAL OBJECTS OF WHICH ARE:

1. To foreclose the following mortgage:

Mortgage made by Gordon A. Washington to Mortgage Electronic Registration System Inc. as Nominee for America;s Wholesale Lender, dated February 27, 2007, and recorded on March 8, 2007, in Mortgage Book 20764 for Morris County, at page 0171, et seq. Said Mortgage has been assigned from Mortgage Electronic Registration System Inc. as Nominee for America; Wholesale Lender to The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5.

2. To recover possession of the land described in Schedule A attached.

3. The Complaint was filed in the Superior Court of New Jersey on December 14, 2007.

**FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP**
Attorneys for Plaintiff

Date: 02/05/2013     By: _____

Dori L. Scovish, Esq.

Book22249/Page459

SCHEDULE A

THE PROPERTY CONSISTS OF THE LAND AND ALL THE BUILDINGS AND
STRUCTURES ON THE LAND IN THE , COUNTY OF  Morris, AND STATE OF NEW
JERSEY.  THE LEGAL DESCRIPTION IS:



Being commonly known as 11 Walnut Street, Madison, New Jersey

Being designated on the tax maps of the County of Morris as Block 1001, Lot 25

Book22249/Page460

N

FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP
80 Main Street, Suite 460
West Orange, NJ 07052
(973) 325-8800
Attorneys for Plaintiff,
The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed
Certificates Series 2007-5
Our File No. 03-004870-F00

| The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5, | Superior Court of New Jersey Chancery Division Morris County |
|---|---|
| Plaintiff, | Civil Action |
| vs. | Docket No.: F-034837-07 |
| Gordon A Washington | **DISCHARGE OF LIS PENDENS** |
| Defendants, | |

TO CLERK / REGISTER OF THE COUNTY OF Morris:

THIS IS TO CERTIFY that, WHEREAS a certain Lis Pendens was filed on February 7, 2013

in the Office of the Clerk/Register of Morris County in the above entitled action and recorded in your

office in Book 22249 at Page 0459, et seq. regarding a Mortgage dated February 27, 2007, and

recorded on March 8, 2007, in Mortgage Book 20764 for Morris County, at page 0171.

WHEREAS the matters and things in dispute have been amicably adjusted between the

parties, and, therefore, the said Lis Pendens should be discharged of record;

MORRIS COUNTY, NEW JERSEY
JOAN BRAMHALL, COUNTY CLERK
DLP-DR BOOK 22400 PG 1797
RECORDED 08/21/2013 11:31:40
FILE NUMBER 2013068174
RCPT #: 896299 RECD BY: ABedkowski
RECORDING FEES $40.00
MARGINAL NOTATION CO 10.00 ST 10.00

Book22400/Page1797

NOW, THEREFORE, the Clerk / Register of Morris is hereby authorized, empowered and
directed to discharge, cancel and make null and void the said Lis Pendens, and for his so doing, this
shall be his sufficient Warrant.

WITNESS my hand and seal this 9th day of August, 2013.

Signed, Sealed and Delivered       FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP
In the Presence of                 Attorneys for Plaintiff

                                   By: John Caporale, Esq.

State of New Jersey
                        ss:
County of Essex

BE IT REMEMBERED that on August 9, 2013   John Caporale, Esq. personally
appeared, an associate of the firm of FRENKEL LAMBERT WEISS WEISMAN & GORDON, LLP,
who, I am satisfied, is the person mentioned in the within instrument, and thereupon he
acknowledged that he signed, sealed and delivered the same as his act and deed for the uses and
purposes therein expressed.

                                   KARINA BONIFACIO
                                   NOTARY PUBLIC OF NEW JERSEY
                                   My Commission Expires 9/23/2016

Book22400/Page1798

O

IN THE MATTER OF RESIDENTIAL MORTGAGE

FORECLOSURE PLEADING AND DOCUMENT

IRREGULARITIES

Administrative Order 01-2010

ADMINISTRATIVE ORDER DIRECTING
SUBMISSION OF INFORMATION FROM
RESIDENTIAL MORTGAGE FORECLOSURE
PLAINTIFFS CONCERNING THEIR DOCUMENT
EXECUTION PRACTICES TO A SPECIAL
MASTER

To:    Foreclosure Plaintiffs Filing 200 or more residential mortgage
foreclosure actions in 2010:

AURORA LOAN SERVICES
BANK OF NEW YORK MELLON
BAYVIEW LOAN SERVICING, LLC
BENEFICIAL NEW JERSEY
DEUTSCHE BANK, N.A.
FEDERAL HOME LOAN MORTGAGE
FEDERAL NATIONAL MORTGAGE ASSOCIATION
HOUSEHOLD FINANCE CO
HSBC BANK USA, N.A.
HSBC MORTGAGE CORPORATION
HUDSON CITY SAVINGS
METLIFE HOME LOANS

MIDFIRST BANK
MORTGAGE ELECTRONIC REGISTRATION SYSTEM
NATIONSTAR MORTGAGE
NJ HOUSING & MORTGAGE FINANCE AGENCY
PHH MORTGAGE CORP
PNC BANK
SOVEREIGN BANK
SUNTRUST MORTGAGE INC.
TD BANK, N.A.
THE BANK OF NEW YORK
US BANK, N.A.
WACHOVIA BANK N.A.

This Administrative Order regarding uncontested residential mortgage

foreclosure matters is issued by the Acting Administrative Director of the Courts in the

performance of his supervisory responsibilities over the Office of Foreclosure in the

Administrative Office of the Courts as provided by the Rules of Court (as set forth

below), in accordance with the Supreme Court's Order of December 20, 2010, adopting

emergent amendments to the Rules of Court, and the accompanying Notice to the Bar,

in coordination with the December 20, 2010 order to show cause issued by Superior

Court Judge Mary Jacobson regarding certain uncontested residential mortgage

1

A146

foreclosures.  The Administrative Order is in response to the request by the Chief

Justice for an examination into the foreclosure document preparation and filing

practices.

This order addresses several steps taken by the Judiciary today in an effort to

ensure the integrity of the residential mortgage foreclosure process:  (1) Judge

Jacobson's order directing six lenders and service providers who have been implicated

in irregularities in connection with their foreclosure practices to show cause why the

processing of uncontested residential mortgage foreclosure actions they have filed

should not be suspended; (2) administrative action directing twenty-four lenders and

service providers who have filed more than 200 residential foreclosure actions in 2010

to demonstrate affirmatively that there are no irregularities in their handling of

foreclosure proceedings, via submissions to retired Superior Court Judge Walter R.

Barisonek, who has been recalled to temporary judicial service and assigned as a

Special Master; and (3) the adoption of amendments to the Rules of Court and a Notice

to the Bar which require plaintiff's counsel in all residential foreclosure actions to file

certifications confirming that they have communicated with plaintiff's employees who

have (a) personally reviewed documents and (b) confirmed the accuracy of all court

filings, and which remind all counsel of their obligations under the New Jersey Rules of

Professional Conduct.

Foreclosure rates are climbing rapidly across the nation, and New Jersey is no

exception.  In recent years, New Jersey's courts have witnessed an enormous

expansion in foreclosure filings.  In court year 2006, plaintiffs filed 21,752 foreclosure

2

actions; by court year 2010, that number grew to 65,222 foreclosure filings. Thus, in the past five years, the annual rate of foreclosure filings in this State has nearly tripled.

In court year 2010, approximately 11,500 answers were filed in foreclosure actions. Of those, answers in only about 4,500 cases – that is, in just six percent of all foreclosure actions – were deemed to be contested. Thus, 94 percent of foreclosure cases proceed in the absence of any meaningful adversarial proceeding. The significance of this disparity is even more striking because many of the contested proceedings are defended pro se. Because these actions frequently lack an aggressive defense, the Office of Foreclosure and our General Equity judges are tasked with the responsibility of ensuring that justice is done for absent and pro se parties.

On November 4, 2010, the Supreme Court received a detailed report prepared by Legal Services of New Jersey, with supporting materials, alleging industry-wide deficiencies in foreclosure filings. Serious questions have surfaced about the accuracy of documents submitted to courts by lenders and service-providers in support of foreclosure requests.

In New Jersey, proceedings in state and bankruptcy courts have revealed instances of pervasive "robo-signing"[1] in foreclosure and bankruptcy filings. In In re Rivera, 342 B.R. 435 (Bankr. D.N.J. 2006), EverHome Mortgage Co.[2] (EverHome) hired

---

[1] "Robo-signers" are mortgage lender/servicer employees who sign hundreds -- in some cases thousands -- of affidavits submitted in support of foreclosure claims without any personal knowledge of the information contained in the affidavits. "Robo-signing" may also refer to improper notarizing practices or document backdating.

[2] Formerly known as Alliance Mortgage Co. In re Rivera, 342 B.R. 435, 442 (Bankr. D.N.J. 2006).

3

A148

First American National Default Outsourcing, LLC[3] (FANDO) to process foreclosure and

bankruptcy documents.[4]  Amirah Shahied was a FANDO employee whose signature

appeared on numerous foreclosure and bankruptcy certifications alleging debtor

default.[5]  Shahied admitted to receiving stacks of signature pages -- detached from any

corresponding certifications -- and signing them in bulk.[6]  Not only did the New Jersey

law firm representing EverHome fail to verify whether Shahied had personal knowledge

of the facts relevant to each case, the firm's attorneys filed at least 251 certifications in

Shahied's name after Shahied's FANDO employment terminated.[7]  Firm attorneys

testified that for at least four years, they knowingly affixed pre-signed documents

prepared by the outsourcing company to certifications alleging debtor default.[8]

      In state court proceedings, Thomas Strain, an employee of a servicing company

associated with the New Jersey and Pennsylvania law firm of Phelan, Hallinan &

Schmieg, LLP (Phelan), admitted in a deposition to notarizing approximately fifty

foreclosure-related documents per day, often outside the signer's presence.[9]  After New

Jersey Chancery Division judges expressed concerns related to Phelan's mortgage

---

[3] In 2004, First American National Default Outsourcing, LLC purchased another
outsourcing company with which the firm worked called LOGS Financial Services, Inc.
Id. at 439.
[4] Id. at 443–44.
[5] Ib. at 443.
[6] Id. at 456-57.
[7] Id. at 444, 456-57.
[8] See id. at 446-55.
[9] See Deposition of Thomas P. Strain at 8, 22,  Bank of New York v. Ukpe, No. F-
10209-08 (Ch. Div. Dec. 18, 2008).

assignment practices, Phelan spent $175,000 to redo approximately 3,000 assignments that Strain had notarized.[10]

Questions have also arisen as to whether plaintiffs filing foreclosure actions actually own the underlying mortgages.  In a recent case, a New Jersey equity court found that a plaintiff attempting to foreclose a mortgage, which had been transferred through a series of securitizations, never obtained actual title to the underlying mortgage.[11]  Confounding the problem, the court found that plaintiff's filings made "no meaningful attempt to comply with the provision of R. 4:64-1(b)(1) by 'reciting all assignments in the chain of title.'"[12]

Nationally, six major institutions have recently been implicated in robo-signing activities: Bank of America; JPMorgan Chase; Citi Residential; GMAC (now Ally Financial); OneWest Bank; and Wells Fargo.

### Bank of America

As the robo-signing issue drew national attention, a deposition implicating Bank of America came to light, suggesting that Bank of America foreclosed on homes with the aid of documents executed en masse, in the absence of due diligence, by people with no knowledge of the information contained in the documents and no experience in the financial services or mortgage processing industry.[13]  On October 8, 2010, Bank of

---

[10] See Transcript of Oral Argument at 3-4, 16-17, U.S. Bank Nat'l Assoc. v. Sinchegarcia, No. F-18446-08 (Ch. Div. May 27, 2009).

[11] Bank of New York v. Raftogianis, ___ N.J. Super. ___, ___ (Ch. Div. 2010) (slip op. at 2).

[12] Id. at ___ (slip op. at 47, 48).

[13] A signer for Bank of America said in a deposition taken in Massachusetts that she signed about 400 documents per day.  See Deposition of Krystal Hall at 4-9 (Nov. 30, 2009)(provided by Legal Services of New Jersey).  See also Ariana Cha, Bank of America Joins J.P. Morgan Chase, Ally in Halting Foreclosures in 23 States, Wash. Post, Oct. 1, 2010, http://voices.washingtonpost.com/political-economy/2010/10/bank_of_america_halts_foreclos.html.

America Home Loans announced a freeze on foreclosure sales pending a review of foreclosure documents in all fifty states.[14] The moratorium began in the wake of increased scrutiny surrounding robo-signing practices, as numerous legislators and state prosecutors began investigating foreclosure documentation practices.[15] On October 18, 2010, Bank of America Home Loans announced that it would resubmit affidavits in 102,000 foreclosure actions in judicial foreclosure states and proceed to resume foreclosure sales.[16]

### J.P. Morgan Chase & Co.

Deposition testimony of an employee of Chase Home Finance, a division of J.P. Morgan Chase & Co., revealed that her team of eight people was responsible for signing affidavits, deeds, assignments, allonges, lost note affidavits, and lost mortgage affidavits.[17] Her team executed about 18,000 affidavits per month.[18] She did not personally review any information to determine the factual accuracy of documents she signed.[19] On September 30, 2010, J.P. Morgan Chase & Co. announced a suspension of foreclosures in all judicial foreclosure states, pending a review of procedures.[20] JPMorgan announced in early November that it would begin re-filing foreclosure

---

[14] Press Release, Bank of America Home Loans, Statement from Bank of America Home Loans (Oct. 8, 2010), available at
http://mediaroom.bankofamerica.com/phoenix.zhtml?c=234503&p=irol-newsArticle&ID=1480657.
[15] See Dan Fitzpatrick, Damian Paletta, & Robin Sidel, BofA Halts Foreclosures, Wall St. J., Oct. 9, 2010, at A1.
[16] Press Release, Bank of America Home Loans, Statement from Bank of America Home Loans (Oct. 18, 2010), available at
http://mediaroom.bankofamerica.com/phoenix.zhtml?c=234503&p=irol-newsArticle&ID=1483909.
[17] Deposition of Beth Ann Cottrell at 6, Chase Home Finance, LLC v. Koren, No. 50-2008-CA-016857 (Fla. Cir. Ct. May 17, 2010).
[18] Ibid.
[19] Id. at 7-11, 35-36.
[20] David Streitfeld, JPMorgan Suspending Foreclosures, N.Y. Times, Sept. 30, 2010, at B1.

6

documents within a few weeks; that estimate has since been revised and re-filing will not be wholly underway for several months.[21]

### Citi Residential Lending, Inc.

An individual employed by Nationwide Title Clearing, Inc., with signing authority for Citi Residential Lending, Inc., testified in a deposition that when he signed documents for Citi, he did not review them for substantive correctness.[22]  Indeed, he could not even explain what precisely an assignment of mortgage accomplishes.[23]  He had no prior background in the mortgage industry.[24]  Further, a second person with signing authority for Citi Residential Lending, Inc., testified that she never reviewed any books, records, or documents before signing affidavits and that she instead trusted the company's internal policies and procedures to ensure the accuracy of the information she signed.[25]  She signed several documents each day (in many instances without knowledge of what she was signing) and indicated that they were often notarized outside of her presence.[26]  On November 18, 2010, Harold Lewis, Managing Director of CitiMortgage, informed the House Financial Services Committee that Citi initiated a

---

[21] Dan Fitzpatrick & Ruth Simon, Foreclosure Restarts Limp Out of the Gate, Wall St. J., Nov. 27, 2010, at B1.
[22] Deposition of Bryan Jay Bly at 32-33, Deutsche Bank Nat'l Tr. Co. v. Hannah, No. 2009-CA-1920 (Fla. Cir. Ct. July 2, 2010).
[23] Id. at 39-40.
[24] Id. at 23-27.
[25] Deposition of Tamara Price at 7-8, 14-18, 24, Deutsche Bank Nat'l Tr. Co. v. Young, No. CA-2007-0114 (Fla. Cir. Ct. Apr. 21, 2008).
[26] Id. at 19-20.

7

A152

review of 10,000 affidavits for correctness and another 4,000 affidavits to ensure that a notary was present when they were signed.[27]

### GMAC, LLC (Ally Financial)

The team leader of the document execution unit of GMAC Mortgage, LLC (now Ally Financial Inc.) testified in a deposition that his team of thirteen people executed approximately 10,000 "affidavits and things of that nature" per month.[28] The signer assumed that these documents were checked for accuracy prior to their submission for signing, though he lacked actual personal knowledge of their contents.[29] Notarization often occurred at a different time and place than signing, and signers would sometimes not check that all listed exhibits were attached to the affidavits they signed.[30] In September, Ally Financial announced a temporary freeze on evictions in judicial foreclosure states, citing "an important but technical defect" in foreclosure filings.[31]

### OneWest Bank

In a deposition for a case where IndyMac Federal Bank, FSB (now OneWest Bank, FSB) serviced a mortgage owned by Deutsche Bank National Trust Company, a OneWest employee described the process of executing documents. She signed

---

[27] Robo-Signing, Chain of Title, Loss Mitigation and Other Issues in Mortgage Servicing: Hearing Before the H. Comm. on Financial Servs., 111th Cong. 3 (2010) (statement of Harold Lewis, Managing Director, CitiMortgage).
[28] Deposition of Jeffrey Stephan at 6-7, GMAC Mortgage, LLC v. Neu, No. 50-2008-CA-040805XXXX-MB (Fla Cir. Ct. Dec. 10, 2009) (hereinafter Stephan, Dec. 2009 Dep.). In subsequent deposition testimony, the witness revised his estimate and indicated that the number was 6,000 to 8,000 documents per month. Deposition of Jeffrey Stephan at 46-47, Fed. Nat'l Mortgage Ass'n v. Bradbury, No. BRI-RE-09-65 (Me. Dist. Ct. June 7, 2010) (hereinafter Stephan, June 2010 Dep.).
[29] E.g., Stephan, Dec. 2009 Dep., supra note 28, at 10, 12-13.
[30] Stephan, June 2010 Dep., supra note 28, at 54, 56; Stephan, Dec. 2009 Dep., supra note 28, at 13.
[31] Ariana Eunjung Cha, Ally Financial Suspends Evictions in 23 States, Wash. Post, Sept. 21, 2010, at A14.

approximately 750 documents per week, taking no more than thirty seconds to execute each document.[32] She did not personally check the accuracy of the documents and instead relied on others to check prior to signing.[33] Documents were notarized, and witnessed if necessary, some time after execution, outside of the employee's presence.[34]

Banks utilizing loan servicers have expressed concern. For example, Deutsche Bank has issued several letters and memoranda to its servicers expressing concern regarding allegations of potential defects in foreclosure practices, procedures, and/or documentation, and reminding the servicers to conduct themselves in accordance with applicable law.[35]

### Wells Fargo

Wells Fargo employees have admitted in depositions to signing documents without verifying the information contained therein. In one foreclosure case, a loan administration manager stated that he signed 50 to 150 documents per day, including assignments, declarations, and affidavits related to foreclosure.[36] He signed the documents without checking the information and relied on employees of another

---

[32] Deposition of Erica Johnson-Seck at 11-13, IndyMac Fed. Bank, FSB v. Machado, No. 50-2008-CA-037322XXXX MB AW (Fla. Cir. Ct. July 9, 2009).
[33] Id. at 14-16.
[34] Id. at 18, 21-22.
[35] See Memorandum from Deutsche Bank Nat'l Trust Co. and Deutsche Bank Trust Co. Ams. to Securitization Loan Servicers (Oct. 8, 2010); Memorandum from Deutsche Bank Nat'l Trust Co. and Deutsche Bank Trust Co. Ams. to Securitization Loan Servicers (Jul. 28, 2008); Memorandum from Deutsche Bank Nat'l Trust Co. and Deutsche Bank Trust Co. Ams. to Securitization Loan Servicers (Aug. 30, 2007).
[36] Deposition of H. John Kennerty at 9, Geline v. Nw. Tr. Servs., No. 09-2-46576-2-SEA (Wash. Super. Ct. May 20, 2010).

9

department to ensure the accuracy of the information.[37]  The manager and others with the same position could sign as a Vice President of Loan Documentation for purposes of executing loan documents but were not otherwise officers of the company.[38]

In another foreclosure case, an employee stated that she spent about two hours a day signing between 300 to 500 documents.[39]  She held the title of Vice President of Loan Documentation for the purpose of signing the documents.[40]  She did not review or have personal knowledge of the facts in the documents, relying on outside counsel or an employee in the foreclosure department for accuracy.[41]  Similarly, for a bankruptcy case in Texas, a Wells Fargo employee stated that she sometimes did not personally review documents before signing, relying on the expertise of the document preparer.[42]

On October 27, 2010, Wells Fargo stated in a press release that "[a]s part of the company's review of its foreclosure affidavit procedures, the company has identified instances where a final step in its processes relating to the execution of the foreclosure affidavits (including a final review of the affidavit, as well as some aspects of the notarization process) did not strictly adhere to the required procedures."[43]  Wells Fargo then announced that it would "submit supplemental affidavits for approximately 55,000 foreclosures" in all judicial foreclosure states.[44]

---

[37] Id. at 61-64, 69.
[38] Id. at 10-13.
[39] Deposition of Xee Moua at 29-31, Wells Fargo Bank, NA v. Stipek, No. 50-2009-CA-012434XXXXMB-AW (Fla. Cir. Ct. Mar. 9, 2010).
[40] Id. at 40.
[41] Id. at 31, 46-48.
[42] Deposition of Tamara Savery at 28-30, Guevara v. Wells Fargo Bank, N.A., No. 07-32604 (Bankr. N.D. Tex. July 15, 2009).
[43] Press Release, Wells Fargo & Company, Wells Fargo Provides Update on Foreclosure Affidavits and Mortgage Securitizations (Oct. 27, 2010).
[44] Ibid.

Others have raised questions about the entire industry's handling of foreclosure matters.

### Congressional Report

On November 16, 2010, the Congressional Oversight Panel released an in-depth report analyzing the recent robo-signing allegations.[45]  The Panel found that "[t]he foreclosure documentation irregularities unquestionably show a system riddled with errors."[46]   Legal consequences stemming from alleged irregularities

> range from minor, curable title defects for certain foreclosed homes in certain states to more serious consequences such as the unenforceability of foreclosure claims and other ownership rights that rely on the ability to establish clear title to real property, forced put-backs of defective mortgages to originators, and market upheaval.  The severity and likelihood of these various possible consequences depend on whether the irregularities are pervasive and when in the process they occurred.[47]

The Panel's report "emphasizes that mortgage lenders and securitization servicers should not undertake to foreclose on any homeowner unless they are able to do so in full compliance with applicable laws and their contractual agreements."[48]

### Congressional Testimony

Katherine Porter, Professor of Law at University of Iowa College of Law, testified that it is still unclear whether "the problems in mortgage servicing occur sporadically or

---

[45] Congressional Oversight Panel, November Oversight Report Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation (Nov. 16, 2010), available at http://cop.senate.gov/documents/cop-111610-report.pdf (submitted under § 125(b)(1) of Title 1 of the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343).
[46] Id. at 34.
[47] Id. at 14.
[48] Id. at 6.

11

are endemic."[49]  Yet, after conducting comprehensive studies, Professor Porter opined

"that the structure of the mortgage servicing industry and the lack of accountability by

financial institutions in the securitization process make it a fair inference that the

problems from flawed foreclosure are not isolated incidents."[50]  She suggested that

"[t]he key task going forward is to provide transparent measures of the depth of deficient

paperwork and to provide reliable monitoring of foreclosure processes."[51]

The Honorable F. Dana Winslow of the New York State Supreme Court,

testifying before the House of Representatives Committee on the Judiciary, stated that

there have been deficiencies in plaintiff mortgagees' proof of their rights to

foreclosure.[52]  Specifically, proof of standing to bring a foreclosure action has become a

large problem.  Mortgagees often fail to produce Notes or produce the wrong Notes.

There are often gaps in the chain of title.  The information provided by plaintiff

mortgagees often differs from the County Clerk's records.[53]  Doubt has also been cast

over the validity of signatures on assignments.

**Other States**

Other state courts and attorneys general have responded in kind.  The Chief

Administrative Judge of the Courts of the State of New York recently issued an order

directing attorneys filing residential foreclosure actions to certify that they have

---

[49] TARP Foreclosure Mitigation Programs: Hearing Before the Congressional Oversight
Panel 7 (2010) (statement of Katherine Porter, Professor of Law, University of Iowa
College of Law).
[50] Id. at 9.
[51] Id. at 14.
[52] Foreclosed Justice: Causes and Effects of the Foreclosure Crisis Before the H.
Comm. on the Judiciary, 111th Cong. (2010)(statement by F. Dana Winslow, Justice,
N.Y. State Supreme Court).
[53] Ibid.

12

personally reviewed the accuracy of all relevant documents and notarizations.[54]  At

least four state attorneys general and the attorney general for the District of Columbia

have required certain lenders, including those named in this Order, to prove the validity

of their residential mortgage foreclosure processes.[55]

### Authority

The Judiciary has an overriding concern about the integrity of the judicial

process.  Its obligation to administer justice extends to safeguarding that process, which

depends on the integrity of documents filed with the court.  The questionable practices

discussed above have the potential to call into question: (1) the validity of affidavits,

certifications, assignments, and other documents filed with the court; (2) the integrity of

residential mortgage foreclosure records; (3) the integrity of the judicial system as a

whole; and (4) the integrity of titles passed through purchase at foreclosure sale.

The Rules Governing the Courts of the State of New Jersey specifically authorize

the Administrative Director of the Courts, at the direction of the Chief Justice and the

Supreme Court, to promulgate and enforce rules and directives related to case

processing and such other matters as the Chief Justice and the Supreme Court direct.[56]

Further, by statute, the Administrative Director, at the direction of the Chief Justice, is

required to:

---

[54] New York State Unified Court System, Attorney Affirmation-Required in Residential Foreclosure Actions (Oct. 20, 2010).  Justice Schack of the Supreme Court, Kings County, New York has denied motions and dismissed foreclosure cases due to insufficiencies of the documents presented to the court.  See, e.g., Onewest Bank, F.S.B. v. Drayton, No. 15183/09 (N.Y. Sup. Ct. Oct. 21, 2010); HSBC Bank USA, N.A. v. Charlevagne, 872 N.Y.S.2d 691 (N.Y. Sup. Ct. 2008).
[55] See Congressional Oversight Panel, supra, note 49, at 44-46 (detailing actions taken in New York, California, Arizona, Ohio, the District of Columbia, and Connecticut).
[56] R. 1:33-3.

(a) Examine the administrative methods, systems and activities of the . . . employees of the courts and their offices and make recommendations to the Chief Justice with respect thereto.

(b) Examine the state of the dockets of the courts, secure information as to their needs for assistance, if any . . . .

(g) Examine, from time to time, the operation of the courts, investigate complaints with respect thereto, and formulate and submit to the chief justice recommendations for the improvement thereof.[57]

The Office of Foreclosure, an administrative unit within the Administrative Office of the Courts, is responsible for reviewing mortgage foreclosure complaints; reviewing uncontested tax, mortgage, condominium, and homeowner association liens and timeshare foreclosures; and recommending the entry of certain orders and judgments in uncontested foreclosure matters subject to the approval of a New Jersey Superior Court judge designated by the Chief Justice,[58] which judge historically has been the General Equity Judge in Mercer County, whose name appears on all judgments of foreclosure. The Office of Foreclosure provides the only review of uncontested foreclosure actions, and that review is restricted to making recommendations related to the matters listed in R. 1:34-6; the Office of Foreclosure is not empowered to make rulings.[59]

**Operative Provisions of this Order**

To protect the integrity of the process and ensure the veracity of filings with the court in foreclosure cases and pursuant to the authority of the Administrative Director of the Courts as set forth above, I announce the following steps:

---

[57] N.J.S.A. 2A:12-3.
[58] R. 1:34-6; R. 4:64-1; R. 4:64-7; First Union Nat'l Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 356 (2007).
[59] Wells Fargo Home Mortgage v. Stull, 378 N.J. Super. 449, 452 n.1 (App. Div. 2005).

1.    In a separate proceeding, Judge Mary C. Jacobson, Presiding Judge of the General Equity Division, Mercer County, has today issued an order directing the six lenders and service providers identified above, who have been implicated in irregularities in connection with their handling of foreclosure matters, to show cause why the processing of uncontested residential foreclosure matters they have filed should not be suspended.  In that order to show cause, Judge Jacobson indicates her intention to appoint a Special Master to inquire into the document preparation practices of those entities and to review any remediation plans they may be directed to submit.

2.    All other lenders and service providers who have filed more than 200 residential foreclosure actions in 2010 (as listed in the caption of this administrative order) are required, within 45 days, to demonstrate affirmatively that there are no irregularities in their handling of foreclosure proceedings.  To that end, they are to detail the processes they follow and, in particular, outline the manner in which documents are handled, reviewed, and verified, in order to demonstrate the reliability and accuracy of documents and other submissions to the court in foreclosure proceedings.  As appropriate, they should describe the practices of their subsidiaries and all related servicers and outsource firms acting on their behalf.  In addition, they should confirm their full compliance with the Rules of Court and applicable statutes.

3.    Those lenders and service providers described in the previous paragraph are to make submissions to retired Superior Court Judge Walter R. Barisonek, who by separate order effective January 3, 2011 has been recalled to temporary judicial service and assigned as Special Master, and who will be paid by the Judiciary.  Submissions should be in the form of affidavits or certifications.  On reviewing such submissions, the

15

Special Master may request additional information and take appropriate follow-up measures including taking live testimony and referring matters to Judge Jacobson for further review.

    4.     Foreclosure actions involving the institutions described in paragraph 2 above will continue to be processed by the Superior Court Clerk's Office and the Office of Foreclosure during the 45-day period during which materials are to be submitted.[60]  If the Special Master finds the submitted documents sufficient to establish that an institution has not engaged in irregular practices, then foreclosure actions involving those institutions will continue to be processed by the Superior Court Clerk's Office and the Office of Foreclosure in the normal course.

    If the Special Master finds the documents provided to be insufficient or finds they raise concerns that an institution has engaged in irregular practices, the Special Master may refer the matter to Judge Jacobson for appropriate action, including conducting a hearing and, depending on her findings, ordering the suspension of processing residential mortgage foreclosure actions involving a particular institution.

    All counsel are reminded of their obligations under the New Jersey Rules of Professional Conduct and that, pursuant to Rule 1:4-8(a)(3), an attorney's signature on any paper filed with a court "certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," all "factual allegations have evidentiary support, or, as to specifically identified allegations, they are either likely to have evidentiary support or they will be withdrawn or corrected if reasonable opportunity for further investigation or discovery indicates insufficient

---

[60] This paragraph does not apply to the parties who are the subject of Judge Jacobson's order.

evidentiary support." All counsel are further reminded that pursuant to Rule 4:64-1(b)(10), "if plaintiff is not the original mortgagee or original nominee mortgagee," the complaint must provide "the name of the original mortgagee and a recital of all assignments in the chain of title."

Further, I hereby direct that, pursuant to the Supreme Court's order of December 20, 2010 adopting emergent amendments to the Rules of Court and the Notice to the Bar accompanying that rule amendment order, plaintiff's counsel in all residential foreclosure actions shall file the following with the court: (1) an affidavit or certification executed by the attorney that the attorney has communicated with an employee or employees of the plaintiff who (a) personally reviewed documents for accuracy and (b) confirmed the accuracy of all court filings in the case to date; (2) the name(s), title(s), and responsibilities of the employee(s) of the plaintiff who provided this information to the attorney; and (3) an affidavit or certification executed by the attorney that all the filings in the case comport with all requirements of Rule 1:4-8(a).

The aforementioned shall be filed: (1) immediately upon the commencement of any new residential mortgage foreclosure action filed after the date of this order, as to the accuracy of the information contained in the complaint, as set forth in Rule 4:64-1(b)(1) through (13); (2) within 60 days of the date of this order in any residential foreclosure action today pending and awaiting judgment, as to the accuracy of the complaint and of any proofs submitted; (3) within 45 days of the date of this order in any residential foreclosure action in which judgment was entered but no sale of the property has yet occurred; and (4) with the motion to enter judgment in all future

residential foreclosure actions in which judgment is sought, as to the accuracy of any

proofs submitted pursuant to Rule 4:64-2.

/s/ Glenn A. Grant

Hon. Glenn A. Grant, J.A.D.
Acting Administrative Director of
the Courts

Date:   December 20, 2010

18

A163

P

# NOTICE TO THE BAR

## IN THE MATTER OF RESIDENTIAL MORTGAGE FORECLOSURE PLEADING AND DOCUMENT IRREGULARITIES (ADMINISTRATIVE ORDER 01-2010) – SUBMISSIONS TO THE SPECIAL MASTER

Administrative Order 01-2010, captioned "Administrative Order Directing Submission of Information from Residential Mortgage Foreclosure Plaintiffs Concerning Their Document Execution Practices to a Special Master, as issued December 20, 2010 by the Acting Administrative Director of the Courts in In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities, directed lenders and service providers who each filed more than 200 residential mortgage foreclosure actions in 2010 (other than those six lenders and service providers who are the subject of Judge Mary Jacobson's Order to Show Cause in the separate Mercer General Equity matter, In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities, Docket No. F-059553-10) to submit affidavits or certifications by February 2, 2011 to the Special Master, retired Assignment Judge Walter R. Barisonek.   The Supreme Court temporarily recalled Judge Barisonek to judicial duty for purposes of assigning him to serve as Special Master in this administrative matter.

Although not a Superior Court case, for record keeping purposes and to distinguish the Administrative Order proceedings from the proceedings in the matter before Judge Jacobson, the Acting Superior Court Clerk has assigned docket number F-238-11 to the Administrative Order. Submissions made to Judge Barisonek therefore should reference both Administrative Order 01-2010 and Docket Number F-238-11.

Any such submissions to the Special Master in Administrative Order 01-2010/Docket Number F-238-11 should be sent to the following address:  Hon. Walter R. Barisonek (Special Master), Union County Courthouse, 2 Broad Street, Courtroom 101, Elizabeth, NJ 07207.  Judge Barisonek can also be reached by phone at 908-659-4787.

A copy of each submission made to Judge Barisonek should also be sent simultaneously to the Superior Court Clerk either (a) electronically in Microsoft Word format to SCCOForeclosure.Mailbox@judiciary.state.nj.us, with the subject line "F-238-11 - Affidavit (or Certification) of (Name of Party)" or (b) by regular mail to Superior Court Clerk's Office, Attn: F-238-11, PO Box 971, Trenton, NJ  08625-0971.

Questions concerning this notice may be directed to Jennifer M. Perez, Esq., Acting Superior Court Clerk by e-mail at jennifer.perez@judiciary.state.nj.us or by phone at 609-984-4200.

/s/ Glenn A. Grant

_____
Glenn A. Grant, J.A.D.
Acting Administrative Director of the Courts

Dated: January 18, 2011

Q

**FILED**   Jan 31, 2011

IN THE MATTER OF RESIDENTIAL MORTGAGE

FORECLOSURE PLEADING AND DOCUMENT

IRREGULARITIES

Administrative Order 01-2010
Docket # F-238-11

SUPPLEMENTAL ADMINISTRATIVE ORDER
DIRECTING SUBMISSION OF INFORMATION BY
RESIDENTIAL MORTGAGE FORECLOSURE
PLAINTIFFS CONCERNING THEIR DOCUMENT
EXECUTION PRACTICES

To·   Foreclosure Plaintiffs Filing 200 or more residential mortgage
foreclosure actions in 2010.

AURORA LOAN SERVICES
BANK OF NEW YORK MELLON
BAYVIEW LOAN SERVICING, LLC
BENEFICIAL NEW JERSEY
DEUTSCHE BANK, N A
FEDERAL HOME LOAN MORTGAGE
FEDERAL NATIONAL MORTGAGE ASSOCIATION
HOUSEHOLD FINANCE CO
HSBC BANK USA, N A
HSBC MORTGAGE CORPORATION
HUDSON CITY SAVINGS
METLIFE HOME LOANS

MIDFIRST BANK
MORTGAGE ELECTRONIC REGISTRATION SYSTEM
NATIONSTAR MORTGAGE
NJ HOUSING & MORTGAGE FINANCE AGENCY
PHH MORTGAGE CORP
PNC BANK
SOVEREIGN BANK
SUNTRUST MORTGAGE INC
TD BANK, N A
THE BANK OF NEW YORK
US BANK, N A
WACHOVIA BANK N A

I issued Administrative Order 01-2010 on December 20, 2010 in response to the

request by the Chief Justice for an examination into residential mortgage foreclosure

document preparation and filing practices   That Administrative Order was directed to

twenty-four foreclosure plaintiffs that each filed 200 or more residential mortgage

foreclosure actions in 2010 as identified in the caption

The operative provisions of the Administrative Order provided *inter alia* that the

twenty-four named foreclosure plaintiffs were required within 45 days to make

submissions to the Special Master, Recall Judge Walter R. Barisonek, demonstrating

1

affirmatively that there are no irregularities in their handling of foreclosure proceedings.
That portion of the Administrative Order is hereby modified so as to provide that no later
than February 11, 2011, each of the twenty-four named foreclosure plaintiffs shall
provide to Judge Barisonek a certification detailing its role in the foreclosure process,
including but not limited to:

(1) whether it or any affiliate engages in servicing residential mortgage loans
itself and, if so, for what entities, and the number of loans it or its affiliates serviced for
each such entity in New Jersey in 2010;

(2) whether others service residential mortgage loans on its behalf or on behalf of
any of its affiliates and, if so, the names of such servicers and the number of loans
serviced by each in New Jersey in 2010; and

(3) any other information relevant to its ability to make the demonstration
originally contemplated by the Administrative Order regarding lack of irregularity in the
handling of foreclosure proceedings.

The requirement for any other submissions set forth in the Administrative Order
shall be held in abeyance until further order.

Submissions to Judge Barisonek in Administrative Order 01-2010/Docket
Number F-238-11 should be sent to the following address:  Hon  Walter R. Barisonek
(Special Master), Union County Courthouse, 2 Broad Street, Courtroom 101, Elizabeth,
NJ 07207.  A copy of each submission made to Judge Barisonek should also be sent
simultaneously to the Superior Court Clerk either (a) electronically in Microsoft Word
format to  SCCOForeclosure.Mailbox@judiciary.state.nj.us, with the subject line "F-

238-11 - Affidavit (or Certification) of (Name of Party)" or (b) by regular mail to Superior

Court Clerk's Office, Attn. F-238-11, PO Box 971, Trenton, NJ 08625-0971.

Hon Glenn A Grant, J A D
Acting Administrative Director of
the Courts

Date: January 31, 2011

3

R

IN THE MATTER OF RESIDENTIAL MORTGAGE FORECLOSURE PLEADING AND DOCUMENT IRREGULARITIES

Administrative Order 01-2010
Docket # F-238-11

CLOSURE OF DECEMBER 20, 2010 ADMINISTRATIVE ORDER DIRECTING SUBMISSION OF INFORMATION FROM RESIDENTIAL MORTGAGE FORECLOSURE PLAINTIFFS CONCERNING THEIR DOCUMENT EXECUTION PRACTICES TO A SPECIAL MASTER

To:   Foreclosure Plaintiffs Filing 200 or more residential mortgage foreclosure actions in 2010:

AURORA LOAN SERVICES
BANK OF NEW YORK MELLON
BAYVIEW LOAN SERVICING, LLC
BENEFICIAL NEW JERSEY
DEUTSCHE BANK, N.A.
FEDERAL HOME LOAN MORTGAGE
FEDERAL NATIONAL MORTGAGE ASSOCIATION
HOUSEHOLD FINANCE CO
HSBC BANK USA, N.A.
HSBC MORTGAGE CORPORATION
HUDSON CITY SAVINGS
METLIFE HOME LOANS

MIDFIRST BANK
MORTGAGE ELECTRONIC REGISTRATION SYSTEM
NATIONSTAR MORTGAGE
NJ HOUSING & MORTGAGE FINANCE AGENCY
PHH MORTGAGE CORP
PNC BANK
SOVEREIGN BANK
SUNTRUST MORTGAGE INC.
TD BANK, N.A.
THE BANK OF NEW YORK
US BANK, N.A.
WACHOVIA BANK N.A.

Administrative Order 01-2010 was issued on December 20, 2010, and modified by Supplemental Administrative Order on January 31, 2011, in response to the request by the Chief Justice for an examination into residential mortgage foreclosure document preparation and filing practices, in order to protect the integrity of the process and ensure the veracity of filings with the court in foreclosure cases.

The operative provisions of Administrative Order 01-2010 provided *inter alia* that the twenty-four foreclosure plaintiffs that each filed 200 or more residential mortgage foreclosure actions in 2010 as identified in the caption were required to provide the

1

A174

Special Master, Recall Judge Walter R. Barisonek, with certifications detailing their roles and the roles of their subsidiaries, servicers, and outsource firms in the foreclosure process and demonstrating affirmatively the absence of irregularities in their handling of residential mortgage foreclosure proceedings.  Having found as to each respondent that the submitted documents are sufficient to establish that the institution has not engaged in irregular practices, the Special Master has entered dismissals in favor of each of the respondents, thereby allowing residential mortgage foreclosure actions involving those institutions to continue to be processed by the Superior Court Clerk's Office and the Office of Foreclosure in the normal course.

In a separate but related proceeding (In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities, Docket No. F-59553-10), Judge Mary C. Jacobson, Presiding Judge of the General Equity Division, Mercer County, issued a December 20, 2010 order directing six lenders and service providers[1] that had been implicated in irregularities in connection with their handling of residential mortgage foreclosure matters to show cause why the processing of uncontested residential foreclosure matters they had filed should not be suspended.  By order dated March 29, 2011, Judge Jacobson appointed a Special Master, retired Judge Richard J. Williams, to inquire into the document preparation practices of those entities and to review any remediation plans they may be directed to submit.  Pursuant to Reports of Special Master Williams determining that each of the respondents in that order to show cause had made a prima facie showing of the reliability of its processes and upon agreement

---

[1] The six lenders and service providers named in Judge Jacobson's order to show cause were Bank of America; JPMorgan Chase; Citi Residential; GMAC (now Ally Financial); OneWest Bank; and Wells Fargo.

2

by those respondents to a compliance monitoring program, Judge Jacobson

subsequently ordered that each of the six respondents in the order to show cause may

resume the filing and prosecution of uncontested residential mortgage foreclosure

cases.

In accordance with the Judiciary's continuing obligation to protect the integrity of

the residential mortgage foreclosure process and to ensure the veracity of filings with

the court in residential mortgage foreclosure cases and pursuant to the authority of the

Administrative Director of the Courts as set forth in the December 20, 2010

Administrative Order, it is ORDERED that:

1.      The operative provisions of the Administrative Order 01-2010 related to

the twenty-four foreclosure plaintiffs identified in the caption are hereby closed.

However, pursuant to the findings of Special Master Barisonek, as set forth in his Final

Report, I hereby instruct the Office of Foreclosure to periodically review submissions of

respondent PHH Mortgage Corporation ("PHH") and servicer EverBank, d/b/a

Everhome Mortgage ("EverBank/Everhome"),[2] in order to verify that they remain in full

compliance with the provisions of the Rules of Court relating to residential mortgage

foreclosures.  If in that periodic review the Office of Foreclosure finds documents

submitted by PHH and/or EverBank/Everhome to be insufficient or finds that those

documents raise concerns that either of the two institutions has engaged in irregular

practices, the Office of Foreclosure may refer the matter to the Mercer Vicinage General

Equity Presiding Judge for appropriate action, which action might include conducting a

---

[2] EverBank, d/b/a Everhome Mortgage, serviced mortgages for respondents Federal
National Mortgage Association, Federal Home Loan Mortgage Corporation, and Bank of
New York Mellon.

3

A176

hearing and, depending on her findings, ordering the suspension of the processing of residential mortgage foreclosure actions involving those institutions.

2.    The operative provisions of Administrative Order 01-2010 that make reference to Judge Jacobson's separate order to show cause also are hereby closed, subject to Special Master Williams' continued compliance monitoring as agreed to by the six respondents.

/s/ Glenn A. Grant

Hon. Glenn A. Grant, J.A.D.
Acting Administrative Director of
the Courts

Date:   February 2, 2012

4

A177

S

## *Gordon A. Washington*

*11 Walnut Street, Madison, New Jersey 07940*
*March 11, 2014*

*Via Express Mail-with tracking*

Specialized Loan Servicing, LLC
8742 Lucent Boulevard – Suite 300
Highlands Ranch, Colorado 80129

Re:   Property Address
     11 Walnut Street
     Madison, New Jersey
     <u>SLS Loan No. 157806815</u>

---

### R.E.S.P.A. QUALIFIED WRITTEN REQUEST

---

Dear Sir or Madam:

    I received your letter dated March 6, 2014 earlier today along with correspondence dated March 7, 2014. The March 7th correspondence contends I am in default and threatens me with foreclosure of my home.

    As an initial matter, I noticed that your March 6th correspondence does not make reference to prior correspondence I sent to you in December 2013 disputing the debt. The copy of the Note you enclose differs from the one I signed. Additionally, contrary to your assertions, your company has never provided documentation that you, or The Bank of New York as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed Certificates, Series 2007-5, are authorized to collect this debt.

    I have repeated told you I do not owe any money under the Note and have disputed the attempts to charge me. To date, your company has failed to answer any of my written correspondence concerning the servicing of my alleged mortgage, including, but not necessarily limited to, letters dated December 17, 2013; January 13, 2014; January 23, 2014; February 4, 2014; February 6, 2014; and February 8, 2014. I have come to believe your efforts to collect this supposed debt and threaten me with foreclosure where you refuse to comply with my specific written requests violates the law, especially since I understand the Note has been "PAID IN FULL."

    Therefore, I am writing **again** to you to request specific itemized information about the accounting and servicing of my alleged mortgage in order to assist me in understanding various charges, credits, debits, transactions, actions, payments, analyses and records related to the servicing of my alleged loan from its inception to the present date. I am disputing the validity of the current debt you claim that I owe.

1

Based in part on your repeated failure to respond to my correspondence concerning the servicing of my alleged mortgage, I have reason to believe that your calculations are in error. Please treat this letter as a "qualified written request" under the Federal Servicer Act, which is a part of the Real Estate Settlement Procedures Act, 12 U.S.C. 2605(e).

Specifically, I am disputing a) the identity of a true secured lender/creditor, and b) the existence of debt, and c) your authority and capacity to collect on behalf of the alleged lender/creditor. Because of extensive criminal activity and fraud in this arena, I require proof of the chain of secured ownership from the original alleged lender/creditor to the alleged current lender/creditor. Further, I require proof that you are the entity that has been contracted to work on behalf of the alleged lender/creditor.

Pursuant to "Subtitle E Mortgage Servicing" of the Dodd-Frank Wall Street Reform and Consumer Protection Act and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1), please provide:

1. A full, double sided, certified "true and accurate" copy of the original promissory note and security instrument and all assignments of the security instrument.

2. Full name, address and telephone number of the actual entity that funded the transaction.

3. Full name of Trust where the Note Number is trading, or has traded, and the identifying Series of Certificates. (Note: If the note number is being traded in a Fannie Mae Trust or Freddie Mac Trust, please provide all information to identify the Trust (i.e. Fannie Mae Pool Number, CUSIP Number, REMIC or SMBS Trust Number and Trust Class/Tranche).

4. Full name, address, and telephone number of the Trustee.

5. Full name, address, and telephone number of the **Custodian of my original Promissory Note**, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f)(2) of the Truth In Lending Act.

6. Full name, address, and telephone number of the **Custodian of my original Security Instrument**, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f)(2) of the Truth In Lending Act.

7. A physical location (address) of the original promissory note, original security instrument, and all assignments of the security instrument, and a contact name and phone number of someone who can arrange for inspection of said documents.

8. Full name, address and telephone number of any master servicers, servicers, sub-servicers, contingency servicers, back-up servicers or special servicers for this account.

2

A181

9.  The electronic MERS number assigned to this account if this is a MERS Designated Account.

10. **Proof of true sale of the note** from alleged Lender to investors, by showing: Wire transfer document(s), and/or Signed purchase and sale agreement(s), Bank statements or similar documentation.

11. The MERS Milestone Report, if the note number and security instrument was tracked by Mortgage Electronic Registration Systems.  I want to see the audit trail of the alleged transfer in ownership, **Mortgage Discharge** and alleged transfer in security interest.

12. A complete audit history from alleged loan origination, showing the dates payments were applied, and to what internal accounts (i.e. principal, interest, suspense, escrow, etc.) payments were applied.

13. A complete and itemized statement of all advances or charges against this account.

14. A complete and itemized statement of the escrow for this account, if any, from the date of the note origination to the date of your response to this letter.

15. Have you purchased and charged to the account any Force-Placed Insurance?

16. A complete and itemized statement from the date of the note origination to the date of your response to this letter of the amounts charged for any forced-placed insurance, the date of the charge, the name of the insurance company, the relation of the insurance company to you or a related company, the amount of commission you received for each force-placed insurance event, and an itemized statement of any other expenses related thereto.

17. A complete and itemized statement from the date of the note origination to the date of your response to this letter of any suspense account entries and/or any corporate advance entries related in any way to this account.

18. A complete and itemized statement from the date of the loan to the date of your response to this letter of any property inspection fees, property preservation fees, broker opinion fees, appraisal fees, bankruptcy monitoring fees, or other similar fees or expenses related in any way to this loan.

19. A statement/provision under the security instrument and/or note that authorizes charging any such fee against the account.

20. Copies of all property inspection reports and appraisals, broker price opinions, and associated bills, invoices, and checks or wire transfers in payment thereof.

3

21. Complete copy of any transaction report(s) indicating any charges for any "add on products" sold to the debtors in connection with this account from the date of the note origination to the date of your response to this letter.

22. Complete and itemized statement of any late charges added to this account from the date of the note origination to the date of your response to this letter.

23. Complete and itemized statement of any fees incurred to modify, extend, or amend the loan or to defer any payment or payments due under the terms of the loan, from the date of the note origination to the date of your response to this letter.

24. Complete, itemized statement of the current amount needed to pay-off the alleged "loan" in full.

25. Verification of any notification provided to me of a change in servicer.

26. Acknowledgement that you or your servicer received my letters dated December 17, 2013; January 13, 2014; January 23, 2014; February 4, 2014; February 6, 2014; and February 8, 2014.

**You should be advised that within FIVE (5) DAYS you must send us a letter stating that you received this letter. After that time you have THIRTY (30) DAYS to fully respond as per the time frame mandated by Congress, in "Subtitle 'E' Mortgage Servicing" of the "Dodd-Frank Wall Street Reform and Consumer Protection Act and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1).**

---

## TRUTH – IN-LENDING ACT § 131(f)(2)

---

Pursuant to 15 U.S.C. § 1641 (f):

Please provide the name, address and telephone number of the owner(s) of the mortgage and the master servicer of the mortgage.

**You should be advised that Violations of this Section provide for statutory damages of up to $4,000 and reasonable legal fees. The amendments also clearly provide that the new notice rules are enforceable by private right of action. *15 USC 1641***

Very truly yours,

Gordon A. Washington

Service List on Next Page

4

Cc:   Walter D. Nealy, Esq.
       Charles A. Gruen, Esq.
       U.S. Certified Mail # 7013 2250 0000 1409 8581
       Office of RESPA and Interstate Land Sales
       Office of Housing, Room 9154
       US Department of Housing and Urban Development
       451 Seventh Street SW
       Washington, DC - 20410

5

WALTER D. NEALY, ESQ.
Bar No. 023181983
100 South Van Brunt Street, Suite 2C
Englewood, New Jersey 07631
Telephone: (201) 227-0063
Fax: (201) 227-6118
Attorney for Plaintiff-Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | CASE NO.: 14-14573-TBA |
| GORDON A. WASHINGTON | ADVERSARY NO.: 14- 01319 |
| | HEARING DATE: July 15, 2014 |
| *Plaintiff-Debtor* | TIME: 1:00 pm |
| - vs. – | |
| | ***ORDER*** |
| SPECIALIZED LOAN SERVICING, LLC and THE BANK of NEW YORK MELLON, as TRUSTEE for the CERTIFICATE-HOLDERS of the CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-5 | |
| *Defendants-Creditors* | |

The relief set forth on the following pages, numbered two (2) through _____ is
hereby **ORDERED**.

A185

**ORDERED**

1. That the right of the Defendant, Specialized Loan Servicing, LLC and the Bank of
   New_____ to enforce their note and
   mortgage are hereby determined to be barred by the applicable Statue of Limitation.

2. The lien of America's Wholesale Lender and its assignees is hereby declared to be null
   and void.

WALTER D. NEALY, ESQ.
100 South Van Brunt Street – Suite 2
Englewood, New Jersey 07631
Telephone: (201) 227-0063
Attorney for Plaintiff-Debtor

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.: 14-14573 |
| GORDON A. WASHINGTON | CHAPTER 13 |
| *Plaintiff-Debtor* | ADVERSARY NO.: 14- 01319 |
| - vs. – | |
| SPECIALIZED LOAN SERVICING, LLC and THE BANK of NEW YORK MELLON, as TRUSTEE for the CERTIFICATE-HOLDERS of the CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-5 | |
| *Defendants-Creditors* | |

## PLAINTIFF-DEBTOR'S BRIEF IN SUPPORT
## OF
## MOTION FOR SUMMARY JUDGMENT

Walter D. Nealy, Esq.
*On the Brief*

A187

TABLE OF CONTENTS

| | Page(s) |
|---|---|
| PROCEDURAL HISTORY | 1 |
| BACKGROUND | 2 |
| LEGAL ARGUMENT    Point I | |
| SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST DEFENDANTS BECAUSE THE STATUTE OF LIMITATIONS FOR A NEGOTIABLE INSTRUMENT HAS LAPSED RENDERING THE PROMISSORY NOTE UNENFORCEABLE | 10 |
| CONCLUSION | 14 |

TABLE OF CITATIONS

STATUTES

| | |
|---|---|
| | 1 |
| *N.J.S.* 12A:1-101, *et seq.* | 1 |
| *N.J.S.* 56:8-1, *et seq.* | 1 |
| *26 U.S.C. §7623* | 1 |
| *NY EPTL §7-2.4* | 3 |
| *26 U.S.C. §860G(d)(1)* | 1 |
| Fair Foreclosure Act (L. 1995, C.244) | 5 |
| *N.J.S.A.* 12A:3-118 | 1 |

CASES

| | |
|---|---|
| *Alan J. Cornblatt, P.A. v. Barow*, 153 N.J. 218, 232-33 (1998) | 12 |
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) | 10,11 |
| *Bank of New York v. Raftogianis*, 418 N.J. Super. 323 (Ch. Div. 2010) | 6 |
| *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) | 10,11 |
| *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) | 11 |
| *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) | 11 |
| *In re Kemp*, Adv. No. 08-2448- Opinion filed November 16, 2010 | 1 |
| *In re Saldivar v. JP Morgan Chase Bank, N.A.*, (Bankr.S.D. Tex June 5, 2013, No. 11-10689) | 3 |
| *Jersey Central Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109(3d Cir. 1985) | 11 |

i

*Katz v. Aetna Cas. & Sur. Co.*, 972
F.2d 53, 55 (3d Cir. 1992) .................................................... 11

*Marino v. Indus. Crating Co.*, 358
F.3d 241, 247 (3d Cir. 2004) ................................................. 10

*Schoch v. First Fid. Bancorporation*,
912 F.2d 654.657 (3d Cir. 1990) .......................................... 11

*Siegel Transfer, Inc. v. Carrier
Express, Inc.*, 54 F.3d 1125, 1130-31
(3d Cir. 1995) ......................................................................... 11

*United States v. Four Parcels of Real
Property*, 941 F.2d 1428, 1438 (11th
Cir. 1991) ............................................................................... 11

*Wells Fargo, N.A. v. Erobobo*, 39
Misc.3d 1220 (N.Y. Sup.Ct. 2013) ........................................ 3


N.J. SUPREME COURT ORDER
ADMINISTRATIVE ORDER 01-
2010 ..................................................................................... 4,5,6


STATE COURT RULES
R. 4:64-1 .............................................................................. 4,5,6
R. 4:64-2 .............................................................................. 4
R. 1:4-8(a)(3) ....................................................................... 6
............................................................................................
............................................................................................


FEDERAL COURT RULES

Rule 56(a) ............................................................................. 10

TREATISES
31 *Williston on Contracts* §79:14 ...................................... 12
(Lord ed. 4th ed. 2004)

ii

## PROCEDURAL HISTORY

Plaintiff is Debtor, Gordon A. Washington (hereinafter referred to as "Mr. Washington" or "Homeowner"). Mr. Washington filed a voluntary chapter 13 petition on March 12, 2014. Mr. Washington filed this adversary proceeding on March 18, 2014, against The Bank of New York Mellon as the Trustee for the CWABS, Inc. Asset Back Series 2007-5 (hereinafter referred to as "The Bank of New York"[1]) and Specialized Loan Servicing, LLC (hereinafter referred to as "SLS"), its servicer. The gravamen of the adversary complaint is that the promissory note and mortgage executed by Mr. Washington in connection with the purchase of his home on February 27, 2007, allegedly held or serviced by Defendants, is unenforceable under the New Jersey Uniform Commercial Code (UCC), *N.J.S.A.* 12A:1-101, *et. seq.*

Mr. Washington moves for summary judgment at this juncture on the narrow issue of the Statute of Limitations[2] so as to avoid unnecessary legal expense and expenditure of the Court's resources, and to expedite implementation of his plan of reorganization. There is no genuine issue of material fact that (1) there was a default under the Promissory Note and acceleration of the Promissory Note as of June 1, 2007; (2) The Bank of New York filed a foreclosure action in the Superior Court of New Jersey that was dismissed on July 5, 2013; and (3) the Promissory Note is unenforceable under the UCC because more than six years has lapsed since acceleration of the Promissory Note.

---

[1]    The Bank of New York and Mellon Financial Corporation merged effective July 2, 2007. See http://en.wikipedia.org/wiki/The_Bank_of_New_York_Mellon.

[2]    Defendants have not yet filed a Proof of Claim. Discovery has been served to determine whether (a) Defendants are entitled to enforce the Note under other relevant provisions of the UCC (See *In re Kemp*, Adv. No. 08-2448 – Opinion filed November 16, 2010; (b) the Loan documents were actually transferred to Defendants in accordance with the securitization; and (c) the debt was paid/extinguished. See footnotes 5 and 11, *infra*. Discovery will determine whether Mr. Washington has affirmative claims pursuant to the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-1 *et seq.*, and as a relator under 26 *U.S.C.* §7623.

1

## I BACKGROUND

### A.   Purchase

On February 27, 2007 Mr. Washington purchased his three-family home located at 11 Walnut Street, Morris County, New Jersey (hereinafter referred to as the "Property" or the "Home"). In connection with the purchase of the Property, Mr. Washington gave a down payment in the amount of $130,000.00. He also signed a promissory note (hereinafter referred to as the "Promissory Note") with a lender, America's Wholesale Lender, and granted a security interest (hereinafter referred to as the "Mortgage") in the Property to America's Wholesale Lender, which according to the mortgage was a corporation organized and existing under the laws of New York.[3]

After closing and immediately moving into the third-floor unit, Mr. Washington renovated the first and second floor apartments. On April 8, 2007, a plumbing malfunction occurred that caused water damage to the first and second floor apartments, making the apartments un-rentable.

Mr. Washington made at least three payments on the Promissory Note for March, April and May 2007.[4] According to the loan servicer at the time, Countrywide® Home Loans (hereinafter referred to as "Countrywide"), Mr. Washington defaulted on the Promissory Note on July 1, 2007. Mr. Washington contacted Countrywide to inform it of the plumbing issue that resulted in the lack of expected rental income, and inquired about extending or modifying the loan in or about September or early October 2007.

---

[3]      Upon information and belief, America's Wholesale Lender is not, in fact, a New York corporation; rather, it is a fictitious name used by Countrywide Home Loans, Inc.
[4]      Mr. Washington believes an additional payment was made for June 2007 by a third-party who made a payment at his request. However, Mr. Washington cannot verify this since Defendant SLS has not responded to several Qualified Written Requests.

2

**B.    ACCELERATION of DEBT in 2007 & FORECLOSURE PROCEEDING**

Instead of modifying or extending the Promissory Note and Mortgage, Countrywide elected to accelerate the entire principal of the Promissory Note and Mortgage as of June 1, 2007.   On December 14, 2007, The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5[5], filed a foreclosure complaint against Mr. Washington in the Chancery Division, Morris County, New Jersey, under docket number F-34837-07 (hereinafter referred to as the "2007 Foreclosure Complaint").   The Foreclosure Complaint represented that the Promissory Note was in default as of June 1, 2007 and that the entire principal under the Promissory Note had been accelerated as of June 1, 2007.

Upon service of the 2007 Foreclosure Complaint, Mr. Washington discovered for the first time that the Bank of New York claimed it owned the Promissory Note and Mortgage.   Mr. Washington filed an Answer to the Complaint on February 8, 2008 disputing The Bank of New York's right to foreclose on his Home.   The Notice of Intent to Foreclose served in connection with the 2007 Foreclosure Complaint did not comply with applicable law including, but not limited to, the Fair Foreclosure Act, *N.J.S.A.* 2A:50-53, *et seq.*, and Court Rules.

The Promissory Note submitted to the Court in connection with the 2007 Foreclosure Complaint did not demonstrate that The Bank of New York owned the

---

[5]    Upon information and belief, purportedly the Promissory Note and Mortgage were securitized in accordance with a Pool Servicing Agreement (PSA) that created an express trust (REMIC) in accordance New York Estate Powers & Trust Law §7-2.4 and IRS Code 26 *U.S.C.* §860G(d)(1).   A transfer not in conformity with an express trust is void *ab initio. Wells Fargo, N.A. v. Erobobo,* 39 *Misc.3d* 1220 (N.Y. Sup.Ct. 2013); *In re Saldivar v. JP Morgan Chase Bank, N.A.,* (Bankr.S.D. Tex June 5, 2013, No. 11-10689). There is no genuine dispute that the Mortgage was not conveyed in accordance with the PSA and the IRS Code since the Mortgage Assignment was not recorded until 18 months after the close date of the PSA. Plaintiff propounded discovery in this regard.

3

Promissory Note.[6]  Furthermore, after the 2007 Foreclosure Complaint was filed on behalf

of The Bank of New York, Mortgage Electronic Registration System, Inc., as nominee for

America's Wholesale Lender, filed an Assignment of Mortgage (dated November 12,

2007) on September 9, 2008 (hereinafter referred to as the "Assignment of Mortgage"),

purportedly assigning the Mortgage to The Bank of New York, recorded with the Morris

County Clerk at Assignment Book 21153, Page 0683.    The Assignment of Mortgage

provides in relevant part:

> The Assignor Mortgage Electronic Registration System Inc. as Nominee
> for America's Wholesale Lender... assigns to **The Bank of New York**
> **for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed**
> **Certificate Series 2007-5** (bold in original) ... a certain mortgage dated
> February 27, 2007, made by Gordon A. Washington, referred to as the
> Mortgage.... And the Assignor covenants that there is now due and
> owing upon the Mortgage and the Bond, Note or other obligation
> secured thereby, the sum of $519,132.54 ... from June 1, 2007.

Significantly, in light of a review of the entire Foreclosure File obtained from the

New Jersey Superior Court Clerk's Office,[7] The Bank of New York never complied with

applicable law that required it to produce the original Promissory Note and Mortgage, or

produce a certified true copy of the original documents.   New Jersey Court Rule 4:64-2

provides:

> (a)   Supporting Instruments.   Proof required by R. 4:64-1 may be
> submitted by affidavit, unless the court otherwise requires.  The moving
> party **shall** produce the original mortgage, evidence of indebtedness,
> assignments, claim of lien (N.J.S.A. 46:8B-21), and any other original
> document upon which the claim is based.   In lieu of an original
> document, the moving party may produce a legible copy of a recorded or
> filed document, certified as a true copy by the recording or filing officer

---

[6]     Immediately upon receiving the Answer to the Complaint and before any discovery was conducted,
The Bank of New York filed a motion to strike Mr. Washington's answer, which was granted.  Significantly,
the lender on the Promissory Note submitted to the Court is America's Wholesale Lender was not endorsed to
The Bank of New York.
[7]     A certified copy of Case File Report and CD obtained from the Clerk's Office is available in
discovery.

4

or by a New Jersey attorney, or a copy of an original document, if unfiled or unrecorded, certified as a true copy by a New Jersey attorney. (Emphasis Supplied).

Accordingly, the Superior Court of New Jersey rejected The Bank of New York's application for entry of final judgment regarding the 2007 Foreclosure Complaint. The application for final judgment against Mr. Washington was rejected by the Superior Court Office of Foreclosure due to numerous deficiencies as set forth in a Return Notice dated November 28, 2010 (hereinafter referred to as the "Return Notice"). Among other things, the deficiencies in the Return Notice included: "17. Submit notice and proof of service of notice. R.4:64-1(b)... 23. One attorney certified copy of each of the following must be submitted: bond or note, recorded mortgage, assignments, if any.... 27. Failure to comply with Fair Foreclosure Act (L. 1995, C.244)."

Shortly thereafter, upon receiving a detailed report with supporting materials from the Office of Legal Services alleging industry-wide deficiencies in foreclosure filings, on December 20, 2010, the Supreme Court of New Jersey entered an Administrative Order (hereinafter referred to as the "Administrative Order") staying foreclosure proceedings instituted by certain lenders, servicers and entities. The Administrative Order "addresses several steps taken by the Judiciary in an effort to ensure the integrity of the mortgage foreclosure process."

The New Jersey Supreme Court found that six major institutions, including Bank of America[8], have been implicated in robo-signing activities. Both The Bank of New York

---

[8]     According to a January 2008 Press Release, Bank of America Corporation acquired Countrywide Financial Corp. and its affiliates which include Countrywide Home Loans, Inc., Countrywide Home Loans Servicing, LP., Countrywide Securities Corporation, CWABS, Inc., and others. See Bank of America Press Release at http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=iro.

5

and Bank of New York Mellon are specifically named in the Supreme Court's Administrative Order staying foreclosures. As stated by the New Jersey Supreme Court:

> Questions have also arisen as to whether plaintiffs filing foreclosure actions actually own the underlying mortgages. In a recent case, a New Jersey equity court found that a plaintiff attempting to foreclose a mortgage, which had been transferred through a series of securitizations, never obtained actual title to the underlying mortgage. "Confounding the problem, the court found that plaintiff's filings made "no meaningful attempt to comply with the provision of R. 4:64-1 (b)(1) by 'reciting all assignments in the chain of title.'" (citing *Bank of New York v. Raftogianis*, 418 *N.J. Super*. 323 (Ch. Div. 2010).

The New Jersey Supreme Court specifically ordered Bank of America to show cause why its foreclosure matters should not be suspended. Similarly, The Bank of New York and Bank of New York Mellon were ordered "within 45 days, to demonstrate affirmatively that there are no irregularities in their general handling of foreclosure proceedings."[9] The New Jersey Supreme Court in the Administrative Order gave a general order reminding all foreclosure counsel of their obligations under the New Jersey Rules of Professional Conduct, and the effect of the representations made by their signature on a pleading pursuant to Court Rule 1:4-8(a)(3). Additionally, the New Jersey Supreme Court stated:

> All counsel are further reminded that pursuant to Rule 4:64-1(b)(10), "if plaintiff is not the original mortgagee or original nominee mortgagee," the complaint must provide "the name of the original mortgagee and a recital of all assignments in the chain of title."

On February 2, 2012, the Court entered an Order closing the operative provisions of the Administrative Order and permitting the Bank of America, The Bank of New York and Bank of New York Mellon to proceed with foreclosures.

---

[9] The Administrative Order, as amended, required Bank of America to make submissions to a Special Master, in Administrative Order 01-2010/Docket Numbe F-238-11, no later than February 11, 2011.

6

C.     **Dismissal of Foreclosure Complaint**

Notwithstanding, the ability to proceed with the 2007 Foreclosure Complaint, The Bank of New York failed to move forward with the case.     One day short of six years after acceleration of the debt under the Promissory Note, on May 31, 2013, the New Jersey Superior Court Office of Foreclosure sent a Notice of Proposed Dismissal Due to Lack of Prosecution (Notice of Proposed Dismissal) to The Bank of New York.   The Notice of Proposed Dismissal required The Bank of New York to file an amended complaint, prove the matter was stayed by bankruptcy or other condition staying the case, or file an affidavit that the failure to proceed was due to "exceptional circumstances."

On June 21, 2013, foreclosure counsel for The Bank of New York submitted a certification stating that Bank of America, N.A. is working on pleadings and intends to seek permission to issue a curative Notice of Intention to Foreclose.[10]   Significantly, Counsel for The Bank of New York did not submit "the name of the original mortgagee and a recital of all assignments in the chain of title" as mandated by the Notice of Return. Consequently, the Court in its discretion did not deem foreclosure counsel's opposition to the Notice of Proposed Dismissal to be sufficient and entered an order dismissing the Foreclosure Complaint on July 5, 2013 (Order of Dismissal).

The Bank of New York did not appeal the Order of Dismissal, move to reconsider the Order of Dismissal, cure the deficiencies in the Foreclosure Complaint filings, or seek to file an amended Foreclosure Complaint.   On August 21, 2013, foreclosure counsel for

---

[10]     The Bank of New York's Foreclosure attorneys did not serve Mr. Washington with the opposition as it and the Notice of Proposed Dismissal were sent to his former office address in Englewood, which was not forwarded.  Mr. Washington discovered the 2007 Foreclosure Complaint had been dismissed when he consulted counsel, and was instructed to go to Trenton and obtain the Foreclosure File from the New Jersey Superior Court Clerk.

The Bank of New York filed a Discharge of the Notice of *Lis Pendens* dated August 9, 2013.

**C    Bank of America $8.5 Billion Settlement with The Bank of New York Mellon for defective Mortgages**

According to a Press Release issued by Bank of America Corporation, in June 2011 the Bank of America (hereinafter referred to as "BOA") entered into a settlement (hereinafter referred to as the "Settlement") with The Bank of New York Mellon, formerly known as Bank of New York.[11]  In the Settlement, BOA agreed to pay 8.5 Billion Dollars to The Bank of New York as trustee in repurchase exposure for faulty legacy Countrywide residential mortgage-backed securitizations (RMBS).

As previously stated, in July 2013 the New Jersey Superior Court dismissed the 2007 Foreclosure Complaint.  In November 2013, an affiliate of BOA sent correspondence to Mr. Washington notifying him that the Loan was "PAID IN FULL."

**D    SLS/Bank of New York Failure to Respond to Qualified Written Requests**

After Mr. Washington was notified the loan was paid in full, for the first time Defendant SLS wrote to Mr. Washington claiming it was the servicer for the Mortgage, and that The Bank of New York is owed money on the Promissory Note and Mortgage.  SLS threatened to foreclose on Mr. Washington's Home unless he agreed to modify the alleged loan and mortgage.

Since BOA notified Mr Washington that it paid the loan in full, Mr. Washington did not accept SLS's claim that any money was owed to SLS or The Bank of New York. Commencing in December 2013 Mr. Washington sent several qualified written requests

---

[11]    Press Release dated June 29, 2011.  See
http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=iro.

(QWR) to SLS requesting that it (a) demonstrate The Bank of New York has the original Promissory Note by sending a true and genuine copy of the promissory note in its possession endorsed to it; (b) account for any and all payments received with respect to the Promissory Note and Mortgage; and (c) demonstrate that it is an authorized servicer of the alleged Mortgage.

SLS has failed to fully respond to the QWRs.  Mr. Washington has steadfastly denied any amount is owed to SLS or The Bank of New York.  Mr. Washington believes Defendants, SLS and The Bank of New York, are attempting to obtain double payment on the Promissory Note and Mortgage that was paid in full.  In any event, Mr. Washington filed this Adversary Proceeding because the alleged Promissory Note and Mortgage are unenforceable as a matter of law because the Statute of Limitations lapsed.

9

LEGAL ARGUMENT

Point   I

**SUMMARY JUDGMENT SHOULD BE ENTERED
AGAINST DEFENDANTS BECAUSE THE STATUTE
OF LIMITATIONS FOR A NEGOTIABLE
INSTRUMENT HAS LAPSED RENDERING THE
PROMISSORY NOTE UNENFORCEABLE**

Pursuant to Federal Rule of Civil Procedure 56(a) Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 *U.S.* 317, 322-23 (1986). In relevant part, Rule 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

There is a genuine factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 *U.S.* at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable

10

jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (1 1th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Central Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 *U.S.* at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations ...and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 *F.2d* 654,657 (3d Cir. 1990). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex,477 U.S. at 322-23).

11

The Promissory Note is a negotiable instrument governed by the New Jersey UCC. The Statute of Limitations set forth in *N.J.S.A.* 12A:3-118 provides that there is a six-year limitation for commencing an action on a negotiable instrument:

> (a)   Except as provided in subsection (e), **an action to enforce the obligation of a party to pay a note** payable at a definite time **must be commenced** within six years after the due date or dates stated in the note **or, if a due date is accelerated, within six years after the accelerated due date.** (Emphasis supplied).

The pivotal issue here is when Defendant Bank of New York's cause of action accrued. The New Jersey Supreme Court has held that a cause of action is considered to have accrued when the facts give rise to a right to judicial relief or redress occurs. *Alan J. Cornblatt, P.A. v. Barow*, 153 *N.J.* 218, 232-33 (1998). A cause of action to recover on or enforce a note accrues on the date of default. In a contractual setting, a cause of action for a breach of contract accrues when the breach occurs. *See*, 31 *Williston on Contracts* §79:14 (Lord ed. 4th ed. 2004).

In this case before the Court, a cause of action accrued upon default under the Promissory Note, and The Bank of New York, or the holder of the Promissory Note, exercised the remedy to accelerate the Promissory Note. In Fact, The Bank of New York filed a complaint in 2007 asserting that a default had occurred and the negotiable instrument had been accelerated. The complaint filed by The Bank of New York was dismissed due to its failure to prosecute the case and comply with Court Rules. There are no genuine issues of and material fact concerning acceleration of the negotiable Promissory Note, and that this movant is entitled to judgment as a matter of law since more than six years has passed since its acceleration. The following material facts are not in genuine dispute:

12

1.  Countrywide as servicer of the Promissory Note and Mortgage accelerated the debt as of June 1, 2007 in its Notice of Intent to Foreclose purportedly sent on August 2, 2007.

2.  Mortgage Electronic Registration System, Inc., as nominee for America's Wholesale Lender, by Assignment of Mortgage, allegedly executed on November 12, 2007, assigned the Mortgage to the Defendant Bank of New York after acceleration of the Promissory Note.

3.  The Bank of New York filed the 2007 Foreclosure Complaint averring that the Promissory Note had been accelerated.

4.  The Bank of New York was sent a Notice of Proposed Dismissal dated one day before the Statute of Limitations expired and provided an opportunity to proceed in accordance with applicable Court Rule to proceed with the 2007 Foreclosure Complaint.

5.  The Bank of New York failed to proceed with the case or demonstrate exceptional circumstances as to why it could not proceed with the case.

6.  The 2007 Foreclosure Complaint was dismissed on July 5, 2013 due to the failure to prosecute and The Bank of New York did not appeal the dismissal.

7.  More than six years have passed since acceleration of the Promissory Note and Assignment of Mortgage.

Honed to its essentials, this matter is very straightforward. The Bank of New York filed a prior action on an accelerated negotiable instrument and the prior action was dismissed due to the lack of prosecution. There was no legal impediment preventing The Bank of New York from proceeding with the 2007 Foreclosure Complaint and due process of the dismissal was provided. The Bank of New York failed to comply with the requirements of the Notice of Proposed Dismissal. More than six years has lapsed since acceleration of the negotiable Promissory Note; thus, rendering it unenforceable as a matter of law pursuant to *N.J.S.A.* 12A:3-118.

13

## CONCLUSION

Based on the foregoing, the Plaintiff-Debtor, Gordon Washington, respectfully submits that the Court should enter summary judgment granting the relief requested in the Adversary Complaint because there is no genuine issue of fact that the Statute of Limitations expired rending any putative interest Defendants may have in the Promissory Note unenforceable.

Respectfully Submitted,

Walter D. Nealy, Esq.

Dated: May 21, 2014

14

A203

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 207 of 224 PageID: 375
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 1 of 10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

GORDON ALLEN WASHINGTON,

                Plaintiff-Debtor,

              Case No.: 14-14573

    vs.

SPECIALIZED LOAN SERVICING, LLC, and THE      Adversary No.: 14-01319
BANK OF NEW YORK MELLON, AS TRUSTEE
FOR THE CERTIFICATE-HOLDERS OF THE
CWABS, INC., ASSET-BACKED CERTIFICATES,
SERIES 2007-5,

              Defendants-Creditors.

## COUNTERSTATEMENT OF
## UNDISPUTED MATERIAL FACTS BY DEFENDANTS-CREDITORS

I.  Defendants-creditors Specialized Loan Servicing, LLC ("SLS"), and The Bank of

New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of

the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5 s/h/a The Bank of

New York Mellon, as Trustee for the certificate-holders of the CWABS, Inc., ASSET-

BACKED CERTIFICATES, SERIES 2007-5 (the "Trust") (collectively "Defendants"),

hereby responds to the Statement of Undisputed Material Facts submitted by Plaintiff-

Debtor Gordon Allen Washington ("Plaintiff") in support of his motion for summary

judgment pursuant to Court Rule 56.1, as follows:

1.    Plaintiff is Debtor, Gordon A. Washington (hereinafter referred to as "Mr.

Washington" or "Homeowner").

**Response:**   Defendants admit Plaintiff's Statement 1.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 208 of 224 PageID: 376
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 2 of 10

2.    Mr. Washington filed a voluntary chapter 13 petition on March 12, 2014.
Mr. Washington filed this adversary proceeding on March 18, 2014, against the Bank of
New York Mellon as Trustee for the CWABS, Inc. Asset Back Series 2007-5 (hereinafter
referred to as "The Bank of New York") and Specialized Loan Servicing, LLC
(hereinafter referred to as "SLS"), its servicer.

Response:    Defendants admit Plaintiff's Statement 2.

3.    The adversary complaint seeks judgment declaring that the promissory
note and mortgage executed by Mr. Washington in connection with the purchase of his
home on February 27, 2007, allegedly held or serviced by Defendants, is unenforceable
under the New Jersey Commercial Code (UCC), *N.J.S.A. 12A:1-101, et. seq.*

Response:    Defendants admit Plaintiff's Statement 3 to the extent that Plaintiff,
via his adversary complaint, seeks judgment declaring the promissory note and
mortgage unenforceable.

4.    On February 27, 2007 Mr. Washington purchased his three-family home
located at 11 Walnut Street, Morris County, New Jersey (hereinafter referred to as the
"Property" or the "Home").

Response:    Defendants deny Plaintiff's Statement 4, but admit that the subject
loan was extended to Plaintiff in connection with the purchase of the Property.

5.    In connection with the purchase of the property the Homeowner signed a
promissory note (hereinafter referred to as the "Promissory Note") with a lender,
America's Wholesale Lender.

Response:    Defendants admit Plaintiff's Statement 5.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 209 of 224 PageID: 377
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 3 of 10

6.      In connection with the purchase of the Property, the Homeowner gave a
security interest (hereinafter referred to as the "Mortgage") in the Property to America's
Wholesale Lender.

**Response:**     Defendants admit Plaintiff's Statement 6 but clarify that Mortgage
Electronic Registration Systems, Inc. was the mortgagee of record solely in its capacity
as nominee for America's Wholesale Lender.

7.      Countrywide® Home Loans was the servicer of the Promissory Note and
Mortgage.

**Response:**     Defendants deny Plaintiff's Statement 7, but assert that Bank of
America, N.A. ("BANA") and/or its successors serviced the subject loan from the date
of origination until servicing rights were transferred to SLS on November 16, 2013. See
SLS Cert. ¶ 4c; Stahlhut Cert. ¶ 5; see also Ex. I.

8.      Countrywide® Home Loans declared a default due to non-payment on
Promissory Note and accelerated the Promissory Note as of June 1, 2007.

**Response:**     Defendants deny Plaintiff's Statement 8, but assert that the subject
loan has been in default since July 1, 2007 and was accelerated on December 14, 2007
upon the filing of the 2007 Foreclosure Complaint. See SLS Cert. ¶ 4b; Stahlhut Cert. ¶ 7;
see also Ex. E; Pl. Ex. E.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 210 of 224 PageID: 378
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 4 of 10

9.     On December 14, 2007, The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5, filed a foreclosure complaint against Mr. Washington in the Chancery Division, Morris County, New Jersey, under docket number F-34837-07 (hereinafter referred to as the "2007 Foreclosure Complaint").

**Response:**     Defendants admit Plaintiff's Statement 9.

10.     In the 2007 Foreclosure Complaint The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 asserted that it was the present holder Promissory Note.

**Response:**     Defendants admit Plaintiff's Statement 10.

11.     The 2007 Foreclosure Complaint states in paragraph 4 that the Promissory Note had been accelerated as of June 1, 2007 and provides as follows:

> The defendants named in Paragraphs 1 and 2 above, or their grantee or grantees, if any has failed to make the installment payment due on June 1, 2007, and all payments becoming due thereafter.  Therefore the loan has been in default since July 1, 2007, and said payments have remained unpaid for more than 30 days from the date of mailing of the Notice of Default to the obligor, and are still unpaid.  Plaintiff herein, by reason of said default, elected that the whole unpaid principal sum due on the aforesaid obligation...

**Response:**     Defendants deny Plaintiff's Statement 11, but assert that the aforementioned excerpt was stated in Paragraph eight (8) of the 2007 Foreclosure Complaint and that the subject loan was accelerated on December 14, 2007 upon the filing of the 2007 Foreclosure Complaint. See Pl. **Ex. E**.

-4-

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 211 of 224 PageID: 379
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 5 of 10

12.     In the 2007 Foreclosure Complaint The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 asserted that the Mortgage was assigned to it, which Assignment was unrecorded.

**Response:**   Defendants admit Plaintiff's Statement 12 but clarify that said assignment was unrecorded at the time of the filing of the 2007 Foreclosure Complaint. See **Ex. C, D**.

13.     In the 2007 Foreclosure Complaint proceedings, The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 never produced the original Promissory Note, Mortgage or Assignment, or a certified true copy of original documents by an attorney of the State of New Jersey.

**Response:**   Defendants admit Plaintiff's Statement 13 but clarify that copies of said documents were exhibited to the motion for summary judgment of The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5, which motion was granted by the Court in said proceedings.

14.     The Homeowner filed an Answer to the 2007 Complaint filed by The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5.

**Response:**   Defendants admit Plaintiff's Statement 14.

Case 2:14-cv-08063-SDW  Document 12  Filed 01/28/15  Page 212 of 224 PageID: 380
Case 14-01319-MBK  Doc 11-1  Filed 07/29/14  Entered 07/29/14 17:34:09  Desc
Counter-Statement of Material Undisputed Facts  Page 6 of 10

15.    The application for Final Judgment by The Bank of New York for the

Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5

was rejected by the Office of Foreclosure by Return Notice dated November 28, 2010.

The deficiencies in the Return Notice include:

> "17. Submit notice and proof of service of notice. R.4:64-
> 1(b)…"
> "23. One attorney certified copy of each of the following
> must be submitted: bond or note, recorded mortgage,
> assignments, if any…"
> "27. Failure to comply with Fair Foreclosure Act (L. 1995,
> C.244)."

**Response:**   Defendants deny Plaintiff's Statement 15 but assert that said

dispute regards a fact which is immaterial and therefore does not preclude the granting

of summary judgment.

16.    The Bank of New York for the Benefit of the Certificateholders, CWABS,

Inc. Asset-Backed Certificates Series 2007-5 never obtained a judgment against the

Homeowner in the 2007 Foreclosure Complaint.

**Response:**   Defendants deny Plaintiff's Statement 16 and assert that summary

judgment was granted in favor of The Bank of New York for the Benefit of the

Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 and Plaintiff's

answer was stricken within said action.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 213 of 224 PageID: 381
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 7 of 10

17.    On May 31, 2013, the Superior Court of New Jersey Office of Foreclosure sent a Notice of Proposed Dismissal to the Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5.

**Response:**    Defendants deny Plaintiff's Statement 17 but admit the existence of a Foreclosure Dismissal Notice dated May 31, 2013 seemingly sent by the Superior Court Clerk's Office, Foreclosure Proceeding Services.

18.    The Bank of New York for the Benefit of the Certificateholders, CWABS, Inc. Asset-Backed Certificates Series 2007-5 submitted a Certification in opposition to the Notice of Proposed Dismissal dated June 21, 2013.

**Response:**    Defendants admit Plaintiff's Statement 18.

19.    On July 5, 2013, the Superior Court of New Jersey entered an order dismissing the 2007 Foreclosure Complaint.

**Response:**    Defendants admit Plaintiff's Statement 19 but clarify that, pursuant to said order, the foreclosure proceedings were dismissed without prejudice and the plaintiff was given leave to move for reinstatement thereof upon good cause shown.

20.    On August 21, 2013, foreclosure counsel for The Bank of New York filed a Discharge of Notice of *Lis Pendens* dated August 9, 2013.

**Response:**    Defendants admit Plaintiff's Statement 20.

21.    More than six years have passed since acceleration of the Promissory Note and Assignment of Mortgage.

**Response:**    Defendants deny admit Plaintiff's Statement 20.

-7-

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 214 of 224 PageID: 382
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 8 of 10

II. Defendants hereby submit their Counterstatement of Undisputed Material Facts in support of their cross-motion for partial summary judgment pursuant to Court Rule 56.1, as follows:

1.      On or about February 27, 2007, plaintiff-debtor Gordon Allen Washington ("Plaintiff") borrowed the sum of $520,000.00 from America's Wholesale Lender ("AWL"). See Ex. A.

2.      As security for the repayment of this sum, Plaintiff executed a promissory note evidencing the indebtedness to AWL (the "Note") and a mortgage securing repayment of the Note (the "Mortgage") against the real property commonly known as 11 Walnut Street, Madison, New Jersey 07940. See Ex. A, B.

3.      The Note and Mortgage were assigned to The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5 pursuant to an assignment of mortgage dated November 12, 2007. See Ex. C.

4.      The aforementioned assignment was corrected to reflect The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5 as the assignee pursuant to a corrective assignment of mortgage dated December 31, 2013. See Ex. D.

5.      Plaintiff defaulted on the terms of the Note in failing to make the installment payment due and payable on July 1, 2007, and each payment due monthly thereafter. See Wallace Cert. ¶ 4b; Stahlhut Cert. ¶ 7; see also Ex. E.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 215 of 224 PageID: 383
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 9 of 10

6.      Bank of New York and Bank of America Corporation and the latter's affiliates entered into a Settlement Agreement dated June 28, 2011. See Ex. H.

7.      Plaintiff is not a party to said Settlement Agreement dated June 28, 2011. See Ex. H.

8.      BANA and/or its successors in interest serviced the subject loan since the date of origination until November 16, 2013. See Stahlhut Cert. ¶ 5.

9.      On November 16, 2013, BANA transferred its servicing rights with respect to the subject loan to SLS. See Wallace Cert. ¶ 4c; Stahlhut Cert. ¶ 5; see also Ex. I.

10.     At the time of said transfer of servicing rights, the unpaid principal balance due and owing on the Note was $519,132.54. See Wallace Cert. ¶ 4d; Stahlhut Cert. ¶ 8; see also Ex. E.

11.     The unpaid principal balance due and owing on the Note has been neither paid in full by any individual or entity nor deemed satisfied by the Trust, BANA or SLS. See Wallace Cert. ¶ 4d; Stahlhut Cert. ¶¶ 8, 10; see also Ex. E.

Case 2:14-cv-08063-SDW   Document 12   Filed 01/28/15   Page 216 of 224 PageID: 384
Case 14-01319-MBK   Doc 11-1   Filed 07/29/14   Entered 07/29/14 17:34:09   Desc
Counter-Statement of Material Undisputed Facts   Page 10 of 10

12.    The Trust came into physical possession of the original Note and Mortgage on or about March 2, 2007 and has remained in said possession via its custodian and/or counsel, since said date. See Wallace Cert. ¶ 4a; see also Stahlhut Cert. ¶ 6.


13.    The original Note bears an indorsement in blank by Countrywide Home Loans, Inc., a New York Corporation Doing Business As AWL. See Wallace Cert. ¶¶ 3a, 4a; see also Stahlhut Cert. ¶ 6.


Dated:   Elmsford, New York
         July 29, 2014

KNUCKLES, KOMOSINSKI & ELLIOTT, LLP
Attorneys for Defendants-Creditors
*Specialized Loan Servicing, LLC and The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5*

By:    _____
       DAVID V. MIGNARDI, ESQ. (DM-4090)
       565 Taxter Road, Suite 590
       Elmsford, New York 10523
       Tel: (914) 345-3020
       dvm@kkelaw.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GORDON ALLEN WASHINGTON,<br><br>        Plaintiff-Debtor,<br><br>vs.<br><br>SPECIALIZED LOAN SERVICING, LLC, and THE BANK OF NEW YORK MELLON, AS TRUSTEE FOR THE CERTIFICATE-HOLDERS OF THE CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-5,<br><br>        Defendants-Creditors. | **CERTIFICATION OF SPECIALIZED LOAN SERVICING, LLC IN SUPPORT OF DEFENDANTS-CREDITORS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFF-DEBTOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No.: 14-14573<br><br>Adversary No.: 14-01319 |

STATE OF COLORADO      )
COUNTY OF DOUGLAS    ) ss:

      Cynthia Wallace, duly sworn deposes and says:

      1.    I am a Second Assistant Vice President of Specialized Loan Servicing, LLC ("SLS"), servicer and attorney-in-fact for The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5 s/h/a The Bank of New York Mellon, as Trustee for the certificate-holders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5 (the "Trust") (collectively, "Defendants"). I am authorized to execute this certification and am fully aware of the underlying action, as well as the papers and proceedings heretofore had herein. I have personal knowledge of the matters set forth herein or the facts set forth herein are based upon my review of the note, mortgage and other loan documents and related business records, which records were made by myself or from

information transmitted by a person with knowledge of the events described therein, at or near the time of the events described, and are kept in the ordinary course of the regularly conducted business activity of such person and/or SLS on behalf of the Trust, and it is the regular practice of SLS on behalf of the Trust to make such business records.

2.    I make this certification in support of Defendants' cross-motion for partial summary judgment and in opposition to the motion for partial summary judgment submitted of plaintiff-debtor Gordon Allen Washington ("Plaintiff").

3.    Originals of the following documents are maintained by the Trust, through its custodian, and comport with the computerized business records of SLS with respect to the mortgage loan described below:

a.    An adjustable rate note dated February 27, 2007, from Plaintiff to America's Wholesale Lender ("AWL"), in the original principal amount of $520,000.00, which bears an indorsement in blank thereon by Countrywide Home Loans, Inc., a New York Corporation Doing Business As AWL (the "Note"), a copy of which is annexed hereto as **Exhibit "A"**;

b.    A mortgage from Plaintiff to Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for AWL, securing the sum represented in the Note against the real property commonly known as 11 Walnut Street, Madison, New Jersey 07940 (the "Mortgage"), a copy of which is annexed hereto as **Exhibit "B"**. The Mortgage was recorded

with the Morris County Register on March 8, 2007 in Book 20764 of Mortgages at Page 0171;

      c.     An assignment of mortgage from MERS, as nominee for AWL, to The Bank of New York for the Benefit of the Certificateholders, CWABS Inc. Asset-Backed Certificates Series 2007-5 which was signed on or about November 12, 2007, a copy of which is annexed hereto as **Exhibit "C"**. Said assignment was recorded with the Morris County Register on September 9, 2008 in Book 21153 of Mortgages at Page 0683; and

      d.     A corrective assignment of mortgage from MERS, as nominee for AWL, to The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5 which was signed on or about December 31, 2013, a copy of which is annexed hereto as **Exhibit "D"**. Said assignment was recorded with the Morris County Register on January 8, 2014 in Book 22480 of Mortgages at Page 789.

4.     I assert that the following facts are true based upon my review of SLS' business records, which records were maintained as indicated above in the regular course of the business of SLS as a mortgage loan servicer, and more specifically as the servicer for the Trust with respect to the Note and Mortgage:

      a.  That the Trust acquired physical possession of the original Note, indorsed in blank, and Mortgage on or about March 2, 2007 and has remained in physical possession thereof, via its custodian, since said date before

transferring same to its counsel, Knuckles, Komosinski & Elliott, LLP on April 23, 2014;

b.  That Plaintiff defaulted in making the installment payment due and payable on July 1, 2007 pursuant to the terms of the Note, and each payment due monthly thereafter;

c.  That SLS became the servicer for the Trust on November 16, 2013. Prior thereto, the subject mortgage loan was serviced by Bank of America, N.A. ("BANA"); and

d. That at the time SLS acquired servicing rights to the subject mortgage debt from BANA there was an unpaid principal balance due and owing thereon of $519,132.54 and that at no time has said principal balance been paid in full or been identified as having been paid in full.  A copy of the payment history for the subject loan, including those of BANA and of SLS, is annexed hereto as **Exhibit "E"**.

WHEREFORE, Defendants respectfully requests that the Court deny Plaintiff's motion for partial summary in its entirety, grant Defendants' cross-motion for partial summary judgment in its entirety, and grant such other and further relief as is deemed just, proper, and equitable.

By: _____

Specialized Loan Servicing, LLC, servicer and attorney-in-fact for The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2007-5
Name: Cynthia Wallace
Date: July 29, 2014

State of __Colorado__
County of __Douglas__

Subscribed and sworn (or affirmed) before me on this
___ day of __July__, 2014, by __Cynthia Wallace__
proved to me on the basis of satisfactory evidence to
be the person who appeared before me.

Signature: _____

SARAH A MARES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20124074325
MY COMMISSION EXPIRES 11/15/2016

A219

UNIFORM, ALL PURPOSE CERTIFICATE OF ACKNOWLEDGMENT
(Outside of New York State)

State of _____ Colorado _____
County of _____ Douglas _____

On the _29_ day of _July_ in the year of 2014 before me, the undersigned, personally appeared _____ Cynthia Wallace _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their capacity(ies) and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in _Highlands Ranch_, _Colorado_ (Insert the city or other political subdivision and the state or county or other place the acknowledgment was taken)

_Sarah A Mares_
Notary Public

SARAH A MARES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20124074325
MY COMMISSION EXPIRES 11/15/2016

A220

## EXHIBIT D
### LIMITED POWER OF ATTORNEY

Reference is hereby made to (x) each of the pooling and servicing agreements listed in Schedule I attached hereto, by and among The Bank of New York Mellon f/k/a The Bank of New York ("BNY Mellon"), as trustee, Countrywide Home Loans Servicing LP, as master servicer, Countrywide Home Loans, Inc., as seller, one or more additional sellers identified therein, and either of CWALT, Inc. or CWABS, Inc. or CWMBS, Inc., as depositor (each, a "Pooling and Servicing Agreement" and collectively, the "Pooling and Servicing Agreements"), and (y) that certain settlement agreement (the "Settlement Agreement"), dated as of June 28, 2011, by and among BNY Mellon, in its capacity as trustee or indenture trustee of certain mortgage- securitization trusts identified therein, Bank of America Corporation, Bank of America, N.A., as successor by merger to BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing LP) (the "Master Servicer"), Countrywide Financial Corporation and Countrywide Home Loans, Inc. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Pooling and Servicing Agreements or the Settlement Agreement, as the context requires.

BNY Mellon, as Trustee under the Pooling and Servicing Agreements, hereby constitutes and appoints Specialized Loan Servicing, LLC and its authorized officers (collectively, "SLS") and each of them, its true and lawful attorneys-in-fact and agents, with full powers of substitution and resubstitution, for and in its name, place and stead, in any and all capacities, for the limited purpose of executing and recording any and all documents necessary to effect (i) a foreclosure of a Mortgage Loan, (ii) the disposition of an REO Property, (iii) an assumption agreement or modification agreement or supplement to the Mortgage Note, Mortgage, or deed of trust, (iv) defense of the Trustee in litigation and to resolve any litigation where SLS has an obligation to defend the Trustee, including but not limited to dismissal, termination, cancellation, rescission and settlement, which settlement shall release with prejudice all claims and liabilities against BNY Mellon and will not result in admission of guilt by BNY Mellon or (v) a reconveyance, deed of reconveyance or release or satisfaction of mortgage or such instrument releasing the lien of a Mortgage, in each case solely in the performance of SLS's duties and obligations in respect of Mortgage Loans that are then being subserviced by SLS pursuant to a subservicing agreement (the "Subservicing Agreement") with the Master Servicer, then in effect in accordance with the terms of the Settlement Agreement. BNY Mellon also grants unto said attorneys-in-fact and agents, and each of them, subject to the foregoing limitations, the full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as might or could be done in person to effect items (i), (ii) (iii), (iv) and (v) above, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or their substitutes, may lawfully do or cause to be done by virtue hereof; provided that this instrument is to be construed and interpreted as a limited power of attorney and does not empower or authorize the said attorneys-in-fact and agents to do any act or execute any document on behalf of BNY Mellon not specifically described herein.

For the purposes of clarification, but not limitation, BNY Mellon grants unto said attorneys-in-fact and agents, and each of them the full power and authority to (x) execute, acknowledge, seal and deliver deeds, deed of trust/mortgage note endorsements, assignments of deed of trust/mortgage and other recorded documents, tax authority notifications and other instruments of sale, conveyance and transfer, full or partial releases and subordinations, each appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits, and supporting documents as may be necessary and proper to effect the execution, delivery, conveyance, recordation or filing of said documents; (y) execute and deliver affidavits of debt, substitutions of trustee, substitutions of counsel, non-military affidavits, notices of rescission, foreclosure deeds, transfer tax affidavits, affidavits of merit, verifications of complaint, notices to quit, bankruptcy declarations for the purpose of filing motions to lift stays and other documents or notice filings on behalf of the Trustee in connection with foreclosure, bankruptcy and eviction actions; and (z) endorse and/or assign any borrower or Mortgagor's check or negotiable instrument received by SLS as a payment under a Mortgage Loan.

Nothing in this Limited Power of Attorney shall be deemed to amend or modify the Pooling and Servicing Agreements, the Settlement Agreement, the applicable Subservicing Agreement or the respective

rights, duties or obligations of SLS thereunder, and nothing herein shall constitute a waiver of any rights or remedies thereunder. Without limiting the generality of the foregoing, this Limited Power of Attorney does not provide, and shall not be read so as to provide, SLS with the power to perform or undertake actions which SLS is not authorized to take pursuant to the applicable Subservicing Agreement or that the Master Servicer is not authorized to take pursuant to the applicable Pooling and Servicing Agreement. In addition, each attorney-in-fact and agent is only authorized to act pursuant to this Limited Power of Attorney in a manner which complies with all applicable laws, rules and regulations.

SLS shall indemnify, defend and hold BNY Mellon and its successors and assigns harmless, from and against any and all losses, costs, expenses (including, without limitation, actual attorneys' fees), damages, liabilities, demands or claims of any kind whatsoever, arising out of, related to or in connection with any misuse of this Limited Power of Attorney in any manner or by any person not expressly authorized hereby. Acceptance of this Limited Power of Attorney by SLS, or the taking by SLS of any action pursuant to this Limited Power of Attorney, shall be deemed an agreement and acceptance by SLS of this indemnity obligation.

The rights, power, and authority of said attorneys-in-fact and agents granted in this Limited Power of Attorney will commence and be in full force and effect on the date of execution and such rights, powers, and authority will remain in full force and effect until the earlier of (x) 11:59 p.m., New York City time, on the date that is 2 year[s] from such date and (y) the date, if any, on which SLS is no longer an "Approved Subservicer" under the Settlement Agreement; provided, however, that BNY Mellon may terminate this Limited Power of Attorney prior to such date by delivering a written notice of revocation to SLS, with a copy to the Master Servicer.

THE BANK OF NEW YORK MELLON F/K/A THE
BANK OF NEW YORK, as Trustee

Witness: _____
Leela Ragbarsingh

By: _____
Gavin Tsang
Vice President

Witness: _____
Robert Fitzmire

By: _____
Gerard F. Facendola
Managing Director

STATE OF: New York
COUNTY OF: Kings

On the 5th day of June in the year 2014 before me, the undersigned, personally appeared Gerard F. Facendola and Gavin Tsang, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

IN WITNESS THEREOF, I have hereunto set my hand and affixed by official seal the day and hear in this certificate first above written.

RAFAL BAR
Notary Public, State of New York
No. 01BA0293822
Qualified in Kings County
Commission Expires Dec. 16, 2017

_____
Notary Public

A222